## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| MICHAEL EDGE, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>TUPPERWARE BRANDS CORPORATION, MIGUEL FERNANDEZ, and CASSANDRA HARRIS,<br><br>    Defendants. | Case No. 6:22-cv-1518-RBD-LHP |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

I.      Tupperware's "Turnaround Plan" Shifts Sales to New Channels ..................... 3

II.     Tupperware Orders Massive Amounts of Additional Inventory
        Following a Brief COVID-19 Sales Boost as Inflation Skyrockets .................... 3

III.    Tupperware Discounts to Improve Liquidity Rather than Raising Prices
        to Combat Costs ............................................................................................. 3

IV.     In Q3 2021, Tupperware's Sales and Gross Margin Plummet ......................... 5

V.      Defendants' False and Misleading Statements ............................................... 5

VI.     The Truth Is Revealed ................................................................................... 6

ARGUMENT ......................................................................................................... 7

I.      The Complaint Adequately Alleges a §10(b) Claim ....................................... 7

        A.      The Complaint Adequately Alleges False and Misleading
                Statements ........................................................................................ 7

                1.      The Complaint Adequately Alleges That Defendants'
                        Present or Past-Tense Pricing Statements Were False and
                        Misleading ............................................................................. 7

                2.      The Complaint Adequately Alleges That Defendants'
                        Present-Tense Profit and Margin Statements Were False
                        and Misleading ..................................................................... 10

                3.      Defendants' Forward-Looking Statements Are Actionable ........ 12

        B.      The Complaint Adequately Alleges a Strong Inference of Scienter ...... 14

                1.      Defendants' Admissions and the Blatant Falsity of Their
                        Statements Support a Strong Inference of Scienter ..................... 15

                2.      Defendants' Responses to Analyst Questions Support a
                        Strong Inference of Scienter .................................................. 16

                3.      The Importance of the Turnaround Plan Supports a Strong
                        Inference of Scienter ............................................................ 18

4.     The Suspicious Timing of the Revelation of the Truth Supports a Strong Inference of Scienter .......................................... 19

5.     The Suspicious Timing of Harris' Demotion and Firing Support a Strong Inference of Scienter .......................................... 19

6.     The Inference of Scienter Is Stronger Than Any Competing Inference ........................................................................ 20

II.     The Complaint Adequately Alleges a §20(a) Claim .......................................... 20

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. MiMedx Grp., Inc.*,
37 F. Supp. 3d 1271 (N.D. Ga. 2014) ............................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 7

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ........................................................................ 13

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ................................................................................. 18

*Einhorn v. Axogen, Inc.*,
42 F.4th 1218 (11th Cir. 2022) ......................................................................... 14

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ............................................................................ 14

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011).....................................................................7, 10

*Fla. Bd. of Adm'rs v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...................................................................... 16, 17

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F.3d 2d 171, 190-91 (S.D.N.Y. 2010)......................................................... 14

*Gauquie v. Albany Molecular Rsch, Inc.*,
2016 WL 4007591 (E.D.N.Y. July 26, 2016) .................................................... 17

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999)........................................................................... 13

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ............................................................................ 19

iii

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
2015 U.S. Dist. LEXIS 180850 (S.D. Fla. Dec. 22, 2015) ................................... 9

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................... 19

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...................................................... 13

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ............................................................. 15

*In re Clarus Corp. Sec., Litig.*,
201 F. Supp. 2d 1244 (N.D. Ga. 2002) ........................................................... 19

*In re Egidi*,
571 F.3d 1156 (11th Cir. 2009) ........................................................................ 8

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................... 15

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 U.S. Dist. LEXIS 48048 (M.D. Ga. Mar. 23, 2018) ................................ 18

*In re Immucor Inc. Sec. Litig.*,
2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) ..................................................... 7

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ................................................... 19

*In re Nielsen Holdings PLC Sec. Litig.*,
510 F. Supp.3d 217 (S.D.N.Y. 2021) .............................................................. 18

*In re Physician Corp. of Am. Sec. Litig.*,
50 F. Supp. 2d 1304 (S.D. Fla. 1999) ............................................................. 13

*In re PSS World Med., Inc. Sec. Litig.*,
250 F. Supp. 2d 1335 (M.D. Fla. 2002) .......................................................... 14

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .................................................. 18

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002),
aff'd sub nom.,
*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ........................ 15

iv

*In re Sensormatic Elecs. Corp. Sec. Litig.*,
2002 WL 1352427 (S.D. Fla. June 10, 2002)...................................................... 16

*In re Serologicals SEC Litig.*,
2003 U.S. Dist. LEXIS 27465 (N.D. Ga. Feb. 20, 2003) ................................... 19

*In re Unicapital Corp. Sec. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ....................................................... 12, 13

