**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MICHAEL EDGE; MICHAEL J.
DENNEHY; and RALPH ESTEP,

    Plaintiffs,

v.                                         Case No. 6:22-cv-1518-RBD-LHP

TUPPERWARE BRANDS
CORPORATION; MIGUEL
FERNANDEZ; and CASSANDRA
HARRIS,

    Defendants.
_____

## ORDER

Before the Court is Defendants' motion to dismiss. (Doc. 56 ("Motion").) The Motion is due to be denied.

### BACKGROUND

In this securities fraud case, Plaintiffs allege that Defendant Tupperware Brands Corporation ("Tupperware"), via statements made by Defendants Miguel Fernandez, Tupperware's Chief Executive Office ("CEO"), and Cassandra Harris, Tupperware's former Chief Financial Officer ("CFO"), misrepresented Tupperware's profitability, approach to product pricing, and success of the company's turnaround plan ("Turnaround Plan") to investors. (Doc. 44.) Plaintiffs allege that Defendants knowingly made these misrepresentations, so they sue

Defendants for violating the Exchange Act. (*Id.* ¶¶ 173–86.) Defendants now move to dismiss (Doc. 56), and Plaintiffs oppose. (Doc. 59.) The matter is ripe. (Docs. 56, 59, 71.)

## STANDARDS

To survive a motion to dismiss, a fraud claim brought under the Securities and Exchange Act of 1934 must satisfy: (1) the notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2); (2) the fraud pleading requirements in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016).

First, to satisfy Rule 8(a)(2), a plaintiff must plead "a short and plain statement of the claim . . . ." Fed. R. Civ. P. 8(a)(2). The factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept the factual allegations as true and construe them "in the light most favorable" to the plaintiff. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). But this "tenet . . . is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). So a pleading that offers mere "labels and conclusions" is insufficient. *Twombly*, 550 U.S. at 555.

Second, under Rule 9(b), "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). So a

plaintiff alleging fraud must set forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud.

*Galectin*, 843 F.3d at 1269. "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

Third, under the PSLRA, there are other pleading requirements for securities fraud actions. *Galectin*, 843 F.3d at 1269. For claims based on allegedly false or misleading statements or omissions, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading[] [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). The complaint must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind" for each act or omission. *Id.* § 78u-4(b)(2)(A). If these requirements are not met, the complaint must be dismissed. *See id.* § 78u-4(b)(3)(A).

## ANALYSIS

### I. Falsity

First, Defendants argue that Plaintiffs' claims fail because Defendants' present-tense statements were not false or misleading. (Doc. 56, pp. 13–18.)

To state a claim for securities fraud, a plaintiff must allege: "(1) a material

3

misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (cleaned up). Defendants only contest the first two elements, so the Court need not analyze the others. (Doc. 56, pp. 13–25.) "A plaintiff can satisfy the materiality requirement by demonstrating a substantial likelihood that a reasonable investor would view the disclosure of the misrepresented or omitted fact as having significantly altered the total mix of information made available." *Kinnett v. Strayer Educ., Inc.*, No. 8:10-cv-2317, 2012 WL 933285, at *6 (M.D. Fla. Jan. 3, 2012), *report and recommendation adopted*, No. 8:10-cv-2317, 2012 WL 933275 (M.D. Fla. Mar. 20, 2012), aff'd, 501 F. App'x 890 (11th Cir. 2012).

Plaintiffs allege that Defendants made the following false or misleading material misrepresentations relating to profitability, product price increases, and the success of the Turnaround Plan:

- May 5, 2021 Press Release: Harris stated, "Our cash earnings in the first quarter illustrate the benefits of the ongoing Turnaround Plan, which is creating a more profitable company." (Doc. 44, ¶ 84 (cleaned up).)
- May 5, 2021 Earnings Call: Fernandez discussed Tupperware's profit margins, stating, "[W]e're shifting to more profitable sales in this market, and we will reduce some of the highly promotional programs and improved distribution costs." (*Id.* ¶¶ 86–87 (cleaned up).)
- May 27, 2021 Conference Call: Harris stated that Tupperware's margin

