# EXHIBIT 3

## BEFORE THE DELAWARE BOARD OF ACCOUNTANCY

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 04-08-07 |
| | ) | |
| RALPH V. ESTEP | ) | |
| | ) | DECISION AND ORDER |
| LICENSE NO. PA-0000023 | ) | |

## NATURE OF THE PROCEEDINGS

This disciplinary action against public accountant Ralph V. Estep arises from Delaware state court proceedings related to Mr. Estep's unauthorized practice of law. On June 6, 2006, Mr. Estep and the Delaware Office of Disciplinary Counsel ("ODC") appeared before the Board on the Unauthorized Practice of Law and submitted their "Admitted Facts and Admissions of Conduct Constituting the Unauthorized Practice of Law" ("Admissions"). *See* Exhibit A to State Exhibit 1 (1/21/09). In the Admissions, Mr. Estep certified under oath that he engaged in certain conduct that constituted the unauthorized practice of law. Specifically, Mr. Estep agreed that he engaged in the unauthorized practice of law by drafting wills and trusts, acting in a representative capacity in the Register of Wills, giving legal advice on matters related to Delaware estate law, and by drafting legal documents for use in the Register of Wills. Mr. Estep further agreed that he would no longer engage in such conduct or advertise legal services as services provided by his accounting firm. The Board on the Unauthorized Practice of Law subsequently issued a report accepting the Admissions and on October 30, 2006, the Delaware Supreme Court approved said report and issued a Cease and Desist Order directing Mr. Estep to cease and desist the unauthorized practice of law. *In the Matter of Ralph V. Estep*, 931 A.2d 1006, 2006 WL 3062763 (Del. 2006). *See* Exhibit B to State Exhibit 1 (1/21/09).

On December 11, 2006, the ODC filed a Rule to Show Cause Petition in the Supreme Court alleging that Mr. Estep had violated the Cease and Desist Order. The matter was referred to the Board on the Unauthorized Practice of Law, which conducted an evidentiary hearing on April 10, 2007 and, on May 25, 2007, filed its Findings of Fact and Recommendations for Sanctions. On August 15, 2007, the Supreme Court issued a decision accepting the Findings of Fact and Recommendations and held Mr. Estep in contempt for violating the Cease and Desist Order by rendering legal advice related to Delaware estate law and by drafting legal documents. *In the Matter of Ralph V. Estep*, 933 A.2d 763 (Del. 2007). *See* Exhibit C to State Exhibit 1 (1/21/09). Pursuant to its August 15, 2007 decision, the Supreme Court found Mr. Estep guilty of nine counts of contemptuous conduct and ordered him to return fees to a number clients and to pay a fine.

On June 25, 2008, the State of Delaware filed this disciplinary action against Mr. Estep with the Delaware Board of Accountancy ("the Board"). The State alleged in its Complaint that the conduct outlined above violated specified sections of the Board's licensing law, Board Rules and Regulations and the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants and warranted sanction by the Board. *See* State Exhibit 1 (1/21/09).

In his Answers to the Complaint (State Exhibit 2 (1/21/09)), and during the course of the hearing before the Board, Mr. Estep disputed the Admissions, the findings of the Board on the Unauthorized Practice of Law and the decisions of the Supreme Court. He argued that he had not engaged in the unauthorized practice of law and that he had not violated the Supreme Court's Cease and Desist Order. Mr. Estep denied that he had

2

violated any of the Board's laws or rules and stated that he had always discharged his duties as an accountant with integrity, professionalism and an interest in serving the public. *Id.*

## SUMMARY OF THE EVIDENCE

The disciplinary hearing began on January 21, 2009. The presentation of evidence continued on February 18, 2009, March 18, 2009 and deliberations took place on May 20, 2009.

The State's case was presented by Deputy Attorney General Barbara J. Gadbois. Respondent Ralph V. Estep proceeded *pro se*. Deputy Attorney General Eileen Kelly Heeney advised the Board.

### The State's Direct Evidence

Prior to the commencement of the State's case, the Board addressed preliminary matters. Mr. Estep requested that his witnesses be sequestered. His request was granted by the Board. Mr. Estep next stated that he had not been provided with the exhibits that the State intended to rely on at the hearing. The State introduced State Exhibit 3 (1/21/09), a November 7, 2008 letter in which Deputy Attorney General Eileen Kelly directed Mr. Estep to contact Ms. Gadbois with any document requests. Ms. Gadbois advised that Mr. Estep had not contacted her and that she intended to rely on the Complaint with attached exhibits in making her direct presentation to the Board. Ms. Gadbois noted that Mr. Estep already had the Complaint in his possession. Given Ms. Gadbois' representations to the Board, which Mr. Estep did not contest, there was no need for the Board to rule on Mr. Estep's argument that he was entitled to documents prior to commencement of the hearing.

3

Ms. Gadbois stated that her presentation of the State's case would consist of the Complaint with attachments (State Exhibit 1 (1/21/09)). With respect to Mr. Estep's Admissions (Exhibit A to State Exhibit 1 (1/21/09)), Ms. Gadbois pointed out that Mr. Estep had agreed to the Admissions by his notarized signature. Further, in the Admissions, Mr. Estep had agreed that he was not authorized to practice law in Delaware or any other state. His advertising included terms such as "wills," "trusts," "estates," and "probate." His letterhead included a notation "Attorney – Admitted to the Delaware Bar" when no such person worked for his firm. Mr. Estep also admitted that he had provided legal advice with respect to estate planning, drafted estate documents and charged a fee for such services. He had also drafted wills and trusts for various individuals. He had assisted clients with probate matters before the Register of Wills.

Ms. Gadbois noted in particular that Mr. Estep had admitted that he had engaged in the unauthorized practice of law by drafting wills and trusts and by acting in a representative capacity in the Register of Wills, giving legal advice on matters relating to Delaware estate law and drafting legal documents for use in the Register of Wills. In addition, Mr. Estep agreed in the Admissions that he would no longer engage in such conduct or advertise such services in any manner.

