# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 3:22-cv-1518-RBD-LHP

MICHAEL EDGE, Individually and
On Behalf of All Others Similarly Situated,

       Plaintiff,

vs.

TUPPERWARE BRANDS CORPORATION,
MIGUEL FERNANDEZ, and CASSANDRA HARRIS,

       Defendant.
_____/


DEPOSITION OF:    RALPH V. ESTEP

DATE:             Wednesday, April 17, 2024

TIME:             10:14 a.m. - 3:11 p.m.

TAKEN BY:         Defendant

PLACE:            Via Zoom

REPORTED BY:      Sara Miller, Notary Public
                  State of Florida

Page 45

should be able to click that.  There's a header line
at the top that says Exhibit 001 and then there's
a -- like a hash mark or a half arrow right to the
left of that that hopefully will work.

        A.    I'll do it again.  Okay.  That did take
me back, yes.  And you want Exhibit 2 open now?

        Q.    Yes, please.

        A.    Okay.  Okay.  I have that.

        Q.    Do you see a document that should be
stamped in the lower right corner Exhibit 002 Estep?

        A.    Yes, I do.

        Q.    Have you seen this document before?

        A.    I have.

        Q.    And what is it?

        A.    Well, just like I said, this was the
first amended Class Action Complaint of -- what do
you want to know about it?

        Q.    Do you know if there's any differences
between this document and the complaint that I showed
you that I marked as Exhibit 1?

                MR. WERNKE:  Mr. Estep, take as much time
        as you need to review any documents that are put
        before you in order to compare them.

                THE WITNESS:  I don't recall much in a
        way of important information changed other than

the coplaintiffs being changed to Michael and myself.

BY MR. ROSS:

Q.   Other than the class period and the coplaintiffs changing, do you recall anything else that changed in the different versions of the lawsuit in this case?

A.   No, I do not.

Q.   Do you know whether you reviewed the first amended Class Action Complaint before it was filed?

A.   No.  I don't remember but I'm sure I didn't.  I didn't know anything about it.

Q.   Do you know if you read any version of the complaints in this case before they were filed?

A.   No, I can't give you specifics, but Mr. Wernke has been very good at sending me copies of everything before it's filed so I presume I did.

Q.   With respect to the Class Action Complaints specifically, do you have any recollection reviewing those complaints before they were filed?

A.   Which one are we talking about?  The initial or the first amended?

Q.   You had responded that Mr. Wernke generally sends you things before they're filed.  I'm

talking about the same thing.  Mr. Estep, do you see a paragraph in what you're looking at that starts at paragraph 7, the first word is however.

A.   That's correct.

Q.   So hopefully we're all looking at the same thing.  Do you see a reference in the third line there, sir, the first part of the sentence and again, feel free to read the whole thing to yourself, it says according to a confidential witness?

A.   Okay.  I understand what it is, what they're asking, sir.

Q.   Sir, you saw the reference in paragraph 7 to a confidential witness?

A.   Right.

Q.   And you see in the remainder of the paragraph it appears to summarize information that that confidential witness provided?

A.   Yes, I see that.  This confidential witness, his or her opinion is the promises of the president were not carried through.

Q.   Do you know who that confidential witness is?

A.   I do not.

Q.   Have you ever reviewed any notes, recordings or statements by this confidential

witness?

A.   I have not.

Q.   Have you reviewed any recordings, notes or statements by any confidential witness who provided information related to this matter?

A.   No, I have not.

Q.   Did you do anything to investigate or determine whether or not what the confidential witness had said that was included in this complaint was true?

A.   Only I haven't made any inquiries but just from reading it, I felt pretty comfortable that there is some basis of truth there.

Q.   And what was the reason that you felt comfortable that there was a basis for truth?

A.   I think it would be quite inappropriate for my own attorney to be lying to me.

Q.   You trusted your attorney, that was the basis for you to believe it was true?

A.   Absolutely.

Q.   Okay.  Did you have any independent knowledge or perform any independent investigation to determine whether or not anything that the confidential witness said in the first amended Class Action Complaint was true?

