# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

CASE NO. 6:22-cv-1518-RBD-LHP

MICHAEL EDGE, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

TUPPERWARE BRANDS CORPORATION, MIGUEL FERNANDEZ, and CASSANDRA HARRIS,

Defendants.

_____/

April 10, 2024

9:02 a.m. - 3:30 p.m.

DEPOSITION OF MICHAEL J. DENNEHY

TAKEN VIA ZOOM TELECONFERENCE

Taken on behalf of the Defendants before Alice J. Teslicko, Registered Merit Reporter, and Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition in the above cause.

A    Prior to this, no, he had not.

Q    When did he start serving as your investment advisor?

A    Right around -- it would have been around May of 2021, in that time, that area around there. The exact details are in my -- are in the complaint.

But as I recall, that was around the time when I asked him to get involved.

Q    Why did you decide to hire Mr. Estep to serve as your investment advisor?

A    I had a large amount of money and I needed help in managing it, and I asked him and he volunteered to step up.  He does this for other people and he said he could help me with that too, under the right circumstances.

Q    And that arrangement started, you think around May 2021?

A    Somewhere in that area, yeah.  The exact details are in the complaint, but it would be around that area.

Q    We'll talk a little bit more about that arrangement when we get into the complaint and other documents.  But for now, let's talk about the discussion you had with Mr. Estep around this case.

When, approximately, did that conversation

Page 47

A    Yes, I see it now.  Is it okay if I open it?

MR. POTREPKA:  Dr. Dennehy, there is a little, you know, toggle on the side of it that you can scroll up and down to look at as much of the document as you need to.

BY MS. WHEELER:

Q    So you can see here there are 24 pages in this document.  Do you see that?

A    Yes.  Yes, I see it.

Q    If you need any time to review something that I'm asking you about, just let me know and you can take the time that you need.

A    Okay, thank you.

Q    Do you recognize this document?

A    I do recognize this document.

Q    What is it?

A    It is the document that Mr. Edge filed, saying that he was initially concerned about what had happened with Tupperware and Mr. Fernandez and Ms. Harris.

Q    When did you first see this document?

A    It would have been several months ago.  I don't remember exactly when, but it would have been discussed between me and my attorney.

Q    Do you know if you saw it before it was

filed?

MR. POTREPKA:  Object to -- you can answer, if you can.

A    It's my understanding that I did not read this prior to that, no.

Q    So you believe you saw it sometime after the date it was filed?

A    Correct.

Q    You don't recall when you saw it?

A    No, I do not.

Q    When you first saw this document, did you read it in its entirety?

A    I glanced through it at all to make sure I understood it.  I did not read it line for line.

Q    About how long did it take you to go through it?

A    It probably took me about 10 minutes. I know it's a much larger document, but it took me about 10 minutes to get the general idea of what it was covering.

Q    Did you review it in hard copy?

A    No.  No, it was all electronic.

Q    When you first read this complaint, did you agree with everything in it?

MR. POTREPKA:  Object to the form.

A   At this particular time, I don't remember if I did or not.

Q   I'm now going to show you what we're marking as Exhibit 2.  So you can, I think hit that little back button at the top.

(Whereupon a document/item was marked for identification as Defendants' Exhibit 2.)

A   Yep.

Q   It will show up in a moment.  Let me know when you're able to open it.

A   Okay, yes.

Q   Are you familiar with this document?

A   I do remember this document, yes.

Q   What is it?

A   It was the first amended complaint against Tupperware for issues that Mr. Edge had.

Q   Have you ever seen this document before?

A   Yes, I have seen it before.

Q   When did you first see it?

A   It's been over the last few months, when we started working with Mr. Edge and his attorneys, that this became more clear around what concerns they had versus the concerns that myself and Mr. Estep had.

Q   Were you involved in preparing this document?

Page 50

A    No, I was not.

MR. POTREPKA:  Object to the form.

