# EXHIBIT 10

Case 6:22-cv-01518-LHP Document 116-11 Filed 04/23/24 Page 2 of 10 PageID 1470

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

2012 WL 5432367
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

Ralph V. ESTEP, Appellant,
v.
BOARD OF ACCOUNTANCY, Appellee.

C.A. No. N11A–09–012 PLA
|
Submitted: Aug. 17, 2012.
|
Decided: Oct. 2, 2012.

**Synopsis**
**Background:** Accountant appealed revocation of his public accounting license by the Board of Accountancy.

**[Holding:]** The Superior Court, Ableman, J., held that evidence supported decision to revoke accounting license of accountant who committed further violations while under suspension.

Affirmed.

West Headnotes (1)

**[1]** **Accountants** 🗝 Discipline; suspension or revocation

Evidence supported decision of the Board of Accountancy to revoke accountant's public accounting license; accountant published website and yellowpages advertisements during the period that his public accounting license was suspended and while his firm permit had lapsed, advertisements did not comply with Board rules or suspension order, accountant failed to make sufficient efforts to ensure compliance, accountant's prior violations were sufficiently egregious to have alone warranted revocation,

accountant demonstrated a complete lack of insight or understanding of the threat to the public that his conduct posed, and accountant's failure to comply with clear terms of Board rules and suspension order called into question his ability to comply with accounting principles.

On Appeal from a Decision of the Board of Accountancy Affirmed.

**Attorneys and Law Firms**

Ralph V. Estep, pro se, Appellant.

Barbara J. Gadbois, Esquire, Department of Justice, Attorney for The Board of Accountancy.

ABLEMAN, Judge.

### *I. Factual Background & Procedural History*

**\*1** Appellant Ralph V. Estep brings this appeal following revocation of his accounting license by the Board of Accountancy. Estep began practicing accounting in 1969. Since 2009, he has been prosecuted two times before the Board of Accountancy. In the first prosecution, Estep was fined and his license to practice accounting was suspended. In the second prosecution, his license to practice accounting was permanently revoked. This current appeal is taken only from the second prosecution; however, the facts from the first prosecution are also relevant and will be briefly described as well.

#### A. The First Board of Accountancy Proceeding

*1. Background*
Estep's current disciplinary problems began on January 25, 2006 when the Office of Disciplinary Counsel ("ODC") filed a petition with the Board on the Unauthorized Practice of Law (the "UPL Board"). It alleged that Estep had engaged in the unauthorized practice of law by: (1) acting in a representative capacity in a Delaware legal tribunal or governmental agency; (2) giving legal advice on matters relating to Delaware law; (3) drafting legal documents; and (4) holding himself out as authorized to practice law in Delaware. [1] At the

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 3 of 10 PageID 1471

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

time, Estep directly provided estate planning services and representation to clients. Estep agreed with the ODC's allegations, admitted his conduct constituted the unauthorized practice of law, and together with the ODC, filed a document with the UPL Board titled "Admitted Facts and Admissions of Conduct Constituting the Unauthorized Practice of Law." [2] The UPL Board accepted Estep's admissions and submitted a proposed consent decree to the Delaware Supreme Court. [3] On October 30, 2006, the Delaware Supreme Court accepted the UPL Board's recommendation and entered a Cease and Desist Order requiring Estep to stop engaging in conduct constituting the unauthorized practice of law.

Following the Cease and Desist Order, Estep altered his practice of providing estate planning services in an attempt to circumvent the conduct prohibited by the Order. His modifications, however, provided no meaningful difference and his conduct was found to be in direct violation of the Cease and Desist Order. Despite the Cease and Desist Order, Estep changed his estate planning practice only minimally. First, Estep would meet and consult with clients and take detailed notes regarding the clients' estate planning objectives. He would then forward those notes, along with instructions of how to draft the requested estate planning documents, to a Pennsylvania lawyer, who would in turn draft the documents. [4] The Pennsylvania lawyer would then send the prepared estate documents back to Estep. Apparently recognizing that this scheme was not sufficient to avoid the proscribed conduct in the Cease and Desist Order, Estep would forward the documents to a Delaware licensed attorney who would determine whether the documents complied with Delaware law.