*In re VistaCare, Inc. Sec. Litig.*,
2005 WL 8160681 (D. Ariz. Aug. 19, 2005) ..................................................... 16

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ..................................................... 20

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ........................................................ 8

*Institutional Investors Grp. v. Avaya Inc.*,
564 F.3d 242 (3d Cir. 2009)................................................................................ 19

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008)..................................................................... 12, 15

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. June 27, 2017),
report and recommendation adopted,
2017 WL 3610523 (D. Or. Aug. 22, 2017) ....................................................... 14

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).............................................................................. 14

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019)...................................................................... 12

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) .............................................................................. 12

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
595 F.3d 86 (2d Cir. 2010) .................................................................................. 9

*Pub. Emples.' Ret. Sys. Of Miss. v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ..........................................................7, 19

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ............................................................................ 17

v

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .................................................... 17

*S. Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................... 18

*Schultz v. Applica Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) ............................................................ 18

*SEC v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007) ......................................................................... 10

*SEC v. Radius Capital Corp.*,
  2012 U.S. Dist. LEXIS 26648 (M.D. Fla. Mar. 1, 2012) ................................... 10

*Siracusano v. Matrixx Initiatives Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ......................................................................... 14

*Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*,
  2019 U.S. Dist. LEXIS 124134 (M.D. Fla. July 25, 2019) ................................ 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ 15

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ............................................. 18, 20

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................... 18, 20

## Statutes

PSLRA ................................................................................................................ 11, 12

Plaintiffs submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (ECF No. 56).[1]

### PRELIMINARY STATEMENT

In March 2020, after almost a decade of falling sales, Tupperware appointed Miguel Fernandez as CEO and implemented a "Turnaround Plan," promising to expand beyond direct sales to an "omnichannel" model. At the same time, Tupperware experienced a massive sales bump as consumers increasingly prepared food at home during COVID-19 quarantines. As a result, Tupperware "intentionally built up inventory" to match short-term sales.

The COVID-19 sales bump faded quickly. With sales dropping as inventory ballooned, the Company faced a liquidity crisis in early 2021, forcing it to abandon its Turnaround Plan in favor of discounting and unloading excess inventory, even as costs skyrocketed. According to the former Demand Planning and Sales & Operations Planning Manager for North America, who regularly met with Defendant Harris' direct report, Tupperware was "discounting and discounting" its inventory such that margins were "almost zero." Beginning in approximately Q4 2020, "total sales" was a "Key Performance Indicator" for Tupperware, but margins were not.

None of this was disclosed to investors. Contrarily, as analysts repeatedly expressed concern about Tupperware's ability to offset rising costs with price increases, Defendants issued false reassurances. For example, on May 5, 2021, Harris stated,

---

[1] As used herein, "¶__" and "¶¶__" refer to paragraphs in the First Amended Class Action Complaint ("Complaint"). "Plaintiffs" refers to Michael J. Dennehy and Ralph Estep. "Defendants" refers to Tupperware Brands Corporation ("Tupperware" or the "Company"); Miguel Fernandez ("Fernandez"); and Cassandra Harris ("Harris").

"we're shifting to *more profitable sales*" and reducing "*the highly promotional programs*" in North America. On August 4, 2021, Fernandez falsely stated that "*we're making progress in the pricing*" to "offset" inflation, and told investors on February 23, 2023, that the Company had increased prices "*across the board…every single market is increasing prices [in Q1]*" to combat rising costs.

The truth was revealed on May 4, 2022, when the Company announced its Q1 2022 results showing "eroded gross and operating margins." Tupperware admitted that "[p]rofitability was significantly impacted by persisting inflationary pressures and *the latency between rising input costs and our decision to increase prices*." Contrary to prior representations, Defendants admitted that "the vast majority [of price increases] will become effective in the second quarter," and it "*is the first time we've taken pricing actions in quite some time [in North America]*." As a result of the revelation, Tupperware stock plummeted 32.16% on extremely high trading volume.

Defendants do not dispute that they knew about the "discounting" and "zero" margins in North America, yet urge their the May 4, 2022, admissions are consistent with their prior statements, precluding falsity and scienter. Tellingly, Defendants ignore Fernandez' February 2022 statement that Tupperware had increased prices "across the board" in "every market" in Q1 and Harris' later admission that "the vast majority" of increases would occur in Q2. Defendants' blatant lies about price increases when knowing Tupperware was actually discounting prices demonstrates both falsity and scienter. Defendants' arguments should be rejected for the reasons stated below.

## STATEMENT OF FACTS

### I. Tupperware's "Turnaround Plan" Shifts Sales to New Channels

Tupperware manufactures and sells kitchenware produced made from plastic resins. ¶¶26, 29. The Company historically used a process called "direct selling," whereby independent salespeople sell products to end customers. ¶27.