4

performance would not suffer as Defendants began rolling out their omnichannel strategy. (*Id.* ¶ 90.)
- August 4, 2021 Press Release: Harris represented that Tupperware was "delivering profit." (*Id.* ¶ 93.)
- August 4, 2021 Earnings Call: Harris stated, "Looking forward to the second half, we do expect higher product costs versus a year ago, primarily as a result of higher resin and logistics. However, our turnaround plan efforts will continue to drive efficiencies through the supply chain and when coupled with the impact of price increases, we believe we can largely neutralize the overall impacts." (*Id.* ¶ 96 (cleaned up).)
- November 3, 2021 Earnings Call: Harris stated, "As we look forward to 2022, we will look for opportunities to reduce cost, increase efficiencies and opportunistically raise prices where appropriate." (*Id.* ¶ 108 (cleaned up).)
- November 3, 2021 Earnings Call: When questioned by analysts if prices were increasing to offset margin erosion, Harris stated, "Yes, absolutely. So we will be looking to take price, and that is part of our plan. We have taken some pricing. We talked about it in our Q. So we've had some opportunistic pricing this year, especially in more the inflationary markets, that with the higher cost of resin. And now with less of an ability to help offset that manufacturing, we will be looking to take further price increases as we go into next year." (*Id.* ¶ 109 (cleaned up).)
- February 23, 2022 Earnings Call: Harris represented that Tupperware instituted price increases that could address margin erosion, stating: "We also believe that 2022 will be another tale of 2 halves, the trending opposite of 2021, with tougher comps in the first half exacerbated by COVID and persistent cost pressures, followed by relatively easier comps in the second half. We also expect our pricing actions to catch up with cost increases by the second half and for results to benefit from business expansion efforts that began to take root in the latter part of the year." (*Id.* ¶ 112 (cleaned up).)
- February 23, 2022 Earnings Call: Harris stated, "I think you asked about pricing, too. So pricing actions are going to happen in the first half, but the timing of the new channels and products is as [the CEO] stated." (*Id.* ¶ 113 (cleaned up).)
- February 23, 2022 Earnings Call: Fernandez suggested Tupperware had begun raising prices "effectively" to offset margin erosion, stating, "So pretty much, it's across the board. And obviously, we're going to take advantage of new products to make sure that we price accordingly. We literally started pricing in—towards the end of Q4. But absolutely, every single market is increasing prices effectively in Q1. And there's a few of

5

them, very little portion of them in Q2, but in all of them, we're going at least with the rate of inflation." (*Id.* ¶ 114.)

Here, for each statement, Plaintiffs specifically identify the maker, the time and place it was made, and why or how it was misleading. (*Id.* ¶¶ 84–88, 90–91, 93–94, 96–98, 110, 115–16.) So Plaintiffs have satisfied the heightened pleading requirements of Rule 9(b) and the PSLRA. *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1); *Galectin*, 843 F.3d at 1269. Further, to explain why each statement was false or misleading, Plaintiffs rely on later statements made by Defendants and information from a confidential former Tupperware employee who was the Demand Planning and Sales & Operations Planning Manager for the United States and Canada between February 2019 and June 2022. (Doc. 44, ¶¶ 85, 88, 91, 94, 98, 110, 115–16.) Accepting Plaintiff's factual allegations as true, as the Court must at this stage, Plaintiffs plausibly allege that Defendants' statements were false or misleading; actual falsity is a question for another day. *See Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 790 (11th Cir. 2010); *Theodore v. Purecycle Techs., Inc.*, No. 6:21-cv-809, 2022 WL 20157415, at *11 (M.D. Fla. Aug. 4, 2022). So the Motion is due to be denied on these grounds.

## II. Safe Harbor

Next, Defendants argue that the forward-looking statements[1] are protected

---

[1] Certain statements, including Harris' May 27, 2021 statement responding in the affirmative that Tupperware's margin performance would not suffer as Defendants began rolling

6

by the PSLRA's safe harbor provision because they were accompanied by meaningful cautionary language, and they were not made with actual knowledge of falsity. (Doc. 56, pp. 18–25.)

The PSLRA's safe harbor provision "provides three independent, alternative means of inoculating forward-looking statements: those that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity." *Carvelli*, 934 F.3d at 1317.

For meaningful cautionary language, the statute requires the warning only to mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). The statute does not require "a listing of *all* factors." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). "Nor [must the warning] specify all factors that could cause results to differ from a forward-looking statement's projections." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1215 (M.D. Fla. 2014). "Rather, the requirement that a cautionary statement be meaningful is satisfied when an investor has been warned of risks of a significance similar to that actually realized, and the

---

out their omnichannel strategy (Doc. 55, ¶ 90), are present-tense statements that cannot be afforded a protected forward-looking status. *See In re Physician Corp. of Am. Sec. Litig.*, 50 F. Supp. 2d 1304, 1318 (S.D. Fla. 1999) ("[T]he statutory safe harbor . . . does not protect defendants from liability based on statements that misrepresent historical/hard or current facts." (cleaned up)); *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007) ("[T]he safe harbor of the PSLRA only applies to forward-looking statements and not misstatements or omissions of historical or contemporaneous facts.").

cautionary statement is tailored to the risks the business faces." *Id.* at 1216 (cleaned up).