Ms. Gadbois then turned to the Supreme Court's August 15, 2007 decision (Exhibit C to State Exhibit 1 (1/21/09)), in which the Court stated that it had previously approved the Admissions and issued a Cease and Desist Order directed to Mr. Estep. *In the Matter of Ralph V. Estep,* 933 A.2d 763, 765 (Del. 2007). Further, the Cease and Desist Order was a consent decree entered as the result of a voluntary agreement between Mr. Estep and the ODC. The Supreme Court stated as follows:

In that agreement, the Respondent defined what conduct by him would constitute the unauthorized practice of law and represented to this Court that he would not engage in any of those defined prohibited activities. Accordingly, the issue is whether Respondent engaged in the unauthorized practice of law as defined and agreed to by him in his Admissions and voluntary assurances to this Court that constituted the basis for the Cease and Desist Order.

*Id.* at 767.

The Supreme Court's decision set forth the factual findings of the Board on the Unauthorized Practice of Law, in connection with the April 10, 2007 evidentiary hearing. Ms. Gadbois directed the Board to a section of the decision describing Mr. Estep's dealings with estate planning clients. *Id.* at 768. Mr. Estep met with the clients alone; no Delaware lawyer was present. Mr. Estep subsequently provided his meeting notes to Leonard Kingsley, Esquire, who was admitted to practice law in Pennsylvania and New Jersey only. Mr. Kingsley drafted estate documents and then returned them electronically to Mr. Estep. Mr. Kingsley always received instructions from Mr. Estep as to what documents to draft. With only two exceptions, Mr. Kingsley never met with Mr. Estep's clients. The estate documents were then forwarded to Thomas McCracken, Esquire, a member of the Delaware bar. The two attorneys never met to discuss the documents. *Id.* at 768-769.

Mr. Estep had a business agreement with Mr. McCracken, memorialized in a Memorandum of Understanding. Pursuant to their agreement, Mr. McCracken would draft documents, meet with clients and answer client questions. However, both Mr. Kingsley and Mr. McCracken testified, at the April 20, 2007 hearing, that Mr. Kingsley drafted the documents based on Mr. Estep's instructions. Mr. McCracken received the draft documents electronically from Mr. Estep. He never saw Mr. Estep's meeting notes

5

and played no role in determining what documents were prepared. In fact, none of Mr. Estep's clients met with Mr. McCracken prior to executing the documents. The Supreme Court noted that the Board on the Unauthorized Practice of Law had found that Mr. Estep's clients were intentionally misled about Mr. McCracken's role. Clients were given a letter signed by Mr. McCracken stating that he had prepared the documents to carry out the client's wishes. Mr. McCracken did not prepare the documents and did not form or express any opinions as to whether the documents carried out the client's wishes. *Id.* at 769.

After reviewing further sections of the Supreme Court's decision, Ms. Gadbois pointed the Board to the determination that Mr. Estep had violated both the "substance and spirit" of the Admissions and the Cease and Desist Order:

> Respondent's business arrangements with Kingsley and McCracken constitute a transparent, nefarious attempt to circumvent the Cease and Desist Order and continue with "business as usual." The Board found that Respondent interviewed Burch, Welsh, Abbott and Titus and rendered legal advice to each regarding what legal documents they needed as part of their estate planning. Instead of drafting the legal documents himself, Respondent directed Kingsley to draft them for him. While Respondent did not himself perform the drafting, this isolated fact is no defense, because Kingsley, a non-Delaware lawyer, did the drafting at Respondent's direction, using Respondent's forms, for Respondent's pecuniary benefit. Respondent cannot avoid the terms of the Admissions and Cease and Desist Order by concocting a contemptuous scheme whereby he directs a non-Delaware lawyer, as his agent, to draft legal documents in contravention of a Supreme Court Order.
>
> The Board further found that after the documents were prepared, Respondent met with the clients to explain the documents, thereby rendering legal advice on matters relating to Delaware estate law. The only difference in Respondent's post-Admissions conduct is that he now had a Delaware lawyer present to witness the execution of the legal documents. A Delaware lawyer's mere presence does not empower Respondent to engage in conduct otherwise prohibited by the Admissions.

*Id.* at 771.

6

Ms. Gadbois next turned to the section of the Supreme Court decision incorporating the finding by the Board on the Unauthorized Practice of Law that Mr. Estep violated the Cease and Desist Order by either giving legal advice or acting in a representative capacity in the Register of Wills. *Id.* at 773. Mr. Estep had argued that the preparation of an inventory or final accounting for filing in the Register of Wills was essentially accounting work. However, in response, the Supreme Court stated: "More pointedly, regardless of what the practice is in Delaware, Respondent violated his agreement that he would not draft legal documents for filing with the Register of Wills. He further violated his agreement that he would not act in a representative capacity or give legal advice pertaining to probate matters." *Id.*

As Ms. Gadbois stated, the Supreme Court accepted the factual findings of the Board on the Unauthorized Practice of Law and found that they constituted the basis for imposing sanctions on Mr. Estep. Mr. Estep was held in contempt on nine counts of violating the Cease and Desist Order, was ordered to disgorge all fees received for legal services rendered in connection with those counts and was fined for his contemptuous conduct. *Id.* at 774.

After completing her review of State Exhibit 1 (1/21/09) and its attachments, Ms. Gadbois advised that the State had nothing further to present at that time.

**The Respondent's Evidence**

**Ralph V. Estep** was sworn and testified that, thirty years ago, after he obtained his accounting degree, he was hired by a life insurance company. His employer provided him with training on estate planning, and since that time, he has worked a great deal in the estate planning arena. In about 2003, he started to produce documents in-house when

he hired attorney Gina Milligan to work for him as an accountant. On one occasion, Ms. Milligan prepared a will for a client, which led Mr. Estep to think about preparing estate planning documents in-house. Attorney Robert Hallsted, Jr. briefly worked for Mr. Estep and reviewed the viability of this plan. Mr. Estep testified that two other attorneys advised him that his plan of operation was compliant with Delaware law.[1]

Mr. Estep explained his motivation in signing the Admissions in connection with the matter before the Board on the Unauthorized Practice of Law. Although he signed the document, he did not agree it with. He signed it because he had reached an impasse with the ODC and had been advised that the matter could take years to resolve at a cost of $3.5 million in attorney fees. He was also losing time away from his business. He did not understand that he was signing an "admissions" document but thought that he was only agreeing that he would no longer have attorneys working on his staff. In addition, the Admissions included a statement to the effect that the Delaware Supreme Court had not yet ruled on the issue of whether an accountant was permitted to perform the estate services that Mr. Estep was providing. Given that the Supreme Court had not said that he could not perform the services in question, Mr. Estep felt that he was permitted to do so.