Q.   And are you aware of an assignment of rights or property from you -- from Mr. Dennehy to you in connection with this case?

A.   Was I aware of it?

Q.   Are you aware of a transfer from Mr. Dennehy to you of rights or properties relating to this case?

A.   Of course.

Q.   And what was transferred under this assignment?

A.   Representing his I believe 20 thousand shares that I purchased on his behalf.

Q.   And was this a written assignment or was it an oral agreement?

A.   It was a written assignment.

Q.   Do you know who prepared that assignment?

A.   I believe it was the Bromstein firm.

Q.   Do you know whether that assignment is still in effect?

A.   Yes, it is.

Q.   If Mr. Dennehy transferred his rights in connection with this case to you, do you know whether Mr. Dennehy has any right to continue as lead plaintiff for his own claims?

MR. WERNKE:   Object to form.   You can

Page 62

answer to the extent you understand, Mr. Estep.

THE WITNESS:  You're getting into legal matters.  I'm an accountant, not an attorney.

BY MR. ROSS:

Q.   Sir, do you have an understanding -- or understand that if the answer is I don't know, that's fine.  Do you have an understanding if whether someone transfers their rights to someone else, that person who has transferred their rights can no longer assert those rights?

MR. WERNKE:  Object to form.  You can answer to the extent you can.

THE WITNESS:  I don't know the answer to that question.  I presume it's like a lot of things in law, you can't give up your own legal rights or you can't be made to hold your own legal rights.

BY MR. ROSS:

Q.   When you said that Mr. Dennehy had transferred his rights to you in connection with this case, what rights were those?

A.   To represent his purchase.

Q.   When you say his purchase, you mean his purchase of Tupperware stock?

A.   That's correct.

Page 63

Q.   Okay.  So his rights to seek to recover the losses relating to his Tupperware stock?

A.   That's correct.

Q.   Do you have an agreement with him about what's supposed to happen if you're able to recover those losses?

A.   No.

Q.   Do you know whether you're allowed to keep any portion of those losses or do they all go to him?

A.   I have to answer that with none of the above.  It's going to be prorated according to the number of shares that were purchased throughout the group of stock purchasers.

Q.   Did you have to compensate Mr. Dennehy as part of his agreements to assign you his shares?

A.   No.

(Exhibit No. 6 was marked for identification.)

BY MR. ROSS:

Q.   Sir, I'm going to ask you to pull up Exhibit No. 6 now.

A.   Okay.  I've got it.  It says Exhibit A on the first page.

Q.   That's correct.  If you can scroll down

Page 64

to the second page of Exhibit 6.  At the top of the page it should say assignment?

A.    It does.

Q.    Have you seen this document before?

A.    I have.

Q.    Is this the assignment that you've been discussing for the last few minutes?

A.    Yes.

Q.    Did Mr. Dennehy ask you to prepare this document?

A.    No, he did not.

Q.    Did you tell him that you wanted to represent him in this case?

A.    I did.

Q.    Okay.  And did he agree?

A.    Yes, obviously so.

Q.    Tell me how it was that you decided that you wanted to represent his interest in this case.

A.    How was it that I decided I wanted to represent him?

Q.    Yeah.  Was there something that caused you to contact Mr. Dennehy to ask him for his rights in this case?

MR. WERNKE:  And Mr. Estep, I'll just warn you in giving your answer, obviously you can

Page 65

answer the question, but in the course of that don't reveal the substance of any conversations you might have had with attorneys in the process of that.

THE WITNESS:  I did not make that decision to ask him for that as a result of any legal recommendation from any attorneys.  I did it because I thought it was the right thing to do since he was a client and I'm probably more familiar with such matters.

BY MR. ROSS:

Q.   Did you have any other clients who were invested in Tupperware at the time?

A.   I did.

Q.   Did you ask any of those other clients whether or not they wanted to assign their interests and rights in this case to you?