You can answer.

THE WITNESS:  No, I was not aware.

BY MS. WHEELER:

Q    Do you know whether you reviewed this document before it was filed?

A    No, I did not review it prior to it being filed.

Q    Let's go ahead and show Exhibit 3, please. Let me know when you're able to open that.

(Whereupon a document/item was marked for identification as Defendants' Exhibit 3.)

A    Okay, yes, I am aware of this one.

Q    Have you ever seen this document before?

A    Yes, I have.

Q    When did you first see it?

MR. POTREPKA:  Mike, you can look through as much of the document as you need.

A    Yeah, this is the second amended complaint. This would have been filed in March -- or in February of this year.

Q    When did you first see this document?

A    When it was filed in February of this year.

Q    Did you see it before it was filed?

Page 51

A    No, I did not.

Q    Do you understand what's different about this complaint from the prior complaint?

MR. POTREPKA:  Object to the form, calls for a legal opinion.

You can answer.

A    At this particular stage, I cannot tell you why it's different.

Q    Returning back to Exhibits 1 and 2, do you know what's different between the first amended complaint at Exhibit 2 and the complaint at Exhibit 1?

MR. POTREPKA:  Objection, form, calls for a legal opinion.

You can answer.

A    Outside of the details that are in the complaint, I believe that this included Mr. Estep and I being included with Mr. Edge for filing and being concerned about what had happened with Tupperware.

Q    Apart from adding you and Mr. Estep, do you understand if anything else changed?

A    It's my understanding that -- if things did change, I'm not aware of them.  They would be highlighted in the complaints if they had.

Q    We discussed before that this is a class action lawsuit; is that correct?

Page 75

apart from that second sentence at the second paragraph?

A   No, everything else looks consistent with it.

Q   I'm going to point you in particular to Paragraph 3, which is on the second page of the document.

Now, the second sentence of Paragraph 3 reads:  "By virtue of my significant financial interest in the resolution of the action, I am motivated to litigate vigorously, efficiently, and to the best of my ability to maximize the potential recovery for myself and the class I seek to represent."

Is that accurate?

A   That is accurate, yes.

Q   And what did you mean by that?

A   For me it was about 70 percent of my retirement at the time.

Q   And was that statement accurate at the time that you signed this document?

A   Yes, it was.

Q   It's accurate now?

A   (Shakes head).

Q   Do you have any other financial interest in

A    As per my attorney, I can't really express an opinion on that because I don't understand the legal ramifications of it all.

Q    You have no opinion or understanding of what this means, outside of what you've discussed with your attorney?

A    That is correct.

Q    Let me go ahead and take a look at what we're marking as Exhibit 9.

(Whereupon a document/item was marked for identification as Defendants' Exhibit 9.)

Let me know when you have it.

A    Yes, I have it in front of me.

Q    Do you recognize this document?

A    Yes, I do.

Q    What is it?

A    It was me originally saying on August 12th that in working with Ralph, that initially I was going to have him represent both myself and himself with working with Tupperware.

Q    When did you first see this document?

A    It would have been on the date suggested here, August 12th, 2022.

Q    And is that your signature there?

A    Yes, that is my DocuSign signature.

Q    Who prepared this document?

A    This would have been prepared by Ralph Estep.

Q    Why was it prepared?

A    To make sure that he and I were in lockstep at the time around who was going to be responsible for handling the law firm -- or the lawsuit.

Q    What do you understand this document to mean?

MR. POTREPKA:  And I'm going to caution the witness to not divulge any privileged conversations.

A    Without divulging information, it would be difficult for me to express anything at this stage.

Q    Did you discuss this document with Mr. Estep?

A    I did speak with him briefly about it ███ ███████████████    ██████████████████ ██████████████████████    --

MR. POTREPKA:  Excuse me, I'm going to caution the witness not to divulge the content of communications with Ralph Estep in furtherance of a plan to assign rights in furtherance of this litigation at that time.