After the Delaware lawyer reviewed the documents to ensure they complied with Delaware law, Estep would meet with the client in his office to execute the documents. These client meetings were attended by Estep, the Delaware lawyer, and the client. Estep would misrepresent his arrangement with the two lawyers to his clients. He would advise his clients that the Delaware lawyer had prepared the documents when, in fact, the Delaware lawyer later admitted that his role was limited to correcting typographical errors and ensuring compliance with Delaware law. The Delaware lawyer never consulted with Estep's clients nor did he consider the clients' needs when reviewing the documents.

**\*2** Similarly, Estep continued to render legal advice and act in a representative capacity for clients with the Register of Wills. This conduct was specifically prohibited by the Cease and Desist Order. Estep claimed he was only prevented from "serving as personal representative in the Register of Wills," despite the fact that the plain language of the Cease and Desist Order prohibited broader conduct than claimed by Estep. Estep prepared and filed documents on behalf of clients in the Register of Wills which went well beyond normally accepted accounting practices. Indeed, one of Estep's own experts in accounting admitted that such filings are normally accomplished by Delaware attorneys.

Shortly after the Delaware Supreme Court accepted the consent decree and issued the Cease and Desist Order, the ODC became aware of Estep's continued unauthorized practice of law. As a result, the ODC filed a Petition for a Rule to Show Cause in the Delaware Supreme Court alleging violations of the terms of the Cease and Desist Order. The Supreme Court referred the matter to the UPL Board for factual findings and recommendations. After a hearing, the UPL Board found Estep's conduct to be contemptuous and a blatant attempt to avoid the Delaware Supreme Court's Cease and Desist Order. On May 25, 2007, the UPL Board submitted its findings of fact and recommendations to the Delaware Supreme Court. The Delaware Supreme Court accepted the UPL Board's factual findings, held Estep in contempt for his violation of the Cease and Desist Order, and imposed sanctions, consisting of disgorgement of fees earned in violation of the Cease and Desist Order, and a $2,000 fine for each of the nine violations.

During those proceedings, Estep misrepresented to the UPL Board his arrangement with the two lawyers by telling the Board that it was the *Delaware* lawyer who would draft the documents. The UPL Board found Estep's testimony to be not credible and instead accepted the consistent testimony and documentary evidence in contravention of Estep's representations. Despite his denial of the allegations, the Delaware Supreme Court held that Estep had admitted to conduct which was in direct violation of the Cease and Desist Order.

The UPL Board found, and the Delaware Supreme Court agreed, that Estep violated the Cease and Desist Order by "concocting a contemptuous scheme whereby he directs a non-Delaware lawyer, as his agent, to draft legal documents in contravention of a Supreme Court Order." [5] The Court further found that the "only difference in [Estep's] post-admissions conduct is that he now had a Delaware lawyer present to witness the execution of the legal documents." [6]

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 4 of 10 PageID 1472

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

Estep's conduct was described as "a tepid scheme to avoid the Cease and Desist Order." [7]

### 2. The First Board of Accountancy Proceeding

After the two prosecutions by the ODC before the UPL Board and the Delaware Supreme Court, and the imposition of sanctions as a result, the Office of the Attorney General filed a complaint against Estep with the Delaware Board of Accountancy (the "Board"). The complaint alleged that Estep's conduct violated specific sections of the Board's licensing law, Board Rules and Regulations, and the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants (the "AICPA Code"). Estep filed an answer to the complaint, denying the allegations, including the findings of the UPL Board and the Delaware Supreme Court. The Board held a hearing at which the State presented the facts and background of the UPL Board proceedings that were described above.