After years of declining sales, on March 12, 2020, Tupperware appointed Fernandez as CEO as part of its "transformation" program. ¶¶33-36. On April 29, 2020, the Company announced its "Turnaround Plan," which aimed to reach new consumer segments through in-store and internet "omnichannel" sales. ¶¶37-40.

### II. Tupperware Orders Massive Amounts of Additional Inventory Following a Brief COVID-19 Sales Boost as Inflation Skyrockets

Following a brief surge in worldwide sales during 2020, ¶¶41-44, Tupperware "intentionally built up inventory levels" beginning in Q2 2021, causing explosive inventory growth.  ¶¶48-50. In Q2 2020, inflation also began rising worldwide. ¶51. For Tupperware, inflation meant rising resin and freight costs. ¶¶52-54.

### III. Tupperware Discounts to Improve Liquidity Rather than Raising Prices to Combat Costs

CW1 was a Demand Planning and Sales & Operations Planning Manager for North America between February 2019 and June 2022, responsible for predicting inventory needs. ¶24. CW1's supervisor reported to Juan Camilo, Vice President of Supply Chain for the Americas, who reported to Defendant Harris. *Id.* CW1 stated that by Q4 2020, Tupperware's COVID bump had subsided, resulting in a "whip effect" as the Company transitioned from inventory shortfalls to overflow. ¶55. This created a liquidity crisis. By Q1 2021, Tupperware's "Current Ratio," (current assets

divided by current liabilities), was well below average and significantly declining, indicating elevated risk of distress or default. ¶¶58-59.

CW1 confirmed that Tupperware's worsening liquidity prevented it from increasing prices to match inflation and caused it to lower prices to help sell off inventory and increase cash flow—at the expense of profit. ¶¶55-57. CW1 recalled meetings with Juan Camilo (who reported directly to Harris) discussing Tupperware's need to sell off inventory, noting that "no one cared" if it meant heavy discounting. ¶60. According to CW1, Tupperware began "discounting and discounting" its inventory in Q4 2020, and formally memorialized its policy of prioritizing sales over margins. ¶56. CW1 explained that Tupperware had traditionally established "clear goals" for sales, margins, and units, but that from the beginning of 2021, the Company's only goal was to "just sell and reduce inventory." ¶64. "Total sales" became a "Key Performance Indicator" for Tupperware, but margins were not, causing margins to drop to "almost zero." *Id.*

Tupperware's omnichannel strategy also hampered inventory movement. Executive management's focus on "pushing channels" and driving internet sales cannibalized Tupperware's direct sales, resulting in inventory overstock. ¶¶66-70. Further, online and in stores, customers could immediately compare prices, preventing price increases. ¶¶66-70. Tupperware's direct sales teams felt "betrayed" by the Company's shift in focus to lower-priced online sales, "caus[ing] chaos" with Tupperware's direct sales force throughout 2021. ¶71.

- 4 -

**IV.    In Q3 2021, Tupperware's Sales and Gross Margin Plummet**

Tupperware's 2021 discounting did not improve sales. Indeed, sales declined beginning in Q3 2021—further increasing inventory, depleting cash flows, and worsening Current Ratio. ¶¶61-63. Price cuts also caused Tupperware's gross margin percentage to plummet from 70.20% in Q1 2021 to 61% in Q4 2021. ¶72. Similarly, gross profits of $305.6 million in Q4 2020 declined to $240.9 million in Q4 2021. ¶73.

**V.    Defendants' False and Misleading Statements**

Despite "discounting and discounting" inventory starting in Q4 2020 (¶56) to "reduce inventory," and "almost-zero" margins (¶64), Defendants misled investors, stating that "we're shifting to *more profitable sales,*" are reducing "*the highly promotional programs*" (¶87), and have increased prices "*across the board ... every single market is increasing prices*" to combat inflation. ¶114. For example:

- On May 5, 2021, discussing Tupperware's profit margins in "the U.S. and Canada market" (where CW1 worked), Fernandez stated, "*we're shifting to more profitable sales in this market, and we will reduce some of the highly promotional programs.*" ¶87.

- On May 27, 2021, an analyst asked, "<u>one of the strong selling points of Tupperware is your very strong gross margin to begin with. Can you sustain that if you pursue these different channels?</u>" Harris responded:

  > *Yes.* ... *And as we think about entering into these new channels ... it has to be the right price point, the right margin and the right volume of cells to be able to entertain that channel. Our focus is to maintain the profitability of the company as we grow through these other channels.* ¶90.

- On August 4, 2021, in response to an analyst asking about "the pricing that you've implemented <u>so far,</u>" Harris responded, that increases had been implemented "*in some key products*," ¶97, and that the price increases were so significant that "*we believe we can largely neutralize the overall impacts [of inflation].*" ¶97.