Here, Defendants point to language that they provided at the outset of the May 5, 2021 call stating that Tupperware would make "forward-looking statements that are subject to risks and uncertainties described in [Tupperware's] press release and in [Tupperware's] SEC filings." (Doc. 26, pp. 16–17.) They also point to language in their press release identifying factors like "the effects of the outbreak of the novel coronavirus (COVID-19) pandemic," the success of [Tupperware's] efforts to improve its profitability," "the success and timing of growth and turnaround initiatives," "the success of new product introductions and promotional programs," and "risks related to accurately predicting, delivering or maintaining sufficient quantities of products." (Doc. 56-2.) Defendants' 2021 First Quarter form contained similar language, and identified risks like "the ability to implement appropriate product mix and pricing strategies" and "changes in plastic resin prices . . . ." (Doc. 56-4, p. 50.) Defendants made similar statements at the outset of each earning call. (Doc. 56, p. 17.) But "when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the non-disclosure." *Mogensen*, 15 F. Supp. 3d at 1216. Accepting the factual allegations in Plaintiffs' amended complaint as true, none of Defendants'

8

statements disclose to the public that Tupperware allegedly knew it was cutting prices to move inventory, reducing margins to almost zero, and abandoning the Turnaround Plan. (Docs. 56, pp. 16–17; 56-4, p. 50; 56, p. 17.) So at this stage, the Court cannot conclude that the cautionary statements were meaningful so as to protect the alleged misstatements under the safe harbor.

Defendants argue that the statements were not made with actual knowledge of falsity. (Doc. 56, pp. 22–24.) Defendants also argue that their statements were puffery. (*Id.*, pp. 19–20.)

"Even if the forward-looking statement has no cautionary language, the Plaintiffs must nonetheless prove that the Defendants made the statements with actual knowledge that they were false or misleading." *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005) (cleaned up). But "the safe harbor of the PSLRA only applies to forward-looking statements and not material omissions or misstatements of historical or contemporaneous facts." *Id.* Actual knowledge can be alleged through reports, conversations, tips, confidential witnesses that indicate or suggest that Defendants made the statements while knowing them to be false. *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1281 (S.D. Fla. 2017).

Here, the non-forward-looking statements cannot be afforded the PSLRA's safe harbor protection. *See Physician Corp.*, 50 F. Supp. at 1318 (S.D. Fla. 1999). To

the extent that other statements are forward-looking statements, Plaintiffs' complaint alleges that Defendants knew their statements were false because Defendants were aware pricing was not being increased, profitability was questionable, and that the Turnaround plan was not working. (Doc. 44, ¶¶ 84–88, 90–91, 93–94, 96–98, 110, 115–16.) So the Court finds that Plaintiffs have satisfied the standard for actual knowledge, which is also supported by CW1's information.

"[E]xcessively vague, generalized and optimistic comments—the sorts of statements that constitute puffery—aren't those that a reasonable investor, exercising due care, would view as moving the investment-decision needle." *Carvelli*, 934 F.3d at 1320 (cleaned up). But "a statement that represents tangible, verifiable actions taken by a company cannot be considered puffery." *Theodore v. Purecycle Techs., Inc.*, No. 6:21-cv-809, 2022 WL 20157415, at *8 (M.D. Fla. Aug. 4, 2022) (cleaned up). So "when considering a motion to dismiss, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*

Here, Defendants' statements are not mere puffery because the statements regarding profitability, price increases, and the status of the Turnaround Plan represent important information to a reasonable investor. *Theodore*, 2022 WL 2057415, at *8 ("Even if a statement constitutes puffery it doesn't absolve the

reviewing court of the duty to consider the possibility that in context and in light of the total mix of available information, a reasonable investor might nonetheless attach importance to the statement." (cleaned up)).

### III. Scienter

Third, Defendants argue that Plaintiffs fail to allege a strong inference of scienter as to any Defendant. (Doc. 56, pp. 25–30.)

To make out a securities fraud claim, plaintiffs must allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Plaintiffs must allege that "that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). Severe recklessness is defined as "misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (cleaned up); *see Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 & n.18 (11th Cir. 1999). Courts may aggregate the alleged facts to infer scienter. *See Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004).