Mr. Estep explained that after the Admissions, he changed his practice with respect to estate services. His firm would prepare the will in draft, e-mail it to a Delaware attorney who was an independent contractor. The attorney would draft and finalize the documents and come to Mr. Estep's office to meet with the client. After the June 2006 Admissions was signed, Mr. McCracken was Mr. Estep's independent attorney.

---

[1] At this time, Ms. Gadbois stated for the record that she had a continuing objection to any hearsay statements made by a Delaware lawyer not present to testify at the hearing.

Mr. Estep testified that the Attorney General's Office used "underhanded tricks" to influence his clients. In that connection, he offered the Affidavit of Betty Treml for introduction into evidence. In objecting to the document, Ms. Gadbois noted that the Supreme Court had found that Ms. Treml had been given legal advice by Mr. Estep in violation of the Cease and Desist Order. Ms. Treml's affidavit contradicted facts that had already been found by the Supreme Court. Pursuant to the legal principles of res judicata and estoppel, Mr. Estep was precluded from relitigating the findings of the Supreme Court. Ms. Gadbois also argued that the document was inadmissible in that it involved hearsay on top of hearsay: Ms. Treml described statements made to her by an unidentified investigator from the Attorney General's office.

The Board declined to uphold Ms. Gadbois' objection as to hearsay on the grounds that Board Rule 14.2.2 provided that strict rules of evidence should not apply in Board hearings and "[a]ll evidence having probative value commonly accepted by reasonably prudent people in the conduct of their affairs shall be admitted." The Board determined that the document in question could be considered and the Board would determine what weight it should be given. The Board deferred addressing the issue of whether the principles of res judicata and estoppel should limit Mr. Estep's presentation.

Upon admission of Ms. Treml's affidavit, Respondent Exhibit 1 (1/21/09), Mr. Estep stated that the document demonstrated that the investigator for the State tried to influence Ms. Treml by insinuating that Mr. Estep had engaged in wrongdoing. In her affidavit, Ms. Treml stated that Mr. Estep was knowledgeable and capable in handling her taxes and the probate of her sister's estate.

9

Mr. Estep introduced four pieces of letterhead for his business. (Respondent Exhibits 2 – 5 (1/21/09)). Mr. Estep stated that Respondent Exhibit 2, which included the notation "***Attorney-Admitted to Delaware Bar" was used before the Admissions document was signed and was purchased when Mr. Hallsted was working for him. Respondent Exhibit 3 was printed after the Admissions document was signed and does not include the Delaware attorney reference. Respondent Exhibit 5 is the letterhead that Mr. Estep currently uses and contains no reference to "attorney."

Mr. Estep next turned to paragraph 10 of the Admissions, which he read to the Board: "However, the Delaware Supreme Court has not addressed whether the drafting of will and trusts or probating of estates by a non-lawyer constitutes the unauthorized practice of law in Delaware." Mr. Estep stated that his admission that he engaged in the unauthorized practice of law by drafting wills did not matter because the Supreme Court had not held that such conduct violated Delaware law.

Finally, Mr. Estep referenced the Supreme Court decision's discussion of Mr. McCracken's testimony before the Board on the Unauthorized Practice of Law. Mr. Estep stated that if Mr. McCracken testified that he never saw client files and did not know if the documents he drafted satisfied the needs of the clients, he had not testified accurately.

Mr. Estep sought to introduce into evidence documents prepared for clients for filing in the Register of Wills on the grounds that they represented accounting and not legal work. Ms. Gadbois stated that the quality of Mr. Estep's work was not at issue. Rather, the issue was whether his violation of the Admissions showed a lack of honesty and integrity which made him ineligible to continue as a Delaware licensed accountant.

Mr. Estep agreed to summarize the documents for the Board's information to explain that no legal work was involved and did so.

In response to questioning by the Board, Mr. Estep stated that he continued to provide estate services after signing the Admissions because he thought that using an independent attorney would be acceptable.[2]

**Nancy Jennifer** was sworn and testified that she met Mr. Estep when he prepared taxes for her father, Robert Gardner, in February 2006. At no time did Ms. Jennifer, or her family members, believe that Mr. Estep was an attorney. In the course of their dealings, Ms. Jennifer did not find Mr. Estep to be deceitful or dishonorable. Ms. Jennifer testified that none of her father's will documents indicated that Mr. Estep was an attorney.

Ms. Jennifer recalled a meeting at her father's house with her father, Mr. Estep, Mr. McCracken and the witnesses to the will. Mr. McCracken questioned Mr. Gardner to ascertain his competence and discussed this issue with Mr. Estep. Mr. Estep's recommendations regarding Mr. Gardner's estate were deemed beneficial and accepted by his family. Ms. Jennifer would recommend Mr. Estep to others. She had no reason to question Mr. Estep's competence, integrity, honesty or moral character.

**William J. Rhodunda, Jr., Esquire** was sworn and testified that he is an attorney with the law firm Wolf Block. He represented Mr. Estep in connection with matters with the ODC and the Attorney General's office. In response to Mr. Estep's questions regarding his opinion of Mr. Estep's business practices, Mr. Rhodunda stated that Mr.

---

[2] At this time, the parties agreed that Mr. Estep would be permitted to address the issues of res judicata and estoppel at a later time and the parties would present closing arguments in written form.

11

Estep was capable of complying with all regulations pertaining to the practice of accounting.