A.   I did.

Q.   How many clients did you ask that?

A.   I don't recall.

Q.   Do you think it was more than ten?

A.   No.

Q.   More than five?

A.   I simply don't know.

Q.   Do you have --

A.   It's simple as that.

Q.   Do you recall the names of any other clients who were asked to assign their rights to you?

A.   I simply don't know if I even did.  If you're referring to just one client, Michael Ward, yes.

Q.   Okay.  Well, let's set aside Mr. Ward for a second.  Other than Mr. Ward and Mr. Dennehy, were there any other clients whom you contacted to ask to have them assign their rights relating to Tupperware losses to you?

MR. WERNKE:  Object to form.  You can answer to the extent you can, Mr. Estep.

THE WITNESS:  I don't recall.  I don't remember any of my other clients that I put them into Tupperware stock.

BY MR. ROSS:

Q.   You mentioned someone named Michael Ward. Who is that?

A.   One of my clients.

Q.   Okay.  And that's someone that you contacted to ask if they were interested in assigning their rights in Tupperware stock to you?

A.   That's correct.

Q.   And when did you contact Mr. Ward and

make that request?

A.   I don't remember the date, but it was in close proximity to when I asked Michael Dennehy.

Q.   And what were the reasons that you contacted Mr. Ward and asked to have him assign you his rights?

A.   Same thing that I stated for Michael Dennehy.  Michael Ward would not really be familiar with such matters.  He was a UPS driver.  He didn't know anything about stock market.

Q.   Had Mr. Dennehy already agreed to his assignment of shares at the time you contacted Mr. Ward?

A.   I don't recall who was first.

Q.   Other than what you already said, were there any other reasons why you reached out to Mr. Dennehy to ask him to assign you his rights in Tupperware stock?

A.   I guess so we would have a more representative part of this litigation.

Q.   What do you mean by that?

A.   We would be the top dog in number of shares represented, probably putting us in first place as a lead counsel -- or lead plaintiff.

Q.   You were trying to increase the overall

number of Tupperware stocks or shares that you would be representing?

A.    That's correct.

Q.    And is that also the reason -- one of the reasons why you reached out to Mr. Ward?

A.    Oh, yes.  Same thing.

Q.    So other than that reason and the reason you already gave, was there any other reason why you reached out to Mr. Dennehy to ask him to assign you his rights in Tupperware shares?

A.    No.  Not that I can recall.

Q.    And the same question, sir, for Mr. Ward. Other than what we already discussed, were there any other reasons why you reached out to Mr. Ward to request that he assign you his shares and rights in Tupperware stock?

A.    No.  Not that I recall.

Q.    Has Mr. Dennehy ever told you that he wants to revoke or nullify or otherwise void this assignment?

        MR. WERNKE:  Object to form.  You can answer to the extent you know.

        THE WITNESS:  No.  He never approached me with that, no.

BY MR. ROSS:

Q.   Okay.  Have you heard that term before, revoke?

A.   Of course.

Q.   Okay.  Do you know whether or not this assignment has ever been revoked or attempted to be revoked by Mr. Dennehy?

A.   It was.

Q.   Okay.  And how did that happen?

A.   The mechanics of it, I have no idea, but whatever documentation would be required, it was done.

Q.   And how is it that you're aware that this assignment was at some point revoked?

A.   How was I aware that it was?

Q.   Yes.  Sir, you mentioned before, if I understood your testimony, that Mr. Dennehy never asked you to revoke or void this assignment, correct?

A.   Not that I can recall.

Q.   Okay.  But I thought you said after that, that you believe at some point it was revoked or voided?

A.   Well, it was.

Q.   Okay.  So when is it -- when is it that you believe that this assignment was revoked?

A.   I don't know.

Q.   How is it that you believe this assignment was revoked?

A.   I've heard it several times in various conversations.

Q.   Have you had those conversations with Mr. Dennehy?

A.   Yes.

Q.   Okay.  What is it that he told you about this assignment being revoked?

MR. WERNKE:  I'm going to caution the witness now to the extent you're talking about conversations that occurred, you know, through the -- through this litigation, I'm going to advise you not to -- not to answer the question. If these are conversations that you're having as part of the prosecution of this litigation.

THE WITNESS:  Then I'm not going to answer.  That's a correct statement.