MS. WHEELER:  Counsel, were they in a joint

prosecution agreement as of August 12th, 2022?

MR. POTREPKA:  It's very obvious that they were, in fact, intending as of August 12th, 2022 to assign rights to Mr. Estep in a joint prosecution endeavor, yes.

MS. WHEELER:  Were they counter-parties in this transaction?

MR. POTREPKA:  The document speaks for itself, I would say.

BY MS. WHEELER:

Q    Dr. Dennehy, you said Mr. Estep prepared this document?

A    Yes, he did.

Q    And Mr. Estep asked you to sign this document?

A    Yes, he did.

Q    Did you discuss this document with anyone other than Mr. Estep?

A    I discussed it with my wife briefly.

Q    Did you discuss it with your attorney?

A    No, I did not discuss it with my attorneys.

Q    And when you discussed it with your wife, what did you discuss?

A    ██████████████████████████████████████████

████████████████    ██████████████████████████

Page 81

████████████     ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ .

Q    Why did your wife believe that Mr. Estep was distracted?

MR. POTREPKA:  I'm going to object on the basis of spousal privilege, of communications in furtherance of, you know, lawsuits and litigation in general, on the basis of spousal privilege.

BY MS. WHEELER:

Q    To confirm, you did not discuss this document with your attorneys prior to signing?

A    Correct, I did not.

Q    And did Mr. Estep send you this document on August 12th, 2022?

A    Correct, he did.

Q    And you signed it that same day?

A    I did sign it that same day.

Q    Had you retained your attorneys at the time that you signed this document?

A    No, I had not.

Q    What do you understand to be the impact of this document?

A    The impact was to say that I was going to --

initially I was going to cede my interest over to Ralph, to have him head up this.

Q    When you say "this," what do you mean?

A    That I was going to seek control over managing the outcome of the lawsuit to Ralph over myself.

Q    And what did you believe -- what powers did you believe you were giving to Mr. Estep at this time?

A    At this time I thought I was giving him control over it, since he was the one who purchased the stock and it made sense for him to follow up and determine if there was more to it that needed to be done.

Q    When you say "control," what do you mean?

A    Ownership of the responsibility for handling this account.

Q    Did you have any understanding of whether this assignment affected your ability to serve as lead plaintiff in this case?

MR. POTREPKA:  Objection to form, calls for a legal opinion.

A    Can you repeat the question?

Q    Did you have any understanding of whether this assignment affected your ability to serve as lead plaintiff in this case?

MR. POTREPKA:  Same objections.

A    It was my understanding at the time that it would not impact that.  Over time it became clear that I needed to take more control over this.

Q    What was the basis of your understanding?

A    That Ralph was going to be leading the charge to try to get this dealt with financially.

Q    Did you have any understanding as to whether this assignment would impact your ability to be a plaintiff at all in this case?

MR. POTREPKA:  Objection to the form, calls for a legal opinion.

Go ahead.

A    No, I did not.

Q    Did you ask for anything from Mr. Estep in exchange for this assignment?

A    No, I did not ask for anything from Ralph.

Q    Did Mr. Estep agree to give you anything in exchange for this assignment?

A    Mr. Estep did not give me anything in exchange for doing this.

Q    Did anyone agree to give you anything in exchange for signing this assignment?

A    Nobody stepped in to do that.

Q    Did you have any understanding as to whether

this assignment would impact any recovery you would receive from this case?

A   It was my understanding that it would not impact my ability to recover what was owed to me.

Q   What was the basis of that understanding?

MR. POTREPKA:  Objection, form, foundation.

A   Basically, what it says in the note would apply to me, and the fact that it was still my stock, it was still my money and that the damage was done to me personally.

Q   When you say "what it says in the note," what are you referring to?

A   When it talks about Ralph agreeing to remit any proceeds received as a result of the assignment.