**\*3** Estep's testimony attempted to undermine the legitimacy of the proceedings before the UPL Board and the Delaware Supreme Court. He contested the evidence presented and the findings of those prior proceedings. Estep also called clients, one of his own attorneys, employees, investigators, and the Delaware attorney he used to prepare estate documents. Through this testimony, Estep attempted to show the Board that: (1) his prior clients were satisfied with his performance; (2) others should bear the blame for his unauthorized practice of law; (3) he was competent in handling accounting matters; (4) there were additional allegations against him that were unfounded; (5) he handled representation in estate matters competently; (6) he obtained legal advice that he could maintain multi-disciplinary practice comprised of legal and accounting professionals; and (7) the Supreme Court's factual findings were inaccurate.

The State presented several rebuttal witnesses in response to Estep's witnesses. An investigator from the Delaware Department of Justice first testified about some of the State's evidence showing that Estep advertised to perform legal services. In addition, he stated that Estep was a convicted felon, and although that rendered him ineligible to probate wills in the Register of Wills, he did so anyway. The Director of the Fraud and Consumer Protection Division next testified about litigation the State brought against Estep in the Delaware Court of Chancery. That litigation resulted in a judgment against Estep in the amount of $582,355, of which a majority was distributed to aggrieved consumers who were Estep's former clients.

Some of those aggrieved consumers also testified. One of those clients was Patricia Rosemary. She met Estep in 1999 when he prepared a will for her and her husband. Several years later, in 2004, after her son died she returned to Estep for revisions to her will. Estep entered into an agreement with Rosemary to probate the estate of her deceased son, which included a home in Claymont Delaware. Estep told Rosemary that he had found a buyer for the home. The sale documents, revealed during the Chancery litigation against Estep, listed different buyers and sales amounts. Estep had told Rosemary that an individual had purchased the home. During the Chancery litigation, evidence revealed that Estep had arranged for the estate to sell the home to the Claymont Fire Company with Estep to receive some of the proceeds. Rosemary was never informed of that arrangement. At settlement, Rosemary was told the estate received $26,881.95 and that the purchase price was $115,000. In reality, Estep sold the property to Claymont Fire Company for $218,500. Based on the actual purchase price Estep had arranged, the Rosemary estate should have been paid $131,989.94, far more than the $26,881.95 it received. Needless to say, Rosemary felt Estep had been dishonest in his dealings with her son's estate. During his *pro se* cross examination of Rosemary, Estep introduced a sales contract purporting to show that Rosemary had sold the house to Estep for $120,000. Rosemary testified that she never agreed to sell the home to Estep and did not believe the document was authentic.

**\*4** Another former Estep client testified that she located Estep's name in the "Lawyers" section of the Yellow Pages and sought help in preparation of a will for an ill family member. Estep misrepresented his practice to this individual and her ill family member. After a dispute arose regarding the fee, Estep finally admitted he was not an attorney. Estep had taken a power of attorney document from the ill family member and, when the dispute arose over his fee, refused to return it. When confronted about that document, Estep claimed it had been shredded.

The Board considered all of the evidence and concluded, by Order of September 16, 2009, that the State had proved the allegations against Estep. The Board prohibited Estep from relitigating the matters decided by the Delaware Supreme Court and concluded that he was bound by the decisions of the UPL Board. The Board also determined that Estep had violated the Board's licensing statute, 24 *Del. C.* § 117, in

several respects. The Board found he "engaged in acts of fraud in the practice of accounting and engaged in dishonorable, unethical or unprofessional conduct intended to or likely to deceive, defraud or harm the public." [8]

The Board further concluded that Estep had violated provisions of the Board's Rules and the AICPA Code, by which every certified public accountant is bound. Estep violated the AICPA Code by agreeing to perform services outside his professional competence, had acted without integrity, and was self-dealing, misrepresenting facts, failing to fulfill the obligation to serve the public interest and honor the public trust in the profession, conducting business without due care and competence, and advertising in a manner that is false, misleading, or deceptive.