- On November 3, 2021, in response to a question, "<u>are you considering price increases?</u>" Harris responded "*Yes, absolutely … We have taken some pricing … [W]e've had some opportunistic pricing this year.*" ¶109.

- On February 23, 2022 – two thirds of the way through Q1 2023 – an analyst asked, "<u>And just in terms of the pricing, I mean, are you -- can you give us a little more color?</u> Like, is it across the board?" Fernandez stated:

  > *Yes. … So pretty much, it's across the board. … We literally started pricing in -- towards the end of Q4. But absolutely, every single market is increasing prices effectively in Q1. And there's a few of them, very little portion of them in Q2 ….* ¶114.

## VI.    The Truth Is Revealed

The truth concerning Tupperware's failure to increase prices and its shrinking margins was revealed on May 4, 2022, when Defendants announced Q1 2022 results, revealing "eroded gross and operating margins." ¶118. Tupperware explained that "[p]rofitability was significantly impacted [by] … *the latency between rising input costs and our decision to increase prices.*" ¶120. Fernandez admitted Tupperware had not taken price increases previously and was only now "making fundamental and rapid changes in the market, including 10% price increases effective in early May, *which is the first time we've taken pricing actions in quite some time.*" ¶120. Harris admitted that "*the vast majority will become effective in the second quarter.*" ¶124. Defendants also admitted that Tupperware's Turnaround Plan was not "on track" and "still require[d] a lot more work." ¶118. The Company also announced Harris' demotion from CFO to COO. ¶136. Harris would be terminated less than a month later. ¶138.

As a result of the revelation of the truth, the price of Tupperware stock plummeted 32.16% on extremely high trading volume.  ¶126.

## ARGUMENT

Allegations need only be "plausible[,]" *i.e.*, "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court must accept the facts pled as true and construe them in the light most favorable to the plaintiff. *Pub. Emples.' Ret. Sys. Of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1285 (N.D. Ga. 2021). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *7 (N.D. Ga. Oct. 4, 2006).

## I.    The Complaint Adequately Alleges a §10(b) Claim

To state a §10(b) claim, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *FindWhat Inv'r Grp. V. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011). Here, Defendants only challenge elements (1) and (2).

### A.    The Complaint Adequately Alleges False and Misleading Statements

#### 1.    The Complaint Adequately Alleges That Defendants' Present or Past-Tense Pricing Statements Were False and Misleading

Defendants repeatedly misstated that Tupperware instituted price increases in its "key products" and "across the board" to combat inflation. For example:

- On August 4, 2021, in response to an analyst asking about what "pricing that you've implemented so far," Harris responded that they had implemented increases in "***key products.***" ¶97.

- On November 3, 2021, when asked "are you considering price increases?" Harris stated "***Yes, absolutely … We have taken some pricing … we've had some opportunistic pricing this year***, especially in more inflationary markets." ¶109.

- On February 23, 2022, in response to an analyst asking if Defendants knew details of the price increases, Fernandez stated "***Yes … it's across the board …We literally started pricing in – towards the end of Q4. But absolutely every single market is increasing prices in Q1.***" ¶114.

These statements were false and misleading because, as Defendants themselves later admitted on May 4, 2022, the "vast majority" of price increases would "become effective in the second quarter," and it was "the first time we've taken pricing actions" in North America. ¶123. Indeed, as confirmed by CW1, Tupperware had actually been dramatically slashing prices since Q4 2020 to reduce inventory and increase cash flow.

Defendants argue that their admission that no price increases had been taken prior to Q2 2022 does not render their prior statements misleading because that admission was limited to the North American market, whereas their prior statements were limited to other markets. Def. Br. At 12. Tellingly absent from Defendants' brief is Fernandez' assurance that they had already instituted price increases "***across the board***," and "***absolutely every single market*** is increasing prices in Q1." ¶114. This lie was so egregious that even Fernandez does not now defend it. Defendants' waiver alone should result in denial of the motion to dismiss. *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (arguments not raised in an initial brief are waived); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *3 (S.D.N.Y. Feb. 17, 2022) (one "sufficiently alleged" false statement alone "warrants denial of [a] motion to dismiss").

Moreover, a statement is misleading if it "conveyed to the public a false impression." *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 U.S. Dist. LEXIS 180850, at *11 (S.D. Fla. Dec. 22, 2015). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

A jury could easily find that reasonable investors understood Defendants' statements that price increases had occurred in "key products" and in "inflationary markets" to include North America, particularly in light of Defendants' "across the board" and "absolutely every single market" statements. Tupperware is headquartered in North America, and the region is critical to the Company's success. Defendants' proposed inference (impermissible on a motion to dismiss) depends on the unreasonable assumptions that no "key products" were sold in North America and that it was not an "inflationary market," though it experienced record inflation. Moreover, Defendants were responding to analyst questions about *Companywide* pricing, and when Harris announced price increases on "key products," she stated that those increases "can largely neutralize the overall impacts" from the *Companywide* higher costs. ¶96.[2] Contrary to Defendants' speculation, investors and analysts did understand that price increases were occurring "across the Company," (Def. Br. At 12), and D.A. Davidson, in fact, issued a report stating: "TUP started taking broad-

---

[2] Similarly, it is reasonable to infer that Tupperware's strategy in North America to unload inventory by cutting prices was deployed elsewhere given Tupperware's Companywide inventory surplus.