Here, Plaintiffs allege that Defendants knew or should have known their statements about pricing, profitability, and the status of the Turnaround Plan were false or misleading when they were made. (Doc. 44, ¶¶ 85, 88, 91, 94, 98, 110, 115–16.) "Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleadingly, or incomplete . . . a classic fact pattern giving rise to a strong inference of scienter appears." *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002).

First, Plaintiffs allege facts showing that Defendants were or should have been knowledgeable on the statements. Plaintiffs allege that Harris and Fernandez made several public statements on these topics. (Doc. 44, ¶¶ 84–88, 90–91, 93–94, 96–98, 110, 115–16.) Plaintiffs also allege that the Turnaround Plan was a core operation of the business and so Fernandez and Harris, as senior management, would have had knowledge on the plan's goals and status. (*Id.* ¶¶ 141–45); *see Schultz*, 488 F. Supp. 2d at 1226 (inferring strong inference of scienter as to the company's CEO regarding misrepresentations related to a product line that bolstered the company's financial projections); *see also In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) (inferring strong inference of scienter as to the company's corporate officers and insiders where one transaction accounted for large part of the company's revenue because "it would be an extreme departure

from the standard of ordinary care for corporate officers and insiders charged with the control of the corporate information not to be familiar with the nature and terms of the transaction.").

Second, Plaintiffs allege that information has emerged that Defendants were aware or should have known that their statements on pricing, profits, and the Turnaround Plan were false or misleading. Plaintiffs allege that Fernandez and Harris made statements that directly contradicted their earlier statements about pricing, profitability, and the success of the Turnaround Plan. (Doc. 44, ¶¶ 130–35.) "[I]ncongruity between word and deed establishes a strong inference of scienter." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d, 206, 238 (S.D.N.Y 2010) (inferring strong inference of scienter where it was alleged that a company was internally acting to address certain risks but concurrently the company was continuing to mislead investors about the significant problems associated with those risks).

And Plaintiffs allege that information revealed by a former employee in upper management shows that Defendants had an excess of inventory and aimed to reduce inventory and overall sales, including at discounted prices, rather than increased pricing and profits. (Doc. 44, ¶ 60.)

> The weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the

>complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

*Mizzaro*, 544 F.3d at 1240.

Plaintiffs allege that the confidential witness ("CW1") was employed at Tupperware as a Demand Planning and Sales & Operations Planning Manager for the United States and Canada between February 2019 and June 2022. (Doc. 44, ¶ 24.) Plaintiffs also allege that CW1 attended meetings with Defendant Harris' direct report where pricing and margins were discussed. (*Id.* ¶¶ 60–61.) And Plaintiffs allege that CW1 was responsible for demand planning and determining how much inventory Tupperware needed to have available to meet Tupperware's various forecasted needs. (*Id.* ¶ 24.) Because Plaintiffs describe CW1 with a large degree of specificity and allege CW1's knowledge basis, CW1's information should not be discounted. *See In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005).

Finally, Plaintiffs allege the timing of Harris' demotion and subsequent termination support an inference of scienter. (Doc. 44, ¶¶ 136–39.) "The departure of corporate executive defendants is a factor that can strengthen the inference of scienter." *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 118 (3d Cir. 2018). "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something

other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news." *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)). Plaintiffs allege that Tupperware's stated reason for removing Harris from her dual position as CFO/COO to COO to "permit her to devote more of her attention to operations" was pretextual and was instead a precursor to her termination. (Doc. 44, ¶¶ 137–38.) But Plaintiffs provide no plausible facts raising any inference that Harris' demotion and termination was for some inculpatory reason.

Personnel changes that are uncharacteristic or accompanied by suspicious circumstances lead to a strong inference of scienter. *See In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020). Plaintiffs allege that the timing of Harris' announced position change during the May 4, 2022 earnings call was suspicious. (*Id.*) The timing aspects of Harris' demotion and later termination may add some weight to the inference of scienter, but it is not substantial. *See Brophy v. Jianbo Pharms., Inc.*, 781 F. 3d 1296, 1305 (11th Cir. 2015).

A strong inference of scienter is one that is cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs*, 551 U.S. 308, 310 (2007). Collectively, Plaintiffs allege sufficient facts to support an inference of scienter as to each Defendant. So the Motion is due to be denied.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion (Doc. 56) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 28, 2023.

ROY B. DALTON, JR.
United States District Judge