With respect to the proceeding with the ODC, Mr. Rhodunda stated that, prior to the June 6, 2006 Admissions, there was no explicit rule as to what an accountant could do as related to will, trusts and acting as a personal representative and filing documents with the Register of Wills. However, Mr. Estep agreed that he would not perform such services in the future. After signing the Admissions, Mr. Estep changed his practice by having a Delaware lawyer handle wills, trusts and estate administration matters. Ultimately, it was determined that this change in practice was not sufficient and violated the Admissions.

Mr. Rhodunda saw written agreements between Mr. Estep and the independent attorneys he hired to perform legal work. He felt that the burden rested with the attorneys to know whether they were acting appropriately in working with Mr. Estep. Mr. Rhodunda was aware that there subsequently was testimony by the attorneys that conflicted with the written agreements. The audit of Mr. Estep's files revealed no accounting issues or missing funds.

On cross-examination, Mr. Rhodunda stated that he represented Mr. Estep when he was working with his prior law firm, Oberly, Jennings and Rhodunda. Mr. Estep terminated Mr. Rhodunda's firm at the conclusion of the matter filed against Mr. Estep in Chancery Court. Mr. Rhodunda's firm had to file suit against Mr. Estep to recover legal fees. Mr. Rhodunda believed that Mr. Estep willfully and intentionally decided not to pay his firm. In January 2008, a default judgment was entered against Mr. Estep and the matter was resolved with partial payment.

12

In connection with the fee dispute, Ms. Gadbois offered the related complaint filed in Superior Court and Mr. Estep's letter to Superior Court Judge Jane Brady. Mr. Estep objected to admission of these documents on the grounds that they had no relevance to his accounting practice. Ms. Gadbois responded that the documents were relevant to Mr. Estep's integrity and moral character, which were at issue. The Board over-ruled Mr. Estep's objection and the documents were admitted into evidence.

With respect to Mr. Estep's letter to Judge Brady, Mr. Rhodunda denied that he had committed malpractice in his representation of Mr. Estep, although he could understand why Mr. Estep was unhappy with the outcome of the ODC matters. Mr. Estep was sanctioned by the Supreme Court for violating the Cease and Desist Order and subsequently paid a sizeable amount in connection with resolving the matter filed in Chancery Court. The Chancery Court action alleged violations of the Consumer Protection and Deceptive Trade Practices Acts, in relation to legal services rendered by Mr. Estep. The Supreme Court decision sanctioning Mr. Estep for violating the Cease and Desist Order impacted the decision to settle the Chancery Court action.

On redirect examination, Mr. Estep introduced into evidence a February 27, 2007 letter from Peter Gordon, Esquire to Mr. Rhodunda. (Respondent Exhibit B (2/18/09)). The letter listed estate and trusts where Mr. Estep had control of the funds. Mr. Rhodunda agreed that no money was missing from any of these funds and that Mr. Gordon had told him that the files were in good order. Mr. Rhodunda agreed that after signing of the Admissions, it was Mr. Estep's intent to try to comply with its requirements.

**Rebecca Mellon** was sworn and testified that she worked for Mr. Estep for seven

13

years as his personal assistant and as a junior accountant. For the last year of her employment, Ms. Mellon worked as Mr. Estep's personal assistant and sat in his office with him. In response to telephone inquiries, Ms. Mellon advised callers that Mr. Estep was not an attorney. Ms. Mellon never observed anything deceptive or fraudulent in Mr. Estep's dealings with clients and found him to be competent in his accounting work.

Ms. Mellon explained the process involved with an estate planning client. Mr. Estep met with the client at length. The client file was then e-mailed to Mr. Kingsley, who would draft the will and send it to Ms. Mellon, who then e-mailed the will to Mr. McCracken. Mr. McCracken would e-mail the will back to Ms. Mellon. Any statement by Mr. McCracken that he did not see client files was not true. Mr. McCracken came to client meetings early to review the files. At client meetings, Mr. McCracken responded to client questions.

On cross-examination, Ms. Gadbois had Ms. Mellon's November 29, 2006 deposition introduced into evidence. (State Exhibit C (2/18/09)). Ms. Gadbois directed Ms. Mellon to her testimony that Mr. Estep prepared wills and then sent them to Mr. McCracken. Ms. Mellon explained that her deposition testimony conflicted with her testimony before the Board because, at her deposition, she was nervous and forgot to mention Mr. Kingsley's role.

**Edward Black** was sworn and testified that he worked for Mr. Estep from 2001 through 2007. Mr. Black became a certified public accountant in 2005. Mr. Black stated that he found Mr. Estep to be very professional with clients and knowledgeable and competent in his practice of accounting. Mr. Estep introduced into evidence Mr. Black's November 30, 2007 letter in which he stated that he was resigning his employment due to

14

his anxiety regarding the State's investigation of Mr. Estep. (Respondent Exhibit D (2/18/09)). On cross-examination, Mr. Black explained that his anxiety related to the incident when the State Police came to Mr. Estep's office to execute a subpoena for records.

**Paul Eihinger** was sworn and testified that he is an investigator for the Division of Professional Regulation. Mr. Estep and Mr. Eihinger met in January 2008 in connection with a complaint by a citizen and in connection with the Supreme Court's decision finding Mr. Estep in contempt of the Cease and Desist Order. He concluded that the citizen complaint was unfounded but that the Supreme Court issue should be referred to the Attorney General's office.

**Thomas McElhone** was sworn and testified that he has known Mr. Estep for 25 years. A few years ago, he sought Mr. Estep's services with respect to his brother's estate. Mr. Estep acted as personal representative of the estate and assisted Mr. McElhone in resolving an issue regarding the sale of his brother's house. Mr. Estep never gave Mr. McElhone legal advice. Mr. McElhone was satisfied with Mr. Estep's professionalism and had no reservations regarding his competence, ability or knowledge.

On cross-examination, Ms. Gadbois introduced as evidence Mr. McElhone's claim form submitted to the Consumer Protection Unit to be reimbursed for legal fees paid to Mr. Estep. (State Exhibit D (2/18/09)). Mr. McElhone testified that he submitted this form on Mr. Estep's recommendation. The form indicated that he paid Mr. Estep $4,176 for probate or estate administration services.