BY MR. ROSS:

Q.   Okay.  You're going to follow your attorney's instruction and not answer that question, sir?

A.   I am.

Q.   So let me ask it another way, sir, and maybe you can answer this one but wait for your

Other than conversations with counsel, have you ever received any understanding that this assignment was revoked?

A.  I don't recall.  I really don't.

Q.  Have you ever seen anything in writing that says this assignment was revoked?

A.  I have not.

Q.  Did you agree that the assignment could be revoked?

A.  I don't think I had any choice in the matter.

Q.  So you have not agreed that the assignment has been revoked?

MR. WERNKE:  Object to form.

THE WITNESS:  Well, I do agree that the assignment was rejected.

BY MR. ROSS:

Q.  I understand that, sir.  I'm asking a slightly different question so let me ask it again, hopefully a little more clearly.  You said that you don't believe you had any choice in the matter.  Does that mean that you do not believe you had an option of agreeing or disagreeing that the assignment could

Q.   And let me ask it the opposite way.  Did you ever expressly consent to the revocation?

MR. WERNKE:  Object to form.

THE WITNESS:  Not that I recall.

(Exhibit No. 7 was marked for identification.)

BY MR. ROSS:

Q.   All right.  Thank you, sir.  Sir, can you please pull up Exhibit 7?

A.   Okay.  That says Exhibit B.

Q.   There should be at the bottom of the first page if you scroll down a stamp that says Exhibit No. 7.

A.   Yes.

Q.   And sir, you may not recognize the first page of this, but if you can turn to the second page. Please let me know if you've seen that document before.

A.   Yes, I have.

Q.   What is it?

A.   Well, it's a display of shares purchased with dates, quantities, for how much money.

Q.   Did you prepare this document?

A.   Absolutely not.

Q.   Okay.  Do you know whether it was printed

Page 77

reflected there the amount of losses that were in that account based on the sale?

MR. WERNKE:  Object to form.  You can answer.

THE WITNESS:  I presume they are accurate although I have not compared those to my own sources, my own documentation, but that looks about right.

BY MR. ROSS:

Q.   Do you recall why you sold all of these shares at the end of 2021?

A.   I felt that it was on its way down and to protect my investment from further loss.

Q.   Did you talk to Mr. Dennehy about selling his shares at that time?

A.   I don't recall.

Q.   What about Mr. Ward, do you recall having any discussions with him about whether he should sell his shares at that time?

A.   I do not.

Q.   Would it have been your practice if you had the same security position as your clients that when you decided it was a good idea to sell, you would have discussed with your clients the reasons why you thought that was a good idea?

A.   I have.

Q.   Did you prepare this document or was it prepared by the Bromstein firm?

A.   It was prepared by them.

Q.   The earlier assignment we looked at, and you can feel free to pull it up, if you would like, is dated August 2nd, 2022.  This one is December 2nd, 2022.  Do you see that?

A.   I do.

Q.   Do you know why this assignment was executed four months later?

A.   I don't.

Q.   Do you think you may have asked Mr. Ward closer to this time period, November, December 2022 for the first time to assign the shares to you or do you still believe you asked him around the same time you asked Mr. Dennehy earlier that year?

A.   I don't know.

Q.   Do you recall there being any delay in time between when Mr. Ward was asked by you to assign the shares to you and when he actually executed the assignment?

A.   Do I recall a delay of time?

Q.   Yes.

A.   Is the question?  I seem to recall that,

yes.  I think I remember that I was expecting it and I called him and asked him where it was and he ran home and got it and brought it back to me the same day I called him.

Q.  How much time do you think elapsed between the time you first talked to him about executing the assignment and when it was executed?

A.  I have no idea.

Q.  Were these assignments sent to Mr. Ward via e-mail to execute?

A.  I don't believe so.

Q.  You think you would have given to them in person?

A.  No.  I think I mailed it to both of them.

Q.  You said both of them.  You mean meaning Mr. Dennehy and Mr. Ward?

A.  That's correct.

Q.  So in both instances you believe you sent them the unsigned version of the assignment in the mail?

A.  That's correct.

Q.  Do you recall how they were returned to you?

A.  Michael brought his in person, Michael Ward.  Michael Dennehy, I don't recall how I got his.

Page 100

A.    To all the class members, yes.

Q.    To all class members, okay.  And what do you understand that fiduciary duty to entail?

A.    To maintain a position where I'm overseeing everything that the attorneys do, questioning the attorneys at reasonable intervals and making sure that any decision I make or suggestion be the best interest of the group.