Q   Did you agree to this assignment because you were not interested in participating in this case?

MR. POTREPKA:  Objection, form, argumentative.  Go ahead.

A   At this particular stage I was not interested in it because I was not happy with the stock purchase in the first place, and when Ralph made the purchase, I asked him questions around that and then when this continued to go further downhill, I was not able to get the information I was looking for.

Q   When you say you were "not happy with the

Page 87

it.

Q    You said Mr. Estep provided an explanation around the purchase and that he could make money with it; is that right?

A    That is correct.

Q    Do you recall what Mr. Estep's explanation was?

A    I'm trying to remember.  Can you repeat that question again?  I'm sorry.

Q    Do you recall Mr. Estep's explanation for why he purchased the stock in the week after November 4th, 2021?

A    Yes, I do remember, and I was okay with it at the time because I thought that he was aware of what he had stepped up to and the impact this was going to have on me.

I was concerned about just the shear volume of one purchase.  I mean, this was literally one stock purchase in one day and he purchased, you know, 70 percent of my money on one stock.  So I was concerned about that.

Q    Do you know if Mr. Estep purchased any shares for himself around that time?

A    That part I do not know.  I believe he did, but I can't tell you for sure whether he did or not

November conversation?

A   No, I did not have any more conversation with him at that point.

Q   Do you recall ever discussing Tupperware stock with him via email?

A   I do remember talking with him about it over email, yes.

Q   When do you recall discussing it with him over email?

A   After this -- after the original note back in November there were a couple times when I did reach out, but I did not hear back, and that was part of the reason why after having assigned this August 12th I revoked that and took it upon myself, because I couldn't trust Ralph to represent me fully in the way that I needed to be represented.

Q   How would you typically communicate with Mr. Estep?

A   Most of it was done over email, as he was hard to reach on the phone.  Plus I wanted to have an electronic copy of it in case I needed it later on.

Q   Why did you think you might need it later on?

A   It's always safer to have something to point back to, rather than trying to point back to a

MR. POTREPKA:  Objection, foundation.

Sorry, go ahead.

THE WITNESS:  Correct, it was changed after that.

BY MS. WHEELER:

Q    Do you believe it was still in effect as of November 30th, 2022?

MR. POTREPKA:  Objection, form, foundation, asked and answered.

A    That part I do not know, Jennifer.  I'm sorry, I don't know the date.

Q    How did you rescind that assignment?

A    There would have been another voice conversation with Ralph where I told him what I was planning to do, and I explained to him that I was planning to do this on my own and we could do it together, but regardless, I was going to handle this myself.

Q    And that was a phone call?

A    Yes, it was.

Q    And do you recall when this phone call took place?

A    I do not recall when it took place.  It was after August 15th, but I cannot tell you when.

Q    And did you have any other discussions with

Q    After August 15th, 2022, approximately how many times do you believe you spoke with Mr. Estep about the assignment?

A    There were probably three or four times, but I can't tell you exactly when or what was covered in each conversation.

Q    You said you revoked the assignment during one of those conversations; is that correct?

A    I told him that I was going to do it myself, and that's when I already reached out and was already working with Greg on moving forward --

MR. POTREPKA:  Sorry, I'm going to instruct you not to discuss conversations that we might have had.

BY MS. WHEELER:

Q    Do you recall which of the three or four conversations with Mr. Estep, in which of those conversations you revoked the assignment?

A    No, I do not remember.

Q    What else did you discuss with Mr. Estep concerning the assignment after August 15th, 2022?

A    There would have been discussions around our taxes and other things around that, and that would have been it.  There were no other conversations around Tupperware outside of this.

Page 108

Q    Did you discuss the assignment with Mr. Estep on three or four occasions?

A    I don't recall exactly when we had the conversations or how often.  So I'm -- three or four is actually a speculative number.

Q    So I believe you said you told Mr. Estep that you intended to pursue this litigation on your own and were therefore revoking the assignment; is that correct?