The Board imposed sanctions on Estep for his violations. They described Estep's violations of the Cease and Desist Order as "flagrant" and held that the evidence established self-dealing and misrepresentations. The Board summarized its conclusion that the evidence showed "an absence of the professionalism, character and integrity essential to the practice of accountancy." [9] Estep was fined $2,000 and his license to practice accounting was suspended for 12 months, followed by 24 months of probation subject to several restrictions. The restrictions provided that Estep could not render legal advice, and must not violate the Board's Rules, AICPA Code, or the Board's licensing statute. In addition, Estep was prevented from having any business dealings with clients, acting in a representative capacity in the Register of Wills, misrepresenting his credentials on his letterhead, or engaging in acts discreditable to the profession of accountancy. The Board's Order also specifically stated "[a]ny violation ... of the terms of his probation may result in further disciplinary proceedings with further sanctions, up to and including revocation of his license." [10] Estep did not appeal the Board's Order.

### B. The Second Board of Accountancy Proceeding

**\*5** The Office of the Attorney General filed a second complaint against Estep with the Board on June 14, 2010. This complaint contained several allegations, including Estep's failure to comply with the terms of his prior suspension order and his operation of an accounting firm without proper licensure. Estep denied the allegations and the Board held a hearing on May 18, 2011. Following the hearing, the Board issued a written decision on July 20, 2011, finding Estep in violation of 24 *Del. C.* § 106(b), 110(a), 111(a), as well as Board Rules 8.3 and 8.4. The Board entered an order (the "Revocation Order") permanently revoking Estep's accounting license as "the only appropriate method [to] ensure[ ] the public will be protected." [11]

The State's allegations were based, in part, upon Estep's failure to comply with the terms of the suspension order as well as his failure to have proper licensure for his accounting firm. Following the suspension order, Estep continued to advertise his accounting services in the Yellowbook and on his firm's website. The State introduced copies of his Yellowbook advertisement and screen shots of his website, both of which were published by Estep during the period of his suspension.

The Yellowbook advertisement includes the words "PUBLIC ACCOUNTANTS" immediately below Estep's name in the heading of the advertisement. It appears in the section titled "ACCOUNTANTS–CERTIFIED PUBLIC." Estep contended that he had requested changes to his advertisement, but that it was published without his requested changes, and he introduced two copies of his prior year's advertisements with the hand written notes indicating his desired changes. In addition, Larry Berman, a Yellowbook account representative, testified that Estep had requested several changes that did not make it into the published phonebook. Yellowbook entered into a settlement agreement with Estep as a result of its failure to implement the requested changes. The State asserts that, even if the changes requested by Estep had been accomplished, they were still not sufficient to comply with the previous suspension order.

Berman explained the process by which Estep requested the changes. The two met in person with a proof copy of the previous year's advertisement. Estep told Berman that he wanted the abbreviations "E.A., P.A." removed after his name, the term "Probate Accounting Services" removed from his list of specialties, and the term "Accounting Resource Center" added in the heading of the advertisement. Estep also claims that he requested that the term "Public Accountants" be removed from the heading. The requested changes were made in Berman's handwriting on the proof, except for removal of the term "Public Accountants." Berman testified that he could not remember whether Estep asked him to remove "Public Accountants." The proof entered into evidence contains lines through other words to be removed from the advertisement, such as "Probate Accounting Services," but there is no

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 6 of 10 PageID 1474

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

indication that any effort was made to remove the term "public accountants." Estep admits that he signed the proof with the requested changes and that nowhere in the proof is there anything requesting that the term "public accountants" be removed.

**\*6** Estep's website also continued to advertise the services of a public accountant after his suspension. The homepage lists his name as "Ralph V. Estep, E.A., P.A. Accountants." The abbreviation "P .A." appears in at least three places following Estep's name on the homepage. Estep claimed at the hearing that he used the term "PA" to mean professional association and not public accountant. The page also states his firm handles accounting services, such as tax preparation and planning, international tax preparation, bookkeeping, payroll, forensic accounting, probate accounting services, management services, audits, preparation of financial statements (for managerial or third party use), reviews and compilations of financial statements, consulting, and incorporation.