- 9 -

based price increases in late-4Q21, and is continuing with that implementation in 1Q22." ¶151. *See* S*EC v. Radius Capital Corp.*, 2012 U.S. Dist. LEXIS 26648, at *18- 20 (M.D. Fla. Mar. 1, 2012) ("[S]o-called 'half-truths' - literally true statements that create a materially misleading impression - will support claims for securities fraud").

Even if, arguendo, the "key products" and "inflationary markets" statements did not include North America, Defendants still violated a duty to disclose. Having touted price increases on "key products" to neutralize inflation "absolutely" occurred, Defendants had a duty to disclose they were slashing prices to move excess inventory. "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" *FindWhat*, 658 F.3d at 1305; *see id.* at 1299; *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) (voluntarily "touting" a subject creates duty to disclose all relevant, material information).

### 2. The Complaint Adequately Alleges That Defendants' Present-Tense Profit and Margin Statements Were False and Misleading

Defendants bolstered their lies about increasing prices "across the board" by claiming that the increases were actually raising profit margins. For example:

- On May 5, 2021, discussing "the U.S. and Canada market" where CW1 worked, Fernandez told investors, "*we're shifting to more profitable sales in this market*, and *we will reduce some of the highly promotional programs*." ¶87. Harris also stated that new management's action pursuant to the Turnaround Plan "*is creating a more profitable company*." ¶84.

- On August 4, 2021, Harris misrepresented that Tupperware's Q2 2021 results were "evidence that *[the Turnaround Plan] is working*" and that the Company was "delivering profit." ¶93.

These statements were false because, as CW1 confirmed, well before Q2 2021, Defendants knew the Turnaround Plan was failing and were massively discounting products to liquidate excess inventory (¶56), shifting toward *less* profitable sales. CW1 also stated that margins for products in Tupperware's catalog, brochures, and other offers (*i.e.*, the "promotional programs" Harris discussed) were "almost zero." ¶64.

Defendants twist Harris' statement that the Company was "shifting to more profitable sales" into a forward-looking statement by altering the quote from "we're shifting" – i.e., we *are* shifting – to "the Company *would be* 'shifting.'" Def. Br. At 14-15. The PSLRA Safe Harbor does not protect present-tense statements.

Defendants misleadingly assert that the statements were not misleading because the Company had reported higher quarterly profits. Def. Br. At 9. Plaintiffs allege that Defendants misled investors about the status of the Turnaround Plan—not misreported revenue or profits. When the Company revealed "eroded gross and operating margins" on May 4, 2022, Tupperware explained that it was a result of "*the latency between rising input costs and our decision to increase prices*" and admitted Tupperware's Turnaround Plan was not "on track" and "still require[d] a lot more work." ¶118. The Complaint alleges that Defendants knew of this fundamental failure of the Turnaround Plan by Q1 2021 as the Company was forced to slash prices, but nevertheless told investors the Plan was "working" by misleadingly pointing to results Defendants knew were not representative.

Defendants also assert that prioritizing inventory sell-off does not necessarily mean lower margins. Def. Br. At 10. Defendants' speculation cannot be credited on a

motion to dismiss. Even if credited, their statements would still be misleading. Having chosen to tout the increased profit margin, Defendants had a duty to inform investors that overall, the North American market was heavily discounting its products to liquidate inventory. *See supra*, 10.[3]

### 3.    Defendants' Forward-Looking Statements Are Actionable

Defendants argue that Harris' following statements are protected by the PSLRA safe harbor, Def. Br. At 13-20:

- Harris' May 27, 2021, "***yes***" to the question of whether the Company could maintain its high profit margins as it pursued new channels under the Turnaround Plan and assurance that the Company's "***focus***" was on profitability, ¶90;

- Harris' August 4, 2021, statement, "***we believe we can largely neutralize the overall impacts***" of inflation through price increases, ¶96; and

- Harris' February 23, 2022, statement, "***We also expect our pricing actions to catch up with cost increases by the second half***." ¶112.

Safe harbor protection is only for forward-looking statements that are accompanied by "meaningful" cautionary language. To provide immunity, a warning effectively needs to render any misrepresentation or omission immaterial. *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1375 (S.D. Fla. 2001).