**Robert H. Hallsted, Jr.** was sworn and testified that while he has a law degree, he is no longer practicing as an attorney. Four years ago, he worked for Mr. Estep for

15

two months. Mr. Hallsted researched the issue of multi-disciplinary practice for Mr. Estep. At that time, he came to the conclusion that only two people can write a will. An attorney can write a will and an individual can write his or her own will.

On cross-examination, Mr. Hallsted testified that while he felt that a multi-disciplinary practice was viable, the ODC would not accept it, and subsequently he terminated his relationship with Mr. Estep. Mr. Hallsted prepared wills for Mr. Estep's clients, whom he felt were his clients.

**Thomas McCracken** was sworn and testified[3] that he is an attorney and member of the Delaware bar but no longer practices law. Mr. McCracken previously worked for Mr. Estep. He was not sure whether he was an employee or independent contractor. He entered into a Memorandum of Understanding with Mr. Estep on August 8, 2006 (Respondent's Exhibit E (2/18/09)). The Memorandum set forth Mr. McCraken's anticipated role with respect to estate matters. The Memorandum indicated that Mr. McCracken would draft needed documents to implement the estate plan and would meet with the client to explain the documents, answer any questions and execute the documents.

With respect to preparation of will documents, Mr. McCracken reviewed documents sent to him by Mr. Estep's office to ensure that they complied with Delaware law. He did not offer an opinion as to whether the documents represented the client's wishes.

In reviewing his testimony before the Board on the Unauthorized Practice of Law (Respondent's Exhibit G (2/18/09)), Mr. McCracken stated that at the time of the signing

---

[3] Prior to beginning his testimony, Mr. McCracken was advised by Board counsel of his right not to incriminate himself with respect to questions eliciting testimony that could lead to criminal charges.

16

of the will documents, when he met with the client, there existed an attorney-client relationship. Mr. McCracken further testified at that hearing that he did not review the client file prior to meeting with the client.

In reviewing the Supreme Court's decision from August 15, 2007 (Respondent's Exhibit H (2/18/09)), Mr. McCracken agreed with the statement that his role with respect to the will documents was to ensure that they complied with Delaware law. He did not exercise independent judgment, give legal advice or ensure that the documents expressed the client's wishes. These facts conflicted with the Memorandum of Understanding. Mr. McCracken agreed that, during client meetings, he would thoroughly explain the documents.

On cross-examination, Mr. McCracken stated that his dealings with Mr. Estep did not comply with the Memorandum of Understanding. Specifically, Mr. Estep did not transfer client files to him, he did not enter into engagement letters with clients, and he did not draft any legal documents. Further, he did not bill clients directly. He did not make any untrue statements when he testified before the Board on the Unauthorized Practice of Law. He was not offered a "deal" before he testified before that Board. He terminated his relationship with Mr. Estep when he became aware of ODC's actions against Mr. Estep. Mr. McCracken felt that, in dealing with estate clients, Mr. Estep did what he felt was in their best interests.

17

## The State's Rebuttal Evidence[4]

**William Prettyman** was sworn and testified that he is a special investigator with the Consumer Protection Unit at the Delaware Department of Justice. In January 2006, he was assigned to investigate consumer complaints against Mr. Estep. He was the only investigator assigned to the matter. With respect to the affidavit of Betty Treml, Mr. Prettyman stated that he never spoke with Ms. Treml.

Mr. Prettyman testified that he took a photograph of a billboard located on Kirkwood Highway in New Castle County. The billboard advertised Mr. Estep's services and included a reference to wills, trusts, probate and estate administration. (State's Exhibit F (2/18/09)). Mr. Prettyman reviewed Mr. Estep's advertisements from the yellow pages section of telephone books from 2003 – 2004, 2005, and 2006. *Id.* Mr. Estep's firm was included in the "Lawyers" section and his advertisements in the "Accountants" section referenced estate and probate services, wills and trusts.

On cross-examination, Mr. Prettyman agreed that the advertisements did not indicate that Mr. Estep was an attorney or that he was providing legal services. An investigator from the Department of Justice went to Mr. Estep's office in an undercover capacity to ask for preparation of a will. Mr. Prettyman did a criminal background check on Mr. Estep, which revealed that Mr. Estep was a convicted felon, which resulted in him being ineligible to probate wills in the Register of Wills.

**Timothy Mullaney, Sr.** was sworn and testified that he is the Director of the Fraud and Consumer Protection Division of the Delaware Department of Justice. Mr.

---

[4] Mr. Estep objected to the State's rebuttal witnesses on the grounds of notice. Ms. Gadbois responded that notice was not required and the witnesses would rebut Mr. Estep's evidence placing his character at issue. The Board overruled Mr. Estep's objection finding that presentation of rebuttal witnesses was permissible as long as such presentation was limited to issues presented in Mr. Estep's case.

18

Mullaney was involved with the Chancery Court litigation against Mr. Estep. That case was resolved with a Stipulated Consent Order and Agreement, which was signed shortly before the case went to trial. (State's Exhibit 3-1 (3/18/09)). The judgment against Mr. Estep was $582, 355, with $382,355 to be distributed to consumers as partial reimbursement for payment of estate administration fees. By reviewing Mr. Estep's records, the Consumer Protection Unit identified consumers who had paid for such services. Claim forms were sent to the consumers. (State's Exhibit 3-3 (3/18/09)). The Consumer Protection Unit received 259 returned forms. The consumers who received reimbursement received approximately 52% of what they had paid Mr. Estep.

Mr. Mullaney read into the record the affidavits of Lisa Cummings and Patrick Taylor, in which both individuals alleged that Mr. Estep had engaged in wrongful conduct in connection with rendering estate planning services. (State's Exhibits 3-4 and 3-5 (3/18/09)).[5]

On cross-examination, Mr. Mullaney agreed that, in the Stipulated Consent Order, Mr. Estep had not admitted any impropriety. The State further stipulated that there was no admission or finding of guilt in the Chancery Court action.