Q.    Do you believe that you in your role as a proposed class representative have any duty to determine whether or not the allegations in the Class Action Complaints are accurate?

A.    I already believe that, so why would I change my mind?

Q.    My question was a little different, sir. So not whether you believe they're accurate.  Do you believe you have any duty to investigate or determine whether they're accurate?

A.    No.  You know, I rely on legal counsel for that.  I know what I know, but they're the ones that are actually conducting the investigation.

Q.    Do you know whether there's a trial date set in this case?

A.    I do not.

Q.    Do you know whether there's a deadline

A.    That's correct.

Q.    What percentage of your business over the last few years starting in 2020 has been accounting work and what percentage has been investment advisory work?

A.    95 percent accounting work.

Q.    Okay.  And is that consistent in the years prior to 2020 as well?

A.    Would that percentage be the same?  Is that what you asked?

Q.    Yes, sir.  Yeah.

A.    Yep.

Q.    So on the investment advisory side, do you know approximately how many clients you have currently?

A.    Right now ten.

Q.    Okay.  And has that number stayed the same within, you know, five or so over the last three years?

A.    Yes.

Q.    Has there ever been a time where you had significantly more than that number, like 25 clients on the investment advisory side?

A.    No.

Q.    Are there differences between the

but after you get a chance to take a look at it, let me know.

A. Engagement letters. Who was I sending this to? Michael three for you and one for Karen. These will cover your personal account -- oh, okay. (Witness reading under breath). I don't remember sending that specific e-mail, but do I remember that time in my life and circumstances, absolutely.

Q. You have no reason to doubt that you sent the e-mail reflected in Exhibit 20; is that right?

A. Say that again, sir.

Q. You have no reason to doubt that you sent that e-mail, is that correct?

A. No, I really don't. I probably did. I remember it very well that one of the accountants I caught stealing was actually taking my client records home. The other we caught writing checks out of a client's account and they posted within the same week when we discovered it.

Q. The investment that Mr. Dennehy -- that you had made for him at the Tupperware, do you know what percentage of his retirement savings went into that invest ment?

A. I do not.

Q. Do you know if it was more than half?

Page 145

Q. Right. And then this version of it with your handwriting on it and the highlighting, you think this also came from your computer?

A. Well, yeah. The initial printing and then I started adding things up.

(Exhibit No. 24 was marked for identification.)

BY MR. ROSS:

Q. All right. Sir, I'm pulling up a new document. I'm going to have this labeled Exhibit 24. In the lower right-hand corner you can see it says Estep 10. Do you see that?