A    That is correct, I did do that.

Q    Did you do anything else to revoke the assignment?

A    No, I did not.

Q    Do you know if there are any written agreements regarding revoking the assignment?

A    I'm not aware of any.

Q    Do you recall signing any written agreements regarding revoking the assignment?

A    Outside of the signatures that are in the case, there was no other information.  There were no other signatures that were had besides those.

Q    When you say "signatures in the case," do you mean documents that have been filed in this litigation on the Court's docket?

A    Correct.

Page 109

Q    Do you know if Mr. Estep executed any documents regarding the revocation of the assignment?

MR. POTREPKA:  Objection, speculation.

A    I can't answer that question.  I don't know.

Q    Have you seen any documents signed by Mr. Estep concerning the revocation of this assignment?

A    No.  Other than the fact that he was okay with me being -- leading my own charge and being okay with me being a co-plaintiff, a co-lead plaintiff, I have not seen or heard anything from Ralph around this.

Q    When you say he was okay with you leading your own charge, how did you come to the understanding that he was okay with you leading your own charge?

A    In the documents he did sign saying he recognized it and he was okay with it.  That's all I can really refer to.  The contents of all of that would have to be in the case that was filed.

Q    What document are you referring to there?

A    That part I can't tell you.  I don't remember off the top of my head.

Q    Did Mr. Estep tell you he was okay with you leading your own charge when you discussed the revocation of the assignment with him?

A    I think he was confused by it, but in the end he was okay with it.  So yes, he was.

Q    When you say "he was confused by it," what do you mean?

A    Well, he said, "I thought that you were turning this over to me.  But if you want to do this yourself, then go ahead."

Q    Did he say anything else about the assignment?

A    That was all he said.

Q    Do you recall seeing any documents, other than those filed on the docket in this case, reflecting anything Mr. Estep approved regarding revocation of the assignment?

MR. POTREPKA:  Objection, asked and answered.

A    Outside of that, I'm not aware of anything, no.

Q    Did you assign your claims regarding your purchases of Tupperware stock to anyone other than Mr. Estep?

A    No, I did not.

Q    Let's take a look at the document we're marking as Exhibit 10.

She said other than speaking with your attorneys. But don't disclose the content of discussions that we had.

THE WITNESS: Outside of that, I don't have any other information.

BY MS. WHEELER:

Q    Is it fair to say that your work on this case has been exclusively speaking with your attorneys?

A    Outside of speaking about it with my wife, no, I have not spoken with anybody else about this.

Q    Have you done any other work besides speaking with your attorneys on this case?

A    No, I have not.

Q    Have you ever heard the term "confidential witness"?

A    I've heard the term, yes.

Q    What do you understand it to mean?

A    That there was somebody that was called upon to interact and help and they've asked to remain anonymous. And I believe that there was somebody, but I don't know of anybody in my case where that would fit.

Q    When you say you believe there was somebody, what do you mean?

Page 132

A    That there was somebody at some point, but I don't know any other details around it.  I've heard the term mentioned a couple of times, but I've never asked for clarification on what it meant, and I'm assuming because it was confidential, it was not meant for my ears to know.

Q    You've heard the term "confidential witness" in connection with this case?

A    That's correct.

Q    When you say you "don't know of anybody in my case where that would fit," what did you mean by that?

A    I'm not sure who it would be.  That's really all I meant.

Q    Do you know if a confidential witness is involved in this case?

MR. POTREPKA:  Objection.  I'm objecting to the form of the question.  But you can answer.

A    I believe that there was somebody.  I don't know if there still is somebody.

Q    Do you know who that person is?

A    No, I do not.

Q    Did you ever speak with that person?

A    No, I have not spoken with anybody from anywhere outside of my account team in regards to

Tupperware.

Q    Did you ever read any notes of what that person said?

MR. POTREPKA:  Objection to form.