Estep claimed on his website that he gave up all other licenses, specifically his SEC investment licenses, because of ethical considerations. The website further states "the only licensure and permits he maintains are in accounting and taxation." The screen shots of Estep's website were taken on August 4, 2010, during the period of time that his accounting license had been suspended.

The State elicited testimony from Estep that showed his advertisements listed specialties in which he had little or no actual prior experience. For example, one section advertises auditing services. At the hearing, Estep testified that if a client came to his office requesting to have an audit performed, he would have performed the audit himself rather than delegate the work to someone else. Questioned regarding his qualifications to perform an audit, he admitted that "the most honest answer is I've never done an audit."

The State also presented evidence that the firm of Ralph V. Estep did not have a valid firm permit from 1999 through 2011. The State argued that Estep's firm provided public accounting services during those periods that it had no valid permit. Public accounting is statutorily defined as:

> [T]he performance, or offer to perform, for a client or a potential

client, by a person or firm holding itself out to the public as a permit holder, of 1 or more kinds of services involving the use of accounting or auditing skills, including the issuance of reports or financial statements, or of 1 or more kinds of management advisory, financial advisory or consulting services, or the preparation of tax returns or the furnishing of advice on tax matters. [12]

The statute further provides the use of the title or designation "public accountant," or the abbreviation "PA," indicates that such a person holds a valid permit to practice. [13] Every person who intends to be or is engaged in the practice of public accountancy is required to obtain and maintain a valid permit to practice public accountancy. [14]

Based on this evidence, the State asked the Board to find that Estep violated statutory provisions, board rules, and his prior suspension order. Specifically, it accused Estep of: (1) conducting public accounting through his firm without a valid permit from 1999 through 2011; (2) continuing to advertise his services as a public accountant in the Yellowbook during the period of his suspension; (3) continuing to advertise his firms services as public accountants in Yellowbook without a valid firm permit; (4) continuing to advertise his services as a public accountant on the firm's website during the period of suspension; (5) advertising public accounting services on the firm's website despite expiration of the firm's permit; and (6) violations of the prohibitions contained in the previous suspension order.

**\*7** In response, Estep contended that the State's allegations constitute mere technical violations. He claimed that he lacked any intent to violate the statute or prior suspension order, and that he had made an effort to change his advertisements to comply with the suspension order.

### II. The Board's Decision

The Board concluded that the State proved the allegations in its complaint against Estep by a preponderance of the evidence. Estep's advertisements in the Yellowbook and on his website continued to advertise in a manner

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 7 of 10 PageID 1475

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

that was permitted only by accountants holding a valid permit. Because Estep's personal accounting license was in suspension and his firm permit had expired, the Board that found the advertisements violated the Board's licensing statute, Board Rules, and the prior Suspension Order.

The Board further held that Estep's admissions alone established violations. For example, he had mailed a letter to the Division of Professional Regulation wherein he admitted a lapse in his firm permit. Because Estep's firm advertised public accounting services during the lapse period, he had admitted a violation of 24 *Del. C.* § 111(a).

Estep claimed that he had requested changes to his Yellowbook advertisements to comply with the applicable statutes, Board Rules, and the Suspension Order. The Board was not convinced. It considered his efforts to fall short of a "professional attempt" and lacking due diligence. Estep also testified that he had made numerous changes to his website for the same reasons but the Board was not persuaded, stating that "with due diligence, it could have been corrected."

The Board found Estep's attempts to correct his Yellowbook advertisements and website to be "unprofessional and sloppy," and problematic because accounting is a profession that "is very much driven by precision and making sure things are correct." His failed attempts to correct his advertisements constituted acts discreditable to the profession of accountancy. The Board also found Estep in violation of the previous suspension order because of his unsuccessful attempts to change his advertisements.

In imposing sanctions, the Board took into account Estep's prior suspension and his failure to ensure that his advertisements complied with applicable statutes, Board rules, and the prior Suspension Order. It found his conduct to be "sloppy and a serious lack of due diligence." The Board again explained that the accounting profession requires precision, and that his failure to correct his advertisements was indicative of a lack of essential skills necessary for the profession. It concluded that Estep's behavior "gives the Board reason to be concerned about the threat [his] practice may impose on the public." As a result, the Board revoked Estep's accounting license to "ensure the public will be protected."