---

[3] Defendants also assert that CW1's first-hand account should be discounted because his purview was North America. Def. Br. at 10-11. Defendants overlook that CW1 attended meetings with Harris' direct report where pricing and margins were discussed. Accounts from former employees in a position to be personally knowledgeable should be fully credited. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008) (crediting CW appropriate where complaint "fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame"); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (crediting CW who lacked direct contact with defendant); *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 208 (5th Cir. 2023) ("While FE1 is only one source, the complaint's details about the responsibilities of his position are directly relevant to the events at issue").

Firstly, Harris' "focus" statement is a present-tense statement of Tupperware's current business. *See In re Physician Corp. of Am. Sec. Litig.*, 50 F. Supp. 2d 1304, 1318 (S.D. Fla. 1999) (no safe harbor protection for "'statements that misrepresent historical/hard or current facts'").[4] As CW1 confirmed, Tupperware's "focus" was increasing sales through discounting, as evidenced by "Total sales" becoming a "Key Performance Indicator," where margins were not. ¶64.

Secondly, none of the cautionary language identified by Defendants was "meaningful." "To qualify as 'meaningful cautionary' language, a statement's warning must advise investors of 'risks of a significance similar to that actually realized.'" *In re Unicapital*, 149 F. Supp. 2d at 1374, quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). It must "discredit the [allegedly misleading statement] so obviously that the risk of real deception drops to nil." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *7 (N.D. Cal. Jan. 6, 2022) (alterations in original).

Here, none of the language cited by Defendants addressed that Defendants **knew** they were slashing prices to move inventory, driving margins to "almost zero," and planned to continue so doing for the rest of 2021, as Harris later admitted. *See In re Unicapital*, 149 F. Supp. 2d at 1374 ("[D]isclaimers must relate directly to that on which the investors claim to have relied"); *In re Physician Corp.*, 50 F. Supp. 2d at 1318 (no safe harbor where complaint alleged "warnings were misleading in light of what

---

[4] Defendants' cases do not say otherwise. Def. Br. 9 n.2, 14; *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1328 (11th Cir. 2019) (where a statement contains "distinct" and "easily severable" components, "it makes sense to afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own."). Unlike the inextricably mixed statements in *Carvelli*, this statement is cleanly severable into distinct clauses. *Carvelli,* 934 F.3d at 1328.

defendants allegedly knew or should have known"). *See also In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002).

Similarly, stating that Tupperware's future results "may" depend on the success of the "turnaround initiatives" (Def. Br. At 16) was insufficient because Defendants *knew* Tupperware was already abandoning that plan.[5] A risk disclosure "with no indication that the risk 'may already have come to fruition'" is insufficient. *Siracusano v. Matrixx Initiatives Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).[6] Courts regularly sustain similar allegations. *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8 (D. Or. June 27, 2017), report and recommendation adopted, 2017 WL 3610523 (D. Or. Aug. 22, 2017) (finding violation where party claimed it could sustain organic growth without disclosing that it used unsustainable sales tactics).[7]

## B.   The Complaint Adequately Alleges a Strong Inference of Scienter

Scienter is adequately pled by alleging facts supporting either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). Severe recklessness is an "extreme departure from the standards of ordinary care" that presents "a danger of misleading buyers or sellers which is either

---

[5] Unlike in *Einhorn v. Axogen, Inc.*, 42 F.4th 1218 (11th Cir. 2022), a Securities Act action where plaintiffs "disclaimed any allegation that [defendant] 'intentional[ly]' misrepresented anything," Plaintiffs here pled detailed allegations supporting actual knowledge. *See*, Section I.B, *infra*.

[6] *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "anticipates a continuation of its accelerated expansion schedule" actionable because it "could reasonably be interpreted as conveying a level of confidence in the continued viability of the expansion program not borne out by the adverse facts").

[7] Defendants' arguments regarding "puffery" (Def. Br. at 19-20) should be rejected for similar reasons. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("in good shape" and "under control" statements not puffery when defendants "allegedly knew that the contrary was true"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F.3d 2d 171, 190-91 (S.D.N.Y. 2010) ("discipline [and] monitoring" statements not puffery when they misrepresent existing facts and would mislead a reasonable investor).

known to the defendant or is so obvious that the defendant must have been aware of it." *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1365 (N.D. Ga. 2002), aff'd sub nom., *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004).

An inference of scienter is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1232 (N.D. Ga. 2019). Because this inquiry examines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," courts must "consider the complaint in its entirety … not whether any individual allegation, scrutinized in isolation, meets that standard." *Mizzaro*, 544 F.3d at 1238. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

### 1.    Defendants' Admissions and the Blatant Falsity of Their Statements Support a Strong Inference of Scienter

Defendants do not dispute that they knew Tupperware never increased prices "across the board," or at all in North America, nor can they; they admitted as much on May 4, 2022, and CW1 confirmed that the precise opposite was occurring. Accordingly, scienter necessarily follows from falsity. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) ("incongruity between word and deed establishes a strong inference of scienter").