**Patricia A. Rosemary** was sworn and testified that she first met Mr. Estep in 1999 when he prepared a will for her and her husband. Ms. Rosemary's son James died suddenly in November 2004. At that time she returned to Mr. Estep to revise the will, because James had been the executor. Ms. Rosemary and her husband entered an agreement with Mr. Estep for him to probate James' estate. They told Mr. Estep that they wanted to sell their son's house located in Claymont. It was Ms. Rosemary's

---

[5] Mr. Estep objected to admission of the affidavits. The Board overruled this objection on the grounds that the evidence addressed Mr. Estep's denial that he had engaged in fraudulent conduct.

19

understanding that the house was sold to a female client of Mr. Estep's whose first and last names began with "P." At the closing, Ms. Rosemary recalled seeing the woman's name listed on numerous documents. However, the agreement of sale provided to the Rosemarys in the course of the Chancery Court litigation listed Kieran Farrell as the buyer with the purchase price as $115,000. The HUD settlement sheet listed Mr. Estep as the borrower with the purchase price as $120,000 and a settlement date of January 27, 2005. "Cash to the seller" at settlement is listed as $26,881.95, which the Rosemarys did receive. Mr. Estep signed the HUD settlement sheet as "buyer." (State's Exhibit 3-6 (3/18/09)). Ms. Rosemary stated that she never sold her son's house to Mr. Estep.

In connection with the Chancery Court litigation, Ms. Rosemary also received a second agreement of sale for her son's house. *Id.* at 7. This agreement of sale, dated June 6, 2005, lists the seller as "the Estate of James Rosemary" and the buyer as "the Claymont Fire Company #1." The purchase price was $218,500. This second agreement of sale indicates, in the section marked "Seller's Address," "c/o Ralph Estep, Administrator for Estate." Ms. Rosemary testified that she and her husband had only given Mr. Estep power of attorney so that he could conduct probate. Ms. Rosemary had no idea that, about seven to eight months after her son died, Mr. Estep was negotiating the sale of his house.

Ms. Gadbois directed Ms. Rosemary to a deed, dated June 24, 2005, which she had never seen before, indicating that she and her husband deeded the property to the Claymont Fire Company. *Id.* at 13. Further, Ms. Rosemary had never seen the HUD settlement statement, which listed the settlement date as June 24, 2005, and indicated that the seller, the Estate of James Rosemary, would be paid $89,885.73. *Id.* at 15. Mr. Estep

20

never told Ms. Rosemary that he had sold the house to the Claymont Fire Company or that the "Estate of James Rosemary" had been paid $131,989.94 for the sale of the house. *Id.* at 17. She never gave him power of attorney to go to settlement of the house in June 2005.

Ms. Rosemary testified that she did not feel that Mr. Estep had been honest in his dealings with her son's estate.

On cross-examination, Ms. Rosemary agreed that she had discussed with Mr. Estep the idea of renovating her son's home prior to sale, but she concluded that she would not recover the cost on sale of the house, so she decided to sell it "as is." Her objection to Mr. Estep buying the house for $120,000 was that he did not inform her that he was the purchaser.[6]

Mr. Estep introduced into evidence a sales contract, dated January 27, 2005, which indicated that the Rosemarys sold James' house to Mr. Estep for $120,000. (Respondent's Exhibit 3-1 (3/18/09)). Ms. Rosemary testified that she had never seen this document, had never sold the property to Mr. Estep and did not believe that the document was authentic.

**Mary Ann Shea** was sworn and testified that she first contacted Mr. Estep in March 2006 in connection with her elderly aunt, who wanted a new will prepared. She found Mr. Estep's name in the "Attorneys" section of the telephone book. When Ms. Shea called Mr. Estep, she asked him to come to her aunt's home due to her illness. During Mr. Estep's first visit to her aunt's home, Ms. Shea believed that Mr. Estep was a lawyer. During the meeting, Ms. Shea's aunt explained to Mr. Estep what she wanted in her will. She did not need powers of attorney, because those had been previously

---

[6] In his cross-examination, Mr. Estep, in effect, admitted that he had purchased the home.

21

prepared. When Mr. Estep left, he took the powers of attorney. Ms. Shea gave them to him because she wanted to ensure that they had been done properly.

When Mr. Estep returned for his second visit, he brought two women and an attorney with him. Mr. Estep presented powers of attorney and a lengthy will. Ms. Shea's aunt was having difficulty signing the paperwork, and Mr. Estep offered to sign for her. Ms. Shea also noticed that the document had already been signed and notarized.

Ms. Shea's aunt became involved in an argument regarding Mr. Estep's fee, which was $1,200. As Mr. Estep was leaving, Ms. Shea asked for an accounting of the fee, and Mr. Estep advised that he had hired an attorney. This was the first time that Ms. Shea learned that Mr. Estep was not an attorney. She subsequently went to Mr. Estep's office to get her aunt's paperwork, in particular, the powers of attorney. Mr. Estep refused to return the paperwork and told Ms. Shea that it had been shredded.

**Nancy Salley** was sworn and testified that she lives with Robert Gardner but has never been married to him and has no children with him. Nancy Jennifer is Ms. Salley's daughter. Mr. Estep prepared a will for her. Ms. Gadbois directed Ms. Salley to a claim form in her name, in which she requested reimbursement for will services performed by Mr. Estep. (State's Exhibit 3-8 (3/18/09)). Ms. Salley stated that she was not familiar with the document.

**Nancy Jennifer** was sworn and testified that she is Ms. Salley's daughter and indicated that Mr. Gardner is not her father. She prepared her mother's claim form for reimbursement for payment of legal fees to Mr. Estep. *Id.* She also prepared Mr. Gardner's claim form. (State's Exhibit 3-9 (3/18/09)). Submission of these claims did

22

not mean that they were dissatisfied with Mr. Estep's services. They believed that if they did not request the funds, they would go back to the State of Delaware.