A. Yes.

Q. Have you seen this document before?

A. I don't recall it, but probably so.

Q. Do you know what this is?

A. Well, it was a trade date on 10/4 and I bought 20,000 shares of Tupperware.

Q. And do you see the account name listed there is Michael Dennehy?

A. Yes.

Q. Do you know whether or not this would have been the purchase on his behalf for his account?

A. Yeah. That's the only one there was, yeah.

A.    Yes.

Q.    Why did you purchase Tupperware stock on Mr. Ward's behalf in July 2021?

A.    Specific reason, I couldn't tell you. What was my purchase price?  Is that an 18 or 19.41?

Q.    I can scroll in if that's helpful.

A.    19.41.  Something at the time led me to believe it was a trustworthy investment.

Q.    You don't recall anything specific about that decision, though?

A.    I do not, no.

Q.    Do you recall whether you considered buying Tupperware for your own account in July of 2021?

A.    I could very well have.  I don't recall but I could have.

Q.    You could have considered it or you could have actually made purchases.  Which one are you saying?

A.    Both.

Q.    Do you know whether or not you did make any purchases in July of 2021 for any of your own accounts?

A.    No.  That's what I say, I don't recall.

Q.    Did you talk to Mr. Ward in July of 2021

A.   I had it around from I'm not sure, early '80s, '81, '82 until three or four years ago.

Q.   Why is it you're no longer carrying that license?

A.   My license was revoked by the Board of Accountancy.

Q.   Why is that?

A.   Well, it's a long story but there had been a disagreement -- well, a position that the board took in reference to me hiring attorneys and having attorneys on staff and doing wills, estates, and trusts.  They felt it was appropriate to take my license for a year, which they did.  After serving my year, at the end of it was looking to, you know, resurrect my name, if you will, because I was taken down from all signs and I was working with Reuben H. Donnelley at the time.  That's the out pages, the yellow book, and worked out a plan of ads in there. And between the time that I spoke to him and the book actually came out and published, instead of marking it down as my name and title Ralph V. Estep EAPA, they put CPA.  Well, I'm not a CPA.  Never have been. So we went to the Board of Accountancy called me back in and said why had I done that?  And I said I didn't do it on purpose, that's for damn sure.  Of course

Q.   Are those licenses still active?

A.   No.

Q.   When did those go inactive?

A.   Around the same time.  35 years or more ago.

Q.   Other than what we've discussed, have any other licenses been revoked for disciplinary action?

A.   No.  The only license revoked has been my accounting license.

Q.   Have you ever -- I'm sorry.

A.   Nothing else has ever been revoked.

Q.   Have you ever registered as an investment advisor?

A.   No.  Yes, I did.  Boy, that would have been around 1969 or '70 and that was with Legg Mason and I'm trying to remember the name of it but I want to say it was something about licensing under the 1930 something or other.  I don't remember much more about it, it was so long ago.

Q.   You're not currently licensed as an investment advisor?

A.   No.

Q.   Have you ever filed an application or sought to be reregistered?

A.   No, I have not.

Page 166

tickets or red light or something like that.

Q.   I'm talking about like a misdemeanor or a felony charge.

A.   No.

Q.   Have you been convicted of any misdemeanor or felony charge?

A.   Misdemeanor, yeah.

Q.   Okay.  What have you been convicted of?  What misdemeanor charge have you been convicted for?

A.   Let's see, I've been married 22 years so it has to be before that.  I'd say 24 years ago, perhaps 25, my wife and I had gone on vacation to the Bahamas and I was attacked and severely beaten.  I ended up in a hospital.  Went home the next day and of course my wife did what she typically did do was drink and take drugs and she called the police and said I threatened to kill her and that ended up with a misdemeanor.

Q.   Do you know what the charge was?

A.   Terroristic threatening.  Don't hold me to that but I think that's what it was.

Q.   You said terroristic threatening?

A.   Yes.

Q.   Other than what we talked about, have you been arrested on any other occasion?

Page 169

BY MR. ROSS:

Q. All right. Sir, let me pull up another document. Can you see the document in front of you, sir?

A. Yes, sir.

Q. Can you see it says verification at the top of the page?

A. Yes, I see it. Yes.

Q. Okay. I actually just showed this to you in connection with the interrogatories we looked at a few moments ago, but do you recall executing this verification?

A. I do.

Q. And that's your signature on this page?

A. It is indeed.

(Exhibit No. 29 was marked for identification.)

BY MR. ROSS:

Q. All right. Thank you for that. All right, sir, I'm pulling up another document I'm going to have marked as Exhibit 29. You can see this is dated July 20th, 2022. You see it says, summary order to cease and desist?

A. Yeah. I see that, yeah.

Q. I'm happy to scroll through this.

Page 170

A.   Oh, yes.  Okay.  I know what it is.

MR. WERNKE:  Sorry to interrupt.  I'm not seeing 29 on the share drive -- on the share exhibit drive.

MR. ROSS:  Okay.  Let me -- no.  Let me -- that might be my fault.

MR. WERNKE:  No problem.

MR. ROSS:  Hopefully you'll see it now.

MR. WERNKE:  Yep.