A    At this stage, I'm not aware of any.

Q    Do you know what that person said?

MR. POTREPKA:  Objection, form.

Are you talking about outside of the complaint?

MS. WHEELER:  Yeah.

BY MS. WHEELER:

Q    Do you know anything about what the confidential witness said?

A    No, I do not.  I do not know any details outside of the fact that there is a confidential informant.  I don't know any details, what they testified to, what they covered or what they spoke about.

Q    Do you know what the allegations in the complaint are about the confidential witness?

A    No, I do not.

Q    Do you think that as a class representative you have any duty to understand whether the information provided by the confidential witness is accurate?

were losses in your account, correct?

A    Correct, he would.

Q    So what were you giving Mr. Estep permission to do here?

A    I was letting him know that I was getting the money set up to let him know that I would be turning the accounts over to him shortly, because at that stage I was expecting it would be.

But then Gary from Merrill Lynch, who is mentioned in here, "Gary from ML", failed to follow through on what Ralph was expecting.  So I had to change over to E*Trade accounts.

Q    I think we'll get into that in a little bit. I want to ask a little bit more about the authority you were giving Mr. Estep.

Were you giving Mr. Estep the authority to make purchases on your account?

A    Yes, I was.

Q    Were there any restrictions on the type of investment he could purchase?

A    No, there was not.

Q    Were you authorizing Mr. Estep to make sales on your account?

A    Yes, I was.

Q    Was there any restriction as to the type of

investments that Mr. Estep could sell from your account?

A    There were no -- there were none at this stage, no.

Q    Were there any restrictions on Mr. Estep's ability to engage in particular types of transactions?

A    No.  No, there was not.

Q    Could Mr. Estep have engaged in short selling on your account?

A    Yes, he could have.

Q    Was Mr. Estep required to discuss any transactions he made on your account with you at any time?

A    No, he was not required to.

Q    Was he required to discuss the transactions with you prior to making any transactions?

A    No, he was not required to.

Q    Did Mr. Estep discuss the transactions with you?

MR. POTREPKA:  Objection, form.

A    From my perspective, if he knew what he was doing, he was invited to run the account and use it the way that he saw fit.  He didn't need to explain to me anything.

Q    Did Mr. Estep ever tell you about a trade or

delay between those two emails; is that right?

A    That is correct.

Q    Were your accounts moved to E*Trade in between those two emails?

A    Yes, they were.

Q    And you believe your accounts were moved to E*Trade at some point before November of 2021?

A    Correct.

Q    Did you have any contact with Mr. Estep between the previous email in May and this email?

A    Not -- no written emails.  I believe there was -- I don't know if there was any phone calls, but there were no other emails that I remember.

Q    I believe you said the first transaction Mr. Estep engaged in on your behalf was the November 4th, 2021 purchase of Tupperware stock; is that correct?

A    That is correct.

Q    And I believe you said you had some phone conversations with Mr. Estep in the week following that purchase; is that right?

A    About the specific purchase and what he was doing with Tupperware, I did.  I was concerned about that.

Q    Did you have any communications with

Page 185

Q    How large were those purchases in comparison to the Tupperware purchase?

A    Oh, they were a lot smaller.  Tupperware was $380,000, $390,000.  These were somewhere in the neighborhood of 20 to $30,000 each.

Q    You think it was one or two other stocks at that time?

A    Two other stocks, I believe.

Q    And I believe you testified previously that you did not discuss the Tupperware purchase with Mr. Estep before he made it?

A    That's correct.

Q    Did you discuss the purchases of the other two stocks with Mr. Estep before he made those purchases?

A    No, we did not.

Q    Let's move to the next-in-time email, which is immediately above the December 9th email.

     Do you see that?

A    Yes, I do.

Q    What's the date of this email?

A    December 15th.

Q    Did you send this email?

A    Yes, I did.

Q    What are you saying in this email?