### III. Standard and Scope of Review

Upon appeal from a decision of the Board, this Court's function "is confined to ensuring that the Board made no errors of law and determining whether there is 'substantial evidence' to support the Board's factual findings." [15] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [16] The "substantial evidence" standard requires "more than a scintilla but less than a preponderance of the evidence." [17]

**\*8** The Court "does not weigh the evidence, determine questions of credibility, or make its own factual findings." [18] These functions are reserved exclusively for the Board. [19] The Court must afford "a significant degree of deference to the Board's factual conclusions and its application of those conclusions to the appropriate legal standards." [20] In reviewing the evidence, the Court must consider the record "in the light most favorable to the prevailing party below." [21] The Court reviews questions of law *de novo* "to determine whether the Board erred in formulating or applying legal precepts." [22]

In applying the standard of review, the Court must search the entire record to determine whether, on the basis of all the testimony and exhibits, the Board could fairly and reasonably reach its conclusions. [23] Where the evidence is sufficient to support the Board's conclusions, its decision will not be disturbed absent an error of law. [24]

### IV. Analysis

Estep has filed this appeal from the second ruling against him by the Board that resulted in the revocation of his accounting license. Estep attempts to reargue many of the issues fully litigated before the Board, and he additionally asks this Court to re-evaluate the weight given to certain evidence. He also asserts that the punishment imposed is not in line with the offenses committed. He then compares his "alleged mistakes" with the Board's failure to provide every other page of a two-sided document contained in the record, and he requests sanctions against the Deputy Attorney General. The State replies by pointing to specific evidence in the record that supports the Board's decision, and it contends that the evidence is more than sufficient to justify Estep's revocation.

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 8 of 10 PageID 1476

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

The Court's analysis must begin by considering the evidence upon which the Board relied in finding Estep in violation of statutory provisions, Board Rules, and the Suspension Order. The record demonstrates that, during the month of August 2010, Estep's public accounting license was suspended and his firm permit had been expired for over ten years. Estep does not dispute these facts. The State entered copies of Estep's website and Yellowbook advertisement into evidence. Both were published during the period of Estep's suspension and while his firm permit had lapsed.

Estep does not deny that the website and Yellowbook advertisement, as published, do not comply with the applicable statutes, Board Rules, or Suspension Order. Instead, Estep argued before the Board, and argues again before this Court, that others should take the blame for his failure to ensure his advertisements complied. He also claims that he lacked intent to violate the applicable provisions.

The Board considered substantial evidence before concluding Estep, and not others, should take the blame for his noncompliant advertisements. He signed the bottom of the proof containing the requested changes. That proof lacked any indication that the term "Public Accountants" was to be removed. The Board did not believe Estep's self-serving testimony that he requested the term be removed since all other terms that he sought to be removed contained a strike-through. Even if Estep actually made such a request, the Board found his effort insufficient and lacking in due diligence. The Board's decision held that Estep's failure to sufficiently modify his Yellowbook advertisements was supported by substantial evidence.

 **\*9** Estep also claims that someone else should take the blame for his failure to bring his website in compliance with the applicable provisions. The Board considered substantial evidence before finding Estep in violation of the counts related to this allegation as well. Estep admitted that he held a supervisory role over the individual responsible for modifications to the website. He requested some changes but neglected to ensure that the changes brought the website into compliance. The Board found that Estep's efforts were insufficient because Estep continued to use the abbreviation "P.A." after his name, and thereby represented himself as a public accountant. Estep argued for sympathy but those pleas could not mitigate the fact that his actions were in flagrant violation of his professional responsibilities. The Board's decision is supported by substantial evidence.