Indeed, the only reasonable inference from Fernandez unambiguously stating that Tupperware instituted price increases "***across the board … absolutely every single market is increasing prices in Q1***" (¶114) when he knew that price increases never

occurred in North America and that the "vast majority" of price increases in all markets would not occur until Q2 is that he knew his statements could mislead investors or was severely reckless. Defendants admitted on May 4, 2022, that the disappointing profitability was a result of "the latency between rising input costs and our decision to increase prices." ¶120. Harris similarly admitted awareness of excess inventory throughout 2021. ¶105. *In re VistaCare, Inc. Sec. Litig.*, 2005 WL 8160681, at *2 (D. Ariz. Aug. 19, 2005) (scienter supported by post-class period admission).

"Where a defendant publishes a statement at a time he […] has access to facts suggesting that the statement is inaccurate, misleadingly, or incomplete—as is alleged here—a classic fact pattern giving rise to a strong inference of scienter appears." *In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002); *see also Fla. Bd. Of Adm'rs v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

### 2. Defendants' Responses to Analyst Questions Support a Strong Inference of Scienter

Throughout the Class Period, analyst asked questions on Tupperware's pricing and margins. Defendants did not demur or claim ignorance, but repeatedly provided detailed answers, demonstrating personal knowledge of the subjects.

For example, on March 10, 2021, in response to a question about increasing resin costs, Harris interjected Tupperware's planned price increases into the discussion, stating "We anticipate that we can offset those…through pricing in specific

- 16 -

markets." ¶128. Harris again discussed the Company's strategy toward price increases on May 5, 2021 and May 27, 2021. *Id.* On June 10, 2021, Harris discussed specific inflationary price increases and assured investors that Defendants were deeply knowledgeable about and "monitor[ing] pricing": "***we'll have to continue to monitor that, make the right decisions on pricing,*" *"our model is such that we know what our cost is,"* *and* *"we're clearly focusing and looking at pricing from a competitive basis as well.*" *Id.*

On August 4, 2021, Harris stated that the Company "had some opportunistic pricing this year, especially in more inflationary markets." *Id.* On February 23, 2022, Fernandez asserted definitive knowledge on the subject, giving an emphatic "Yes," as to whether he could provide "more color" on pricing and stating that it had occurred "across the board … [in] every single market, that "we're going at least with the rate of inflation," and that the Company had again been "opportunistic" with its pricing, and adding that "***[w]e always want to be around 15% to 20% above competition***[.]" *Id.*

"[A]n inference of scienter can be established by the fact that the Defendants touched on the specific issue … in their public statements." *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015). "Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch, Inc.*, 2016 WL 4007591, at \*2 (E.D.N.Y. July 26, 2016). Indeed, courts have "found it 'absurd'" that an executive did not have knowledge where they "communicat[ed] with the press" on the issue. *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014). *See Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 U.S. Dist. LEXIS

- 17 -

124134, at \*14 (M.D. Fla. July 25, 2019).[8] Even assuming no actual knowledge, arguendo, Defendants' representations to the investment community were "actionably reckless." *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

### 3. The Importance of the Turnaround Plan Supports a Strong Inference of Scienter

Alleged misstatements concerning a "core operation" create a strong inference of scienter. *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 48048, at \*45-46 (M.D. Ga. Mar. 23, 2018). Similarly, "falsity may itself be indicative of scienter" where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009); *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 16 (1st Cir. 2021).

Here, the Turnaround Plan was a radical strategy change regularly identified by the Company and analysts as critical to Tupperware's core operations. ¶141. Fernandez was charged with "fixing the core business" through the Plan, referred to "our efforts to fix the core business," and discussed "the core direct sales business." ¶¶142-44. The Plan's utter failure by early 2021, when the Company was forced to slash prices, eviscerate margins, and cannibalize its "core" direct sales force, supports scienter. *See Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 (S.D. Fla. 2007)

---

[8] *See also In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at \*11 (S.D. Cal. Mar. 18, 2019) (finding "specific [statements] . . . in response to questions from analysts and investors" may at the pleading stage "give rise to a strong inference that Defendants acted with the required state of mind"); *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp.3d 217, 237 (S.D.N.Y. 2021) (frequent discussion on topic probative of scienter) (citing cases); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at \*5 (S.D.N.Y. June 21, 2021) (scienter where defendant "held himself out" as knowledgeable).

(inferring scienter as to misrepresentations regarding product line that played an "important role…in financial projections"); *Mohawk Indus.*, 564 F. Supp. 3d 1272, 1284 (N.D. Ga. 2021); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009) (sustaining complaint where misstatements regarded issuer's core business); *In re Clarus Corp. Sec., Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002).