She recalled that, in connection with Mr. Gardner's 2006 will, Mr. McCracken came to Mr. Gardner's home, with Mr. Estep. Mr. McCracken determined that Mr. Gardner was competent to execute the will.

**Gulson Estep** was sworn and testified that she has been married to Mr. Estep for six years. She performs clerical work for Mr. Estep in his Chadds Ford office. She signed Mr. Gardner's February 27, 2006 and August 8, 2006 wills as a witness.

**Ralph V. Estep** was sworn and testified regarding State's Exhibit 3-12 (3/18/09), which included his "Real Estate Planning Questionnaire" for Mr. Gardner. This document indicated that Ms. Jennifer and Mr. Estep would be executors of the estate and that Mr. Estep would be hired to provide all accounting and financial services. Mr. Estep was also listed as an alternate power of attorney.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Board has considered the sworn testimony and exhibits presented. The State has the burden of proving the claims set forth in the Complaint by a preponderance of the evidence.

As a threshold matter, the Board first addressed the State's argument that Mr. Estep was barred from relitigating the matters decided by the Delaware Supreme Court in connection with the disciplinary case before the ODC. The Board found that, pursuant to the doctrine of collateral estoppel, Mr. Estep was bound by the Supreme Court decisions pertaining to the ODC matter. *See In the Matter of Ralph V. Estep,* 931 A.2d 1006, 2006 WL 3062763 (Del. 2006); *In the Matter of Ralph V. Estep,* 933 A.2d 763 (Del. 2007).

23

Collateral estoppel bars a party from relitigating a factual issue previously litigated. For collateral estoppel to apply, the following four factors must be present: 1) the issue previously decided is identical to the issue at bar; 2) the prior issue was finally adjudicated on the merits; 3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and 4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *See City of Newark v. Unemployment Ins. Appeal Board*, 802 A.2d 318, 323 (Del. Super. 2002); *Ingram v. 1101 Stone Associates LLC,* 2004 WL 691770 (Del. Super.).

In this case, the requirements for application of collateral estoppel had been satisfied. First, the issue previously decided, regarding Mr. Estep's unauthorized practice of law, was the factual basis of the Complaint. The matter was fully adjudicated on the merits, as evidenced by the two Supreme Court decisions. The party against whom the doctrine was evoked, Mr. Estep, was a party in the Supreme Court proceedings. Finally, as explained by his attorney, Mr. Rhodunda, Mr. Estep had a full and fair opportunity to litigate the issues presented in the Supreme Court. The circumstance that Mr. Estep may have signed the Admissions in the interests of expedience did not impact his opportunity to litigate the matter.

Therefore, Mr. Estep was precluded from contesting the factual issues decided by the Supreme Court. In particular, he was bound by the finding that he violated the cease and desist order by rendering legal advice related to Delaware estate law and by drafting legal documents. In short, the Board accepted the factual assertions set forth in the Complaint at paragraphs 1 – 16.[7]

The Board then turned to the State's specific claims against Mr. Estep.

---

[7] The State stipulated that it withdrew its claims related to the Deceptive Trade Practices Act.

24

In paragraph 17 of the Complaint, the State alleged that Mr. Estep's "conduct in advertising and rendering legal advice and legal services and continuing to advertise and render such services after he agreed under oath to immediately cease such activities on June 6, 2006, violated 24 *Del. C.* §117(2) in that he engaged in acts of fraud in the practice of accounting and engaged in dishonorable, unethical or unprofessional conduct intended to or likely to deceive, defraud or harm the public."

The Board found that the State failed to meet its burden of proof with respect to Mr. Estep advertising legal advice and services. The Supreme Court found that Mr. Estep had not engaged in such advertising after June 6, 2006, and the Board concluded that it was bound by this finding. *See In the Matter of Ralph V. Estep,* 933 A.2d 763, 773 (Del. 2007).

However, the Board found that the State met its burden of proof with respect to the allegations that Mr. Estep's conduct constituted dishonorable, unethical or unprofessional conduct, in violation of 24 *Del. C.* §117(2).[8] Mr. Estep had violated his June 6, 2006 Admissions, and a Supreme Court order, in continuing to provide legal services to his clients. Such conduct, in and of itself, was dishonorable, unethical and unprofessional.

Further, as stated by the Supreme Court, Mr. Estep intentionally misled his clients with respect to the rendering of legal services. *Estep,* 933 A.2d at 769. Contrary to representations to the clients, Mr. Estep, or his employee, not attorney McCracken, prepared the documents. Mr. McCracken never determined whether the documents

---

[8] The Board concluded that the evidence did not rise to the level of establishing that Mr. Estep engaged in acts of fraud in the practice of accounting.

carried out the clients' wishes. *Id.* As Mr. McCracken testified, he merely reviewed the documents for technical compliance with legal requirements.

The Board also found the testimony of Ms. Rosemary and Ms. Shea to be pertinent to Mr. Estep's honesty, ethics and professionalism. Ms. Shea testified that she thought that Mr. Estep was an attorney. Mr. Estep made numerous misrepresentations to the Rosemarys in connection with their son's estate and the sale of his house.

In paragraph 18 of the Complaint, the State alleged that Mr. Estep's conduct violated 24 *Del. C.* §117(6) in that he violated a provision of the Board's licensing law or a rule or regulation established thereunder. The Board found that, pursuant to Board Rule 2.1, the State met its burden of proof with respect to paragraph 18. Board Rule 2.1 provides that "[a] certified public accountant, or a public accountant holding a certificate or permit issued by this Board, agrees to comply with the Rules of Conduct contained in the Code of Professional Ethics of the American Institute of Certified Public Accountants ["AICPA"]."

The Board first found that Mr. Estep violated ET[9] Rule 201(A), which states, with respect to "professional competence," that an accountant shall "[u]ndertake only those professional services that [he or she] can reasonably expect to be completed with professional competence." The facts found by the Supreme Court established that Mr. Estep drafted wills and practiced law without a license. *Estep,* 933 A.2d at 771. Clearly, as an accountant, Mr. Estep lacked the professional competence to render such services.