BY MR. ROSS:

Q.   Okay.  Mr. Estep, you said you did recognize this document?  Did I hear you correctly?

A.   I do, yeah.

Q.   Okay.  So can you tell me what this is?

A.   Yeah.  This is -- it pertained to actually only one of my clients, but one of my clients, very nice elderly lady, she was left quite a bit from her deceased husband and it was being managed by a broker in Boston.  And several years ago she brought her paperwork in so I would pick up the dividends or whatever off of it and going through it I said, you know, you're not even earning one percent on this.  You ought to talk to your broker.  And I really left it at that.  And then whatever, a year or two year s later, I did a return again and it was

Page 171

still the same pathetic investment advice he had been giving her before and I sat down and wrote a letter to her outlining what my recommendations would be. Of course she took it to the other broker and he turned it into the state of Delaware and then I got this letter and that was the end of it.

Q.    Do you recall what, if anything, this ordered you to do?

A.    Yeah.  Stop giving investment advice.

Q.    And you followed those instructions?

A.    Well, let me restate that.  That's not really true.  I was prohibited by virtue of the cease and desist order from managing portfolios.  We agreed to disagree and if they want to bring an action against me for giving advice, I'll be happy to fight that one.  I mean, I am a degreed accountant.  I've been doing this a hell of a long time.  I know what's a good investment and what's not.

Q.    What's the difference, sir, between managing a portfolio and providing investment advice?

A.    Actually making decisions on what to buy, when to sell, when to purchase at what price as versus just telling someone who's invested in one particular type of market.  When it's a market that doesn't have much return, they ought to get rid of.

Page 174

Q.   Sir, have you ever passed any FINRA security exams?

A.   Have I ever passed a securities exam?

Q.   Yeah.  Have you ever taken any or applied for any FINRA securities accreditations?

A.   No.

(Exhibit No. 30 was marked for identification.)

BY MR. ROSS:

Q.   Mr. Estep, I am going to have this labeled as Exhibit 30.  Please take a moment to review it and let me know after you've had a chance to look at it.

A.   Okay.  I remember it, yes.

Q.   Have you seen this document before?

A.   Yep.

Q.   And what is this?

A.    It was at the end of my effort to provide Delaware citizens with a reasonable cost of estate planning documents and the attorneys who had been representing me throughout, you know, I said there has to be someway that I can do this or at least provide it.  And they said, well, you can't meet with the clients and if you have an attorney meet with the clients and they delivered it to the clients, then

you're out of it entirely.  Well, Supreme Court didn't agree with that statement.

Q.   And in this ruling it looks like you were to cease and desist the unauthorized practice of law.  Do you see that?

A.   Yes.

Q.   Do you recall if there was any other further proceedings related to this matter?

A.   No.  None whatsoever other than from there it went to the Board of Accountancy and that's why they took my permit for a year and they also sent a copy -- I should say a bunch of copies up to the counsel at the Internal Revenue Service, the ones who oversee my credential of enrolled agent and they sent me a letter of inquiry.  I called the lady, asked her if I could come up and see her.  I did and went to New York and met with her for half a day.  At the end of it she said what is their problem?  I don't see any problem here at all.  You're fine.  Goodbye.

(Exhibit No. 31 was marked for identification.)

BY MR. ROSS:

Q.   Give me one moment.  I'm going to pull up I think only two more documents here.  Sir, I just pulled up what I'm going to mark as Exhibit 31.  Take

Page 176

as much time as you need to review it.  This is actually a nine-page document, but let me know if you need me to scroll further.

A.    Well, I have them reversed.  This is the one after I made the changes to have no contact with my clients, I had my attorneys that were working for me do all of it, that's when they took me back in before the Supreme Court and they told me to stop, which I did and that's when the Board of Accountancy took my permit.

Q.    Have you seen Exhibit 31 before this decision?

A.    I don't know what Exhibit 31 is.  Forgive me.

Q.    Exhibit 31 is what I'm showing you now, this nine-page document.

A.    You said did I ever see it before?

Q.    Yeah.  Have you ever seen this decision before?

A.    Yeah.  Sure.

Q.    And do you see in the background summary it says that there was a petition filed based on a violation of a prior Supreme Court order directing you to cease and desist?  Do you see that?

A.    Yep.