The offenses committed by Estep that led to the prosecution on appeal here, may have been less egregious than some of his earlier conduct (which is described in this opinion), but this circumstance does not undermine the Board's ability to impose a fitting sanction. Title 24, Chapter 1 states the "primary objective of the [Board ... ]is to protect the general public from unsafe practice, including incompetent auditing, accounting and tax services rendered by [licensed accountants.]" The Board listed several legitimate bases for its concern that Estep is not competent to practice accounting. First, the Board considered Estep's prior violations. This Court finds these violations sufficiently egregious to have justified it in revoking Estep's license long before this latest ruling. Those prior violations support the Board's finding that Estep's continued licensure posed a substantial threat to the public. The Board also considered the current violations, as well as Estep's excuses for these violations, as demonstrating a complete lack of insight or understanding of the threat to the public that such conduct posed. If Estep was incapable of handling the simple task of complying with the clear terms of the Licensing Statute, Board Rules, and Suspension Order, the Board was justified in questioning his ability to handle complicated accounting matters requiring attention to detail and compliance with accounting principles.

The Court is thus satisfied that the Board's decision to revoke Estep's accounting license, to "ensure the public will be protected," is more than supported by substantial evidence.

### *V. Conclusion*

For the foregoing reasons, the decision of the Board revoking Estep's accounting license is hereby AFFIRMED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Atl. Rptr., 2012 WL 5432367

Case 6:22-cv-01518-LHP    Document 116-11    Filed 04/23/24    Page 9 of 10 PageID 1477

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

## **Footnotes**

1    *In re Estep,* 933 A.2d 763, 765 (Del.2007).

2    *Id.*

3    *Id.*

4    The Pennsylvania lawyer was an employee of Estep's firm prior to the first UPL Board proceedings resulting in the Cease and Desist Order. After the Cease and Desist Order, the Pennsylvania lawyer terminated his employment with Estep and undertook a scheme to operate as an independent contractor, likely for fear of prosecution by the ODC had he remained at Estep's firm.

5    *Estep,* 933 A.2d at 771.

6    *Id.*

7    *Id.*

8    *Decision & Order of the Board of Accountancy,* No. 04–08–07, at 25 (Sept. 16, 2010).

9    *Id.* at 29.

10   *Id.* at 31.

11   *Decision & Order of the Board of Accountancy,* No. 04–04–09, at 10 (July 20, 2011).

12   24 *Del. C.* § 102(11).

13   24 *Del. C.* § 106(b).

14   24 *Del. C.* § 111.

15   *Bermudez v. PTFE Compounds, Inc.,* 2006 WL 2382793, at *3 (Del.Super.Aug.16, 2006).

16   *Anchor Motor Freight v. Ciabattoni,* 716 A.2d 154, 156 (Del.1998) (quoting *Olney v. Cooch,* 425 A.2d 610, 614 (Del.1981)).

17   *Breeding v. Contractors–One–Inc.,* 549 A.2d 1102, 1104 (Del.1988) (citing *DiFilippo v. Beck,* 564 F.Supp. 110 (D.Del.1983)).

18   *Hall v. Rollins Leasing,* 1996 WL 659476, at *2 (Del.Super.Oct.4, 1996) (citing *Johnson v. Chrysler Corp.,* 213 A.2d 64, 66 (Del.1965)).

19   *Giofre v. G.C. Capital Group,* 1995 WL 264585, at *3 (Del.Super.Apr.17, 1995), *aff'd,* 670 A.2d 1338 (Del.1995) (TABLE).

20   *Bermudez,* 2006 WL 2382793, at *3 (citing 29 *Del.C.* § 10142(d)).

21   *Id.* (quoting *General Motors Corp. v. Guy,* 1991 WL 190491, at *3 (Del.Super.Aug.16, 1991)).

22   *Bermudez,* 2006 WL 2382793, at *3.

Case 6:22-cv-01518-LHP     Document 116-11     Filed 04/23/24     Page 10 of 10 PageID
1478

Estep v. Board of Accountancy, Not Reported in Atl. Rptr. (2012)

23      *National Cash Register v. Riner,* 424 A.2d 669, 674–675 (Del.Super.1980).

24      *General Motors Corp. v. Freeman,* 164 A.2d 686, 689 (Del.1960).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.