### 4. The Suspicious Timing of the Revelation of the Truth Supports a Strong Inference of Scienter

On February 23, 2021, Fernandez emphatically confirmed that price increases had occurred "across the board" in "every market" in Q1. Then, on May 4, 2022, Defendants admitted that price increases did not occur until Q2 and had never occurred in North America. Courts agree that an "allegedly fraudulent statement or omission" quickly followed by "disclosure of inconsistent information" can indicate scienter. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). *See, e.g., Institutional Investors Grp. v. Avaya Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) (temporal proximity "strengthens the inference of scienter"); *In re Serologicals SEC Litig.*, 2003 U.S. Dist. LEXIS 27465, at *39 (N.D. Ga. Feb. 20, 2003) (proximity between "rosy statements" and the truth "may be probative of fraudulent intent").[9]

### 5. The Suspicious Timing of Harris' Demotion and Firing Support a Strong Inference of Scienter

Harris' demotion and termination immediately following the revelation of the truth, ¶¶136-139, also support a strong inference of scienter because Plaintiffs "allege[] sufficient information to differentiate between a suspicious change in personnel and a

---

[9] *See also In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *25-26 (N.D. Cal. June 2, 2020) ("implausible" that CEO was unaware of issue given admission two months later).

- 19 -

benign one." *Zucco Partners*, 552 F.3d at 1002. *See also Yannes*, 2021 WL 2555437, at *6 ("[T]he timing and circumstances of resignations … can add to a pleading of circumstantial evidence of fraud"); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) (finding "uncharacteristic" personnel changes indicative of scienter and noting "the close temporal proximity to the initial revelations weigh[s] against an innocent" explanation). Defendants' suggestion that the demotion and termination were mere coincidence is simply not credible.

### 6.    The Inference of Scienter Is Stronger Than Any Competing Inference

Defendants proffer no non-culpable inference. While they argue that the Court should infer the "product-by-product and market-by-market price increases adopted by Tupperware failed to outpace [inflation]," Def. Br. at 24, that does not address how Defendants were not at least reckless in falsely claiming "we're shifting to more profitable sales" and reducing "promotional programs" in North America when the exact opposite was occurring and further misrepresenting that price increases had occurred "across the board" in "every market" when they knew that was false.  Indeed, it defies logic that price increases on only a few products in a few markets could offset "the highest inflation in decades," which was impacting every product and market.

## II.    The Complaint Adequately Alleges a §20(a) Claim

Defendants do not contest their Section 20(a) liability. If the Court finds an adequately pled 10(b) violation, it should also sustain the unchallenged 20(a) claims.

## CONCLUSION

Wherefore, Defendants' motion to dismiss should be denied in its entirety. If this Court grants any part of the motion, Plaintiffs respectfully request leave to amend.

- 20 -

Dated: February 28, 2023  Respectfully submitted,

         By: *Cullin Avram O'Brien*
            Cullin Avram O'Brien
            **CULLIN O'BRIEN LAW, P.A.**
            6541 NE 21st Way
            Ft. Lauderdale, FL 33308
            Tel: (561) 676-6370
            Email: cullin@cullinobrienlaw.com

            *Liaison Counsel for Plaintiffs and the Class*

            Shannon L. Hopkins*
            Gregory M. Potrepka*
            **LEVI & KORSINSKY, LLP**
            1111 Summer Street, Suite 403
            Stamford, CT 06905
            Tel: (212) 992-4523
            Fax: (212) 363-7171
            Email: shopkins@zlk.com
            Email: gpotrepka@zlk.com

            Jeremy A. Lieberman*
            Michael Wernke*
            **POMERANTZ LLP**
            600 Third Avenue, 20th Floor
            New York, NY 10016
            Tel.: (212) 661-1100
            Fax: (212) 661-8665
            Email: jalieberman@pomlaw.com
            Email: mjwernke@pomlaw.com

            *Co-Lead Counsel for Plaintiffs and the Class*

            **BRONSTEIN, GEWIRTZ &**
             **GROSSMAN, LLC**
            Peretz Bronstein
            60 East 42nd Street, Suite 4600
            New York, NY 10165
            Tel.: (212) 667-6484
            Fax: (212) 667-7296
            Email: peretz@bgandg.com

            *Additional Counsel for Plaintiff Ralph Estep*

- 21 -

- 22 -

**THE PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East Suite 600
Los Angeles, CA 90067
Tel.: (310) 6928883
Email: lesley@portnoylaw.com

*Additional Counsel*


*\*pro hac vice* forthcoming or submitted

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 28, 2023, I electronically filed the foregoing document with the Clerk of the Court CM/ECF.


*/s/ Cullin O'Brien*
Cullin O'Brien