The Board also found that, in connection with his dealings with Ms. Rosemary, Mr. Estep violated ET Rule 102, pertaining to integrity and objectivity: "In the performance of any professional service, [an accountant] shall maintain objectivity and

---

[9] "ET" references provisions in AICPA's code.

26

integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others." As Ms. Rosemary testified, and as Mr. Estep admitted, Mr. Estep did not disclose to the Rosemarys that he was the purchaser of their son's home. In dealing with the Claymont Fire Company, he represented that he was acting on behalf of the son's estate, when he was not authorized to do so. Throughout the transactions, he was acting in his best interests, and not in the best interests of his clients, the Rosemarys.

In paragraph 19, the State alleged that Mr. Estep's conduct was unprofessional and violated ET Section 53, pertaining to the public interest. Section 53 provides that an accountant "should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism." The Board found that the State met its burden of proof with respect to paragraph 19. As noted herein, Mr. Estep drafted wills for clients when he lacked the competence, education and training to do so. In the case of the Rosemarys, he consistently acted in his own best interests, and entirely disregarded the instructions, wishes and interests of the Rosemarys.

In paragraph 20, the State alleged that Mr. Estep's conduct was unprofessional and violated ET Section 56, Article V.03, pertaining to due care and competence. Specifically, the State alleged that Mr. Estep "failed to recognize the limitations of his capabilities by consulting with or referring clients to an attorney when professional engagements exceeded his personal competence and license as Respondent lacked the education, experience and professional license to render legal advice and services." Article V provides that an accountant "should observe the profession's technical and

27

ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of [his or her] ability."

The Board found that the State met its burden of proof with respect to paragraph 20. The Supreme Court concluded that Mr. Estep drafted wills and practiced law without a license. *Estep,* 933 A.2d at 771. Clearly, as an accountant, Mr. Estep lacked the professional competence to render such services, and he was ethically and legally obligated to refer his clients to an independent attorney. The Board noted that Mr. Estep's lack of competence also violated ET Rule 201(A), as set forth above.

Finally, in paragraph 21, the State alleged that Mr. Estep's conduct violated ET Rule 502 in that he "sought to obtain clients by advertising or other forms of solicitation in a manner that is false, misleading or deceptive." The State further asserted that Mr. Estep's advertising "contained representations that were likely to cause a reasonable person to misunderstand or be deceived as to his authority and ability to render legal advice and service."

The Board found that the State met its burden of proof with respect to paragraph 21. In support of this finding, the Board relied on the testimony of William Prettyman, an investigator with the Department of Justice, and State's Exhibit F (2/18/09). The testimony and documents showed that Mr. Estep advertised his firm in the "Attorneys" section of the telephone book. The Board gave no credibility to Mr. Estep's testimony that it was not his fault that his advertisement was placed in the wrong location in the telephone book. It was clear that Mr. Estep intentionally engaged in misleading advertising.

28

Having found that the State met its burden of proof with respect to various claims against Mr. Estep, it was incumbent upon the Board to determine the appropriate sanctions. In considering the sanction to be imposed, the Board noted that the matter before it did not concern Mr. Estep's accounting work. Rather, at issue was Mr. Estep's rendering of legal services without the necessary training or education and in flagrant violation of his own Admissions and a Supreme Court order. Further, the evidence established that Mr. Estep engaged in self-dealing and made countless misrepresentations to clients, as demonstrated by his dealings with the Rosemarys. The Board thus concluded that Mr. Estep's conduct demonstrated an absence of the professionalism, character and integrity essential to the practice of accountancy.

Given these circumstances, the Board enters the following order against Mr. Estep:

29

## ORDER

Having considered the evidence presented, and by a unanimous vote of five members, the Delaware Board of Accountancy hereby orders as follows:

1.      Ralph V. Estep shall be fined $2,000.

2.      Ralph V. Estep's license shall be suspended for 12 months, to be followed by not less than 24 months of probation, with said probation to be subject to the following conditions:

   a. Mr. Estep shall not render legal services or legal advice to clients, in particular, pertaining to estate law, and shall not draft wills, trusts, powers of attorney (other than those related to the Internal Revenue Service), healthcare directives or deeds. To clarify, Mr. Estep may render estate planning services but shall not draft the related legal documents or filings;

   b. Mr. Estep shall not violate any of the provisions of Chapter 1 of Title 24, any Board of Accountancy Rule or Regulation, or any of the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants;

   c. Mr. Estep shall have no business dealings with his clients, other than the delivery of services in the normal course of acting as a public accountant;

   d. Mr. Estep shall not act in a representative capacity in the Register of Wills;

30

e. Mr. Estep shall only use letterhead that accurately reflects the current credentials of the listed individuals, with the credentials in full appearing next to each individual's name, rather than by reference or key;

f. Mr. Estep shall engage in no acts discreditable to the profession of accountancy;

g. Mr. Estep shall submit quarterly reports to the Board, beginning three months after the date of mailing of this Decision and Order, specifically attesting that he has complied with the above terms and providing a copy of his current letterhead; and

h. Any violation by Mr. Estep of the terms of his probation may result in further disciplinary proceedings with further sanctions, up to and including revocation of his license.

**IT IS SO ORDERED** this 16th day of September, 2009.

**DELAWARE BOARD OF ACCOUNTANCY**

Sharron Cirillo

David Doane

James A. Cohee

Michael D. Wollaston

Robert Mosch

31

Date mailed: 9/17/09

## APPEAL RIGHTS

29 *Del. C.* § 10142 provides:

(a) Any party against whom a case decision has been decided may appeal such decision to the Court.

(b) The appeal shall be filed within 30 days of the day the notice of the decision was mailed.

(c) The appeal shall be on the record without a trial de novo. If the Court determines that the record is insufficient for its review, it shall remand the case to the agency for further proceedings on the record.

(d) The court, when factual determinations are at issue, shall take due account of the experience and specialized competence of the agency and of the purposes of the basic law under which the agency has acted. The Court's review, in the absence of actual fraud, shall be limited to a determination of whether the agency's decision was supported by substantial evidence on the record before the agency.