# EXHIBIT 11



CANNON BUILDING
861 SILVER LAKE BLVD., SUITE 203
DOVER, DELAWARE 19904-2467

STATE OF DELAWARE
**DEPARTMENT OF STATE**
DIVISION OF PROFESSIONAL REGULATION
December 20, 2012

TELEPHONE: (302) 744-4500
FAX: (302) 739-2711
WEBSITE: DPR.DELAWARE.GOV

## VIA FIRST CLASS & CERTIFIED

Ralph V. Estep

████████████████
████████████████

      RE:    In the Matter of Ralph V. Estep
              Board of Accountancy, Case No. 04-01-12

Dear Mr. Estep:

    Enclosed please find a recommendation that I am making to the Board of Accountancy with regard to the above referenced matter. Please note that if you have any exceptions, comments or arguments regarding the enclosed recommendation, you must **file them in writing to the attention of the Board of Accountancy** at the above address within twenty (20) days of December 20, 2012 pursuant to 29 *Del. C.* §8735(v)(1)d.

    Thank you.

                                    Sincerely,

                                    Roger A. Akin
                                    Chief Hearing Officer

Enclosure

Cc:    Barbara J. Gadbois, DAG *(via email w/ enclosure)*
       Shelly Ide, Board Liaison, Board of Accountancy *(via email w/ enclosure)*

## BEFORE THE DELWARE BOARD OF ACCOUNTANCY

In the Matter of:                          )
                                           )    Case No. 04-01-12
   Ralph V. Estep                          )
   Unlicensed                              )

### Recommendation of Chief Hearing Officer

### Nature of the Proceedings

The State of Delaware, by and through the Department of Justice, has filed a professional complaint against Ralph V. Estep. Mr. Estep was at one time a licensed professional accountant. His accounting permit was revoked by the Board of Accountancy (the "Board") in July 2011.

The State alleges in the complaint that Mr. Estep has continued to engage in the practice of accounting and has held himself out to the public as being duly qualified to do so since the date of his permit revocation. The State alleges that such continued practice violates an Order of the Board as well as the Delaware Board of Accountancy Act, 24 Del. C. Ch. 1.

A hearing in the case was convened before the undersigned hearing officer on due notice at 12:00 noon on November 7, 2012. The State was represented by Barbara Gadbois, Deputy Attorney General. Though offered the opportunity to secure legal counsel, Mr. Estep chose to represent himself.

All witnesses during the hearing testified under oath or affirmation. A registered court reporter was present who made a stenographic record of the proceedings. This is the hearing officer's recommendation to the Board after due consideration of all relevant evidence.

1

### Summary of the Evidence

At the outset Ms. Gadbois represented that she had shared with Mr. Estep all or most of the State's anticipated exhibits, and does not believe that he will object to any of them. She offered a 119-page packet of documents into evidence. Mr. Estep acknowledged that he had received the exhibits, but had not had an opportunity to review them all before the hearing began.

Ms. Gadbois made an opening statement, which is not considered to be evidence. She stated that the State's complaint notes the earlier revocation of Mr. Estep's permit. Since his permit revocation in July 2011, Mr. Estep has continued to advertise accounting services on his website, and did so until he was made aware of the State's new complaint. The State's exhibits include printouts from Mr. Estep's website. The State asks that the hearing officer recommend to the Board that it issue to Mr. Estep an order which directs him to cease and desist from holding himself out as qualified to perform accounting services. The State also requests that the recommendation include a request that the Board seek injunctive relief against such practices and advertising by Mr. Estep. Mr. Estep waived opening statement.

The State first called Mr. Estep, who was duly sworn. The prosecutor chose to question Mr. Estep on the individual documents within its packet of exhibits in order to secure separate rulings on their admissibility. Mr. Estep examined pages 1-13 of the initial packet of State's exhibits and acknowledged that it is a copy of the July 20, 2011 Order of the Board revoking his permit. Those pages were admitted as State Exhibit 1 ("SX 1"). Ms. Gadbois drew Mr. Estep's attention to the indented paragraph on page 4 of SX 1 (a

2

description of Mr. Estep's firm taken from his website). Mr. Estep admitted that he read that paragraph into the record at the May 18, 2011 Board hearing which resulted in his permit revocation. The paragraph describes the types of services offered by his firm as advertised on his website.

Mr. Estep further agreed with the prosecutor that the findings made by the Board in July 2011 as recorded at pages 8-10 of SX 1 were in fact the Board's conclusions. In response to Ms. Gadbois, Mr. Estep admitted that while the Board's 2011 permit revocation decision was on appeal from the Board to the Superior Court, he had not asked that the legal effect of the revocation be stayed pending that review.

The State then offered a decision by the Hon. Peggy Ableman, Associate Judge of the Superior Court, dated October 2, 2012. In that opinion the Court reviewed the procedural history of litigations in which Mr. Estep was involved, and affirmed the Board's July 2011 revocation. Mr. Estep objected to admission of the Court's decision on the ground of relevance. Ms. Gadbois argued that during the May 2011 revocation hearing, the Board had found that Mr. Estep had continued to advertise the provision of accounting services while his accounting permit was suspended. During the judicial appeal Mr. Estep had not sought a stay of the revocation pending the outcome of those proceedings. Hence, the State offers the Court's decision as evidence of a pattern of conduct by Mr. Estep whereby he routinely violates or ignores orders of the Board.

In response, Mr. Estep argued that Delaware Rules of Evidence 401 defines the concept of "relevance". He contends that nothing in Judge Ableman's decision refers to matters alleged in the complaint which prompted this hearing. Ms. Gadbois noted that the

3

Court's decision is relevant here, and that rules of evidence are relaxed in administrative proceedings such as this one. The Superior Court Opinion was admitted as SX 2.

The State next offered a collection of paper copies of certain advertising materials printed from the internet. Mr. Estep stated that internet materials, all of which were printed out in January 2012, were not all taken from his website. He stated that in the past he had advertised through Yellow Book pursuant to a contract. He admitted that he owes certain funds to Yellow Book. The collection of documents was subsequently admitted and is SX 5.

The State then offered a July 2, 2012 letter from the hearing officer to Ms. Gadbois with 23 pages of enclosures. As stated in the cover letter, the enclosures were provided to the undersigned by Mr. Estep when he received notice that a professional complaint had been filed against him. The materials were admitted as SX 4. In response to a question from the prosecutor, Mr. Estep admitted that his letter had not informed the hearing officer of a lawsuit filed against him and his firm by Yellow Book in the Superior Court in December 2011.

The State offered a copy of the Yellow Book complaint and other materials pertinent to that suit. The documents were admitted as SX 3. Ms. Gadbois read into the record para. 4 of the Yellow Book complaint. That paragraph alleges that Mr. Estep and his firm had entered into an advertising agreement with Yellowbook, and that Mr. Estep continued to owe Yellow Book in excess of $45,000. Mr. Estep agreed that the prosecutor had correctly read the paragraph. He also conceded that the Yellow Book complaint alleges that Mr. Estep and his firm continued to owe Yellow Book the sum of $57,291.65 as of December 2011. Mr.

4

Estep also admitted that pages 52-56 of SX 3 is a copy of his answer to the Yellow Book complaint, and that page 56 bears his signature verifying the accuracy of the answer.

Mr. Estep then added that he was not certain whether the State had altered any of the documents in SX 3. Ms. Gadbois asked if he was alleging that the State had offered "forged documents" into the record. He said he was not making that allegation. He added that he had verified that his answer was accurate. After reading the allegations in the Yellow Book complaint and the corresponding answers to those claims, he said that he "presumed" the answer was his. When the prosecutor referred to para. 4 of his answer at SX 3 at 52, he said it was accurate that he had signed a contract with Yellow Book as "manager of the professional association of Ralph Estep, E.A., P.A." Mr. Estep added that he believes that the actions of Yellow Book had caused the Board to revoke his accounting permit.

Ms. Gadbois asked Mr. Estep if he could identify the document at SX 3 at 34. Mr. Estep stated that the document is a copy of what Mr. Berman of Yellow Book brought to his office in order to discuss what his website would contain. He added that the document is Mr. Berman's paperwork, and that he does not know if the document is a contract. Mr. Estep initiated the arrangement with Yellow Book, and paid a deposit of $688 to start the advertising. Mr. Estep could not identify page 35 of SX 3. Mr. Estep signed pages 37 and 38 of SX 3 on December 5, 2007 and agreed to monthly payments of $3,347 to Yellow Book. He agreed that he was the Yellow Book "customer".

Page 40 of SX 3 is a statement of Mr. Estep's Yellow Book account on December 5, 2011. The document reflects a balance due to Yellow Book of $45,868.50. His last payment to Yellow Book was made in April 2010.

5

Pages 41-45 of SX 3 are a portion of the transcript of the May 18, 2011 hearing before the Board. Pages 46-49 are exhibits entered during the May 2011 Board hearing. Ms. Gadbois read the capitalized letters in para. 7 of a Yellow Book contract at SX 3 at 47-48. The paragraph generally outlines, *inter alia*, limitations as to the liability of Yellow Book if there are errors in the advertising. Para. 15 of SX 3 at 49 was also read by the State's attorney. That paragraph is an acknowledgment that the signer of the agreement has the authority to sign the document and agrees to be bound to perform under it.

Para. 13 of SX 3 at 49 states that a sales representative has no authority to make changes in the agreement. Mr. Estep reiterated that Mr. Berman was his representative. SX 3 at 51 is a copy of the Superior Court docket pertaining to the Yellow Book suit against Mr. Estep. Mr. Estep acknowledged that the docket sheet shows that his office was served with suit papers on December 28, 2011. Another portion of the docket sheet shows that Mr. Estep was served with discovery requests in the Superior Court case on August 15, 2012. Mr. Estep stated that his attorney in the case has responded to the discovery.

The State then moved for formal admission into the record all of SX 3. Mr. Estep objected on the ground of their irrelevance to these proceedings. Ms. Gadbois responded by arguing that the exhibit shows that Yellow Book had notified Mr. Estep as of February 2012 at the latest that it was suing him for failure to pay the balance due. Mr. Estep has argued that he was required to sue Yellow Book, but Mr. Estep had failed to inform the hearing officer that Yellow Book had in fact sued him first. The point of the argument is that Mr. Estep knew that his advertising with Yellow Book was continuing. When Mr. Estep received the State's complaint in the instant case, he then hired a different attorney and sued Yellow Book in Pennsylvania. Hence, Ms. Gadbois argued that Mr. Estep is "playing games".

6

I found the documents at least marginally relevant and admitted all of SX 3 into evidence. Ms. Gadbois added that she is offering the Yellow Book agreement in evidence (SX 3 at 46-49) so that the Board may read it if necessary. The State has only chosen to enter into evidence those internet advertisements (SX 5) which relate to SX 3 at 39 of the Yellow Book agreement. She added that the court docket sheets are official business records of a Delaware court. Yellow Book continues to pursue Mr. Estep in litigation.

SX 4 at 58 is the letter from Mr. Estep to the undersigned hearing officer covering the documents he had provided in June 2012. Ms. Gadbois read the second and fourth paragraphs of Mr. Estep's June 18, 2012 letter and observed that the statements in both are true. In the first of the two paragraphs, Mr. Estep advises that he has made demands on Yellow Book to change his website and to do nothing without his approval. The second quoted paragraph states that Mr. Estep is trying to stop "unauthorized advertising", and that Yellow Book is publishing unauthorized advertising.

SX 4 at 59 is a letter from Mr. Estep to Mr. Berman of Yellow Book dated June 18, 2012. Mr. Estep testified that he met with Mr. Berman in January 2012 and advised him of continuing errors in his advertisements. As of June 2011, Mr. Estep admitted that he knew his permit had been revoked by the Board. Ms. Gadbois asked Mr. Estep what he had done during the period January-June 2012 to remove deceptive advertising from the internet. He responded that he had promptly instructed Yellow Book to remove false or unauthorized advertising.

SX 4 at 62 is another letter from Mr. Estep to Mr. Berman dated February 28, 2012. Ms. Gadbois asked why his June 2012 letter stated that a Yellow Book ad was still posted when in February 2012 he said it had been removed. Mr. Estep testified that Yellow Book

7

reposted his advertising after they had taken it down. February 28 is two weeks after Mr. Estep had verified the accuracy of his answer in the Superior Court case filed by Yellow Book. He added that Mr. Berman never contacted him regarding the demands Mr. Estep had made in the February 2012 letter. (The first was that Yellow Book "cancel all forms of advertisement" which could be attributed to Yellow Book. The second was that Mr. Berman contact Mr. Estep to confirm that that the first demand had been met.)

SX 4 at 64 is a letter to Mr. Berman from Mr. Estep dated November 2, 2011. Ms. Gadbois noted that the letter was written months after the Board had revoked Mr. Estep's permit. SX 4 at 66-80 are internet ads for Mr. Estep's practice printed in November 2011. Mr. Estep admitted that the ad bears the words "Public Accountants" under Mr. Estep's name.

SX 6 is the complaint which Mr. Estep caused to be filed in the Court of Common Pleas in Pennsylvania against Yellow Book, USA, Inc. and Mr. Berman. His attorney suggested that he file suit there. SX 6 at 95 is the case docket for the Pennsylvania action. That suit was filed on June 15, 2012. By that time Mr. Estep knew that the Department of Justice had filed this administrative case. Para. 5 of the Pennsylvania complaint (SX 6 at 82) states that Mr. Estep is a "practicing accountant who has been actively engaged in the practice of accounting...since 1969...."

Mr. Estep also confirmed that para. nos. 8 and 9 of the Pennsylvania complaint were also correct. Para. 9 alleges that the 2009 permit suspension by the Delaware Board "greatly affected the type of accounting services" he could offer, and "affected how Estep and his firm could represent themselves to the public...." Mr. Estep testified that he had allowed his Delaware permit to lapse for ten years, but he renewed it when his permit was returned in

8

September 2010. Para. 18 of Mr. Estep's Pennsylvania complaint alleges that certain Yellow Book advertisements placed him in "direct violation of the Board of Accountancy's license suspension order...." SX 6 at 84.

Mr. Estep stated that Yellow Book built his website and posted it, changing his name or title without his permission. Para. 27 of Mr. Estep's Pennsylvania complaint alleges that Mr. Estep was informed by a Verizon representative that Mr. Estep's Yellow Book website was running a video. SX 6 at 85.

At this point the State again offered the various internet advertising documents. Mr. Estep objected on the basis that he had "nothing to do" with the website. It was Yellow Book's work. With Mr. Estep's objection noted for the record, the nine-page document was admitted as SX 5. Para. 37 of the Pennsylvania complaint alleges that the Pennsylvania Board of Accountancy has initiated charges against Mr. Estep for improperly holding himself out to the public as a Public Accountant there by using those words or "PA" to describe himself. SX 6 at 86. Mr. Estep testified that the Pennsylvania licensing matter has been resolved. That Board imposed a $1,000 fine upon him, which he has paid.

Mr. Estep again objected to admission of the Pennsylvania suit materials on the basis that they are irrelevant and that the Delaware Board has not reviewed them yet. He also argued that the document has not been properly authenticated under the Rules of Evidence. The objection was overruled and SX 6 remained part of the record in this case.

The State offered its professional complaint in the instant matter, and it was admitted as SX 7. Mr. Estep testified that from January 31-April 25, 2012, he did not offer himself as a "PA", and did not practice public accounting. Ms. Gadbois noted that the definition of "public accounting" was read into the record during the May 2011 proceedings before the

9

Board.  Mr. Estep admitted that he has prepared certain tax returns, but that such activity does not constitute the practice of public accounting under that definition.  At this point the State rested.

Mr. Estep presented his case through the continuation of his testimony.  He offered a letter from himself to Ms. Judy Letterman, a former Division of Professional Regulation staff person for the Board of Accountancy, dated November 29, 2009, with seven pages attached.  Ms. Gadbois argued that the Board has rejected a prior contention by Mr. Estep that the letter and its contents advanced his credibility.  The exhibit was admitted as Respondent's Exhibit 1 ("RX 1").

A letter to Mr. Estep from Samuel L. Nickerson, former Division Investigative Supervisor, dated February 13, 2012 and enclosing six addition pages was admitted as RX 2.  Mr. Estep testified that the February 13, 2012 letter was the first time he had learned of the Board investigation in this case.  The enclosure with Mr. Nickerson's letter is a copy of the complaint of unlicensed activity which triggered the investigation in this case.  Mr. Estep characterized the narrative of the complaint at page 4 of the enclosure as "vague" and "weak".  He added that no one has ever complained about his competency.

Mr. Estep offered a 48-page, double-sided exhibit which was admitted as RX 3.  Some pages in the exhibit are already contained in SX 4.  He testified that the website "www.taxesbyestep.com" was his website, but was taken down in 2009.  Ms. Gadbois noted that in May 2011 the Board found that the site had not been taken down.  Mr. Estep responded that the website was changed significantly after his first Board hearing.  The prosecutor referred the hearing officer to the Board's July 2011 decision (SX 1) for

10

clarification. Mr. Estep added that letters in RX 3 from him to Mr. Berman at Yellow Book demonstrate his efforts to have his website changed.

A two-paged exhibit offered by Mr. Estep was admitted as RX 4. The exhibit is a letter to Mr. Estep dated July 2, 2012 from a Yellow Book employee. The letter acknowledges an error on his website (a reference to "Certified Public Accountant") and advises him that the website had been taken down as requested.

Mr. Estep testified that in November 2011 he met with a representative of Verizon. That person mentioned a video which she had viewed on Mr. Estep's website. She played the video for him from www.taxesbyestepde.com. She informed Mr. Estep that Yellow Book had posted the video. After that meeting with Verizon, Mr. Estep sent RX 1 to Ms. Letterman. He sent Mr. Berman a letter instructing him to take the website down on November 2, 2011 (RX 3 at 14). He sent Mr. Berman certain attachments showing errors in his website ad.

Mr. Estep then spoke with Mr. Berman in January 2012. He asked Mr. Berman if requested changes had been made in the website. Mr. Berman stated that he had not taken the website down at that point because he wanted to "discuss it". Mr. Estep then sent a letter to Mr. Berman dated February 28, 2012 (SX 4 at 62). He was trying to get Yellow Book to take the website down. Mr. Berman or Yellow Book refused to receive his letters. Mr. Estep then received notice of the administrative complaint in this case.

Mr. Estep continued. He has been diligently trying to get Yellow Book to remove the ad. He noted that the Board disagreed with that statement. Mr. Estep stated that the next step after failing to secure Yellow Book's cooperation would be to "drive a car through the front of their building". The website was taken down in late January or early February 2012,

11

but was then reposted in February with certain changes such as referring to his practice as "Accounting Resource Center." (See, e.g., SX 7 at 25.) However, Mr. Estep stated that Yellow Book did not give him a chance to review the new website before it was posted. He found out about it "from third parties".

When he received notice of the complaint in this case from Mr. Nickerson (RX 2), he thought that the issue had been resolved. He then wrote a letter to the hearing officer and to Mr. Berman. In June 2012 he learned that another "taxesbyestepde.com" site had been posted. That was the third version of it. Mr. Estep added that he had been forthright in explaining what happened to the Board. He has decided to sue Yellow Book subsequent to his permit revocation. At this point Mr. Estep rested. The State offered no rebuttal.

In her closing argument, the prosecutor contended that in this case Mr. Estep blames everyone but himself. He had held himself out as a public accountant after the Board revoked his permit to practice. He continues to prepare tax returns by his own admission. He posted an ad on his website in 2010, and improperly imposed on the Board to critique or approve it. RX 1.

Ms. Gadbois added that it is likely Mr. Estep had not received Mr. Nickerson's February 13, 2012 letter (RX 2) when he verified his answer in the Yellow Book Delaware litigation. However, within a few days of verifying that answer, he knew he was being investigated in Delaware for acting and advertising as a non-permitted accountant. Nor did he raise any affirmative defense in the Delaware litigation that he owed no compensation to Yellow Book on the basis that his website contained errors.

The materials forwarded to the hearing officer by Mr. Estep in June 2012 (RX 3) only prove, in Ms. Gadbois' opinion, that Mr. Estep's website had been taken down by June 2012,

12

but not before. He knew that neither Yellow Book nor Mr. Berman was accepting his mail. Nonetheless, he just "sat back" and waited until he was told what to do.

The letter to Mr. Estep from Yellow Book on July 2, 2012 (RX 4) only said that Yellow Book should not have used the term "Certified Public Accountant" on the website. Two weeks prior to that letter, Mr. Estep's attorney had filed his suit against Yellow Book in Pennsylvania.

SX 4 at 67 is a paper copy of Mr. Estep's website as of January 30, 2012. It explains that Mr. Estep had "submitted his license for cancelation". That is not so. He had been revoked by the Board in July 2011. As of January 31, 2012 Mr. Estep was still representing that he had a valid accounting permit.

Ms. Gadbois continued. SX 7 is the State's complaint in this case. Attached to the complaint as Exhibit A is a printout of Mr. Estep's website as of April 25, 2012. The document reflects the change to "Accounting Resource Center" on the website. The website continues to represent to the public that Mr. Estep had "submitted his license for cancelation...because of ethical considerations." She reiterated that Mr. Estep had been revoked in July 2011.

SX 3 contains papers regarding the Delaware litigation against Mr. Estep and his firm by Yellow Book. Yellow Book had attached a copy of certain contractual provisions as between the parties. The agreement states that the customer is responsible for errors in ads and on websites. SX 3 at 47. The Yellow Book sales rep has no authority to make changes in the advertisement. The customer must verify that the website is accurate.

In this case the State alleges that Mr. Estep has held himself out as a public accountant and has acted as a public accountant. She again referred to the definition of such

13

a practice. Mr. Estep knows that the definition encompasses tax preparation. In this case Mr. Estep has admitted performing such tax services. His website lists the tax services he performs. SX 23 at Exhibit A. Mr. Estep has failed to do all things reasonable and possible to ensure his ads are accurate. If he thought that Yellow Book and/or Mr. Berman had harmed him through their actions, he should have filed suit at an earlier date. It is not true that SX 7 at Exhibit A is not his actual website.

In this case the State seeks a Cease & Desist order against Mr. Estep with regard to the practice of accounting and the unauthorized advertisements on his website. The State also seeks an order imposing fines against Mr. Estep under 24 *Del. C.* Sec. 118(a)(6). Ms. Gadbois argued that Mr. Estep is determined not to stop the practice of public accounting. He "doesn't get it". The State asks for an order imposing a $5,000 fine for each day on which the violations proved in this case have occurred. A "serious" fine may cause Mr. Estep to understand that his continual violations of statutes and orders of the board must stop.

In his closing Mr. Estep argued that Ms. Gadbois' final argument was "30 minutes of nonsense". He has sent letters and has conferred with attorneys. With regard to the State's complaint, there is no evidence that he has practiced public accounting while his permit has been revoked. One does not require a permit in order to prepare a personal tax return. Mr. Nickerson has admitted that to be so. Mr. Estep now has the same authority that an H&R Block tax preparer has.

Mr. Estep argued further that he had nothing to do with the "illegal, unauthorized" website. It was relabeled "taxesbyestepde.com". That site is not his. He added that he chose not to run a Verizon website because the Board would not tell him if proposed language would pose problems. He reiterated that a permit is not required in order to prepare tax

14

returns. The Board should not single him out for discipline. He also reiterated that he has received no complaints alleging incompetence.

Ms. Gadbois objected. She argued that prior Board orders have established violations of Board regulations and the Board of Accountancy Act. Mr. Estep responded that he formerly practiced as "Ralph Estep, E.A., P.A.". He has removed offending words or letters from all of his letterhead and other places. He stated that it is "obvious I have made changes." He has not been "sitting back". He argued that the Department of Justice has waited until now to "bring this up". The Department has been "hitting me during tax season for three years".

In reply, the prosecutor argued that Mr. Nickerson has not said in his correspondence that he has equated Mr. Estep with an H & R Block representative. Mr. Estep has failed to call Mr. Berman as a witness in this hearing.

### Findings of Fact

Based on this record, I do hereby make the following findings of fact:

Mr. Estep did in fact receive good and valid notice of the hearing in this case. That hearing notice provided him with the date, time, place and subject matter of the hearing. Though the hearing notice informed him that he had the right to appear with legal counsel, he chose to represent himself during the proceedings.

In the past Ralph V. Estep has been a permittee of the Board of Accountancy. He is a resident of Delaware. He has practiced under different firm names, and has used various acronyms and initials after his name to advertise his personal credentials.

Prior to this proceeding, Mr. Estep has been the subject of various disciplinary and other proceedings. Those proceedings are summarized here briefly because the facts of the

15

cases and prior findings of the Board and the Superior Court may be pertinent to the disposition of this case.

In or about 2006 Mr. Estep admitted having engaged in the unauthorized practice of law. The claim was made by the Office of Disciplinary Counsel to the Board on the Unauthorized Practice of Law. Both entities are disciplinary arms of the Delaware Supreme Court. In litigation regarding that claim, the Delaware Supreme Court in October 2006 accepted a consent in which Mr. Estep agreed to the entry of a Cease & Desist order with regard to those practices. SX 2 at 98. Thereafter the Supreme Court imposed sanctions on Mr. Estep for having violated the 2006 Cease & Desist order by providing legal services to clients regarding estate matters. *Id.* at 101.

Subsequently the State filed an administrative complaint before the Board of Accountancy, alleging violations of the Board of Accountancy Act and Board regulations. In an Order in September 2009, the Board refused to reopen matters previously decided or admitted in the Supreme Court proceedings. The Board further found that Mr. Estep had engaged in fraudulent, dishonorable, unethical or unprofessional acts likely to deceive or harm the public.

The Board also found that Mr. Estep had violated the American Institute of Certified Public Accountants Code by, *inter alia*, performing services outside his professional competency and by advertising in a false, misleading or deceptive manner. *Id.* at 106. Certain violations were found to have been flagrant. The Board imposed fines on Mr. Estep and suspended his license for 12 months, followed by 24 months' probation. *Id.*

The State filed a second complaint with the Board in June 2010. In the second case the State alleged that Mr. Estep had conducted public accounting through his firm without a

16

proper permit in violation of the Act. The State further alleged that Mr. Estep had continued to advertise services as a public accountant despite the earlier suspension order in violation of the Act and certain regulations of the Board. The Board convened a hearing on the new professional complaint in May 2011.

Thereafter the Board issued an order dated July 20, 2011 in which the Board granted the State's request that Mr. Estep's license be revoked. SX 1 at 11. Certain findings and conclusions of the Board in the July 2011 Order are summarized here because of their pertinence or relevance to these proceedings.

During the May 2011 hearing Mr. Estep admitted that he had allowed his firm's permit to lapse during the period 1999-2011. SX 1 at 2. He claimed that the lapse was the result of an "oversight". After an initial denial, Mr. Estep admitted that during the lapse period he had engaged in public accounting as that term is defined at 24 *Del. C.* §102(11).

In an order dated July 20, 2011, the Board found that, while suspended, Mr. Estep continued to include the words "Public Accountants" under his name in advertisements. SX 1 at 8. The Board further found that Mr. Estep had not made a "professional attempt" to correct the advertisement with Mr. Berman and Yellow Book. The Board further found that Mr. Estep continued to advertise accounting services provided by his firm during the year 2010-2011 despite the fact that he had allowed the firm's permit to lapse for an extended period. *Id.*

It was also found that he had advertised public accounting services on his website despite the fact that his own permit had lapsed. He had done so by including the abbreviation "P.A." after his name, which was a professional representation that he was a Public Accountant. The Board found a lack of due diligence by Mr. Estep in ordering changes to

17

his website to correct this misrepresentation. *Id.* at 9. The Board therefore found violations of the Board of Accountancy Act, Board rules, and the Board's prior order. *Id.*

The Board also found that the fashion in which he attempted to comply with that order was "unprofessional and sloppy", bringing discredit upon the profession. Since the Board noted that the accounting profession is an exacting one, the Board stated its concern that Mr. Estep's practice may threaten the public welfare. *Id.* at 10. Revocation of permit was ordered.

As is his right, Mr. Estep appealed the Board's revocation order to the Superior Court pursuant to 24 *Del. C.* §119(c). While that appeal was pending, Mr. Estep had the legal right to request a "preliminary hearing" and in order to seek to convince the Court that the legal effect of the revocation should be stayed or postponed until the judicial appeal were resolved. 29 *Del. C.* §10144. He apparently chose not to do so. Hence, the revocation order of the Board in July 2011 became immediately effective as against Mr. Estep on the date when it was issued and served upon him.

In its complaint the State now alleges that since the date of his permit revocation, or at least since the date of internet searches performed by the State on January 30-31, 2012 (SX 14), Mr. Estep has continued to offer and advertise the provision of accounting services and the practice of public accounting on his professional website as that term is defined at 24 Del. C. Sec. 102(11). SX 7 at para. 5.

Other than an admission by Mr. Estep during the hearing that he has assisted some individuals in the preparation of their personal tax returns, little or no additional testimony or evidence was offered with regard to the details of his professional activities since January 2012. Put another way, the State did not call any witnesses who have sought professional

18

services from Mr. Estep during that period. Nor were documents placed in evidence which would shed some light on the nature and extent of those practices. Hence, to the extent that the State's complaint alleges that Mr. Estep has in fact engaged in activities which would fall under the definition of "public accounting" at 24 *Del. C.* §102(11) in 2012, I recommend that such claim be dismissed by the Board. The mere fact that he has prepared or has helped clients prepare personal tax returns, without more, does not satisfy the State's burden of proof with regard to such a claim.

That said, the thrust of the State's case is that Mr. Estep has represented himself to the public as the holder of a permit, or as a person authorized to practice the profession of public accountancy in violation of 24 *Del. C.* §121(a). Similarly, the State alleges that Mr. Estep has wrongly used a professional title to unlawfully misrepresent and embellish his credentials.

If he was not already aware of the necessity of holding valid and current firm and personal permits to engage in the practice of public accountancy in Delaware, certainly the proceedings before the Board in May 2011 and the order of the Board which flowed from that hearing placed him on clear and unequivocal notice of those requirements. Similarly, the 2011 case prosecuted before the Board clearly informed him of the strictures imposed on advertising placed by those practicing without permits.

Finally, the 2011 proceedings placed Mr. Estep on notice of the affirmative requirement of due diligence to continually ensure that advertisements of professional services on the internet and in other media were accurate, lawful and current. On appeal from the 2011 revocation decision, the Superior Court held that "the Board was justified in questioning (Estep's) ability to handle complicated accounting matters requiring attention to

19

detail and compliance with accounting principles" when he could not handle the "simple task of complying" with the Act, Board rules, or the earlier suspension order. SX 2 at 119.

During the hearing the State offered into evidence a printout of Mr. Estep's public website (www.taxesbyestepde.com). SX 5. The first five pages of that exhibit were printed from the internet on January 30, 2012. The last three pages of the exhibit are a printout of another portion of the website as of January 31, 2012. Directly under Mr. Estep's name on the first page of each website are the featured, large words "Public Accountants". On the first two pages of the January 30 advertisement Mr. Estep is listed as "Ralph V. Estep, E.A., P.A.". The same appellation appears on the first page of the January 31 advertisement.

Pages 2-4 of the January 30 website posting provide narrative descriptions of the types of services offered by Mr. Estep and his firm. Page 2 labels the firm, "Ralph V. Estep E.A., P.A. Accountants". The January 30, 2012 website advertisement states that Mr. Estep's firm prepares audit reports and financial statements, and reviews such statements. Other listed services are "tax compliance, income tax return preparation, year round tax planning, tax advisory and tax audit representation." SX 5 at 18.

The last three pages of the website printed on January 31, 2012 appear to provide staff photos and biographical information. Mr. Estep's biographical statement represents that he has surrendered all licenses except his accounting permit. In the words of the statement, "the only licensure and permits he maintains are in accounting and taxation." Id. at 21. Finally, the resume states that Mr. Estep's background "allows Ralph to practice in all states, territories and possessions, to represent any kind of taxpayer in any type of tax dispute, and at all levels of the IRS from the collection, audit and appeals dispute through to US Tax Court...." Id.

20

The website was posted and maintained pursuant to a contractual relationship between Mr. Estep and Yellow Book USA, Inc. During the hearing the State introduced a set of documents relating to a lawsuit filed in the Delaware Superior Court by Yellow Book Sales & Distribution Co., Inc. against Mr. Estep and his firm. SX 3. That suit was filed on or about December 5, 2011 (after the revocation). Attached to a copy of the complaint are a series of documents reflecting the types of information which would be included in Mr. Estep's website such as internal headings, locations of internet placement and other information. Mr. Estep signed the agreement most recently in November 2008. SX 3 at 38.

Another document attached to the Yellow Book complaint is a "Customer Contract Terms & Conditions" apparently intended to govern the Estep-Yellow Book relationship. SX 3 at 46-49. The same document was admitted into evidence during the May 2011 Board hearing. Under those terms, the customer (Mr. Estep) assumes the obligation to "immediately" contact Yellow Book with respect to any errors or omissions on an internet site hosted and maintained by Yellow Book. *Id.* at 48. The customer expressly warrants that he holds or it holds "all necessary permits and licenses to provide the products and services identified in...the Internet Services" and that advertising complies with all laws and regulations that may be applicable. *Id.* at 48-49. The customer's signature on the agreement is a representation that he is authorized to sign on behalf of an advertised entity. *Id.* at 49.

Prior to the hearing Mr. Estep submitted a series of documents to the undersigned hearing officer *ex parte.*. Copies of those documents were provided to the prosecutor by the hearing officer, and were then offered into evidence during the hearing. SX 4. The packet of documents contains three letters from Mr. Estep to Larry Berman, the Yellow Book sales representative servicing the Estep account.

21

The first letter is dated November 2, 2011 and demands that Yellow Book take down and discontinue a website which Mr. Estep contends was not authorized by him. SX 4 at 64. Mr. Estep informs Mr. Berman that the unauthorized website contains unauthorized designations and acronyms, and otherwise indicates that Mr. Estep holds a valid accounting license. In the letter Mr. Estep informs Mr. Berman that he is consulting with an attorney.

The second letter to Mr. Berman from Mr. Estep is dated February 28, 2012. SX 4 at 62. In this letter Mr. Estep refers to a meeting between the two men in January 2012, and acknowledges that Yellow Book had removed the offending website. The letter references the initiation of the instant complaint. He states that he suffered permit revocation "because of your (Mr. Berman's) mistakes & errors." The letter demands that Yellow Book remove all forms of advertisement including the website, and that Mr. Berman inform him when that has been done. He again copies the letter to his legal counsel.

The final letter to Mr. Berman from Mr. Estep is dated June 18, 2012. SX 4 at 59. That is 11 days after Mr. Estep received a copy of the formal complaint in this case. He again blames Mr. Berman and Yellow Book for his permit revocation. He claims that Yellow Book has again posted a website on his behalf but without his authorization. He asks that Mr. Berman send a letter to this hearing officer admitting the website is solely Yellow Book's doing.

As noted above, Mr. Estep has fallen into arrears on payment against his contract with Yellow Book. As a result, Yellow Book filed suit for principal and interest on amount (since April 2010) in the Delaware Superior Court against Mr. Estep and his firm. The suit demands payment of $57,291.65 and was filed on December 5, 2011. SX 3. Mr. Estep

denied most of the allegations in the Yellow Book complaint, and verified his answer on February 14, 2012. *Id.* at 56.

With regard to other potentially significant dates in this case, "several" telephonic complaints against Mr. Estep were received at the Division of Regulation prior to January 31, 2012. The complainants alleged that Mr. Estep had been continuing to practice accountancy while revoked. RX 2 at 5. On that date a complaint was generated by the Division after conducting an internet search. RX 2. Mr. Estep was informed on February 13, 2012 that an investigation had been opened in a letter to him from the Division Investigative Supervisor. *Id.*

The Department of Justice filed the professional complaint in this case on April 25, 2012. SX 7. That complaint was forwarded to the Division's Administrative Hearing Unit to begin the hearing scheduling process. Mr. Estep was informed of the initiation of a formal complaint against him and was provided with a copy of the State's complaint in a letter dated June 7, 2012. SX 4 at 61.

Mr. Estep filed suit against Yellow Book and Mr. Berman in the Pennsylvania Court of Common Pleas on June 15, 2012. SX 6 at 95. The suit alleges that the defendants failed to delete certain indicia of permitted accountancy from his website after the Board suspended his license in 2009 and after they were instructed to do so. He further alleges that his permit was revoked in 2011 because of the failure of Yellow Book to "correct the advertising". He claims that Yellow Book created a new website with the URL "taxesbyestepde.com" while his previous authorized site was "taxesbyestep.com". After taking down that site at Mr. Estep's direction, he alleges that Yellow Book posted a new site which contained further unauthorized advertising. He claims that these acts have caused him professional harm, loss

23

of clients and loss of income. (Of course an argument could be made that the post-revocation postings at least temporarily *increased* his income to the extent that they drove uninformed clients to his firm to seek services he was no longer permitted to provide.) In an email dated May 14, 2012 which is attached to the complaint, Mr. Estep's attorney purportedly had forwarded a draft of the complaint to Mr. Estep for his review and verification on that date.

By my calculation, almost four months passed after Mr. Estep's permit revocation order before he instructed Yellow Book and Mr. Berman by letter to make changes in or take down his website or a website clearly steering potential clients to him and his firm but with the letters "de" added to the URL. SX 4 at 64. Another two months passed after his November 2011 letter to Mr. Berman before he actually met with Mr. Berman regarding the website.

Approximately another month passed after the Berman meeting before Mr. Estep sent a second letter to Mr. Berman making the same or similar demands as the first. SX 4 at 62. The second letter followed Mr. Estep's receipt of notice that an investigation had been opened against him by the Division of Professional Regulation. Yet another four months passed before he sent his third letter to Mr. Berman at Yellow Book. SX 4 at 59. The third letter closely followed Mr. Estep's receipt of the formal complaint filed by the Department of Justice in this case.

### Conclusions of Law

The primary objective of the Board of Accountancy is to protect the general public from unsafe and incompetent accounting practices. In order to achieve that objective, the Board has been empowered by the legislature to set minimum standards of competency in accounting, auditing and tax services and to maintain minimum standards in the delivery of

24

such services to the public. 24 *Del. C.* §101. The Board is further authorized to monitor and adjudicate complaints against practitioners and to impose sanctions upon them where necessary and appropriate. *Id.* The creation of a professional board to regulate a profession and to protect the public from incompetent or unauthorized accounting practices is a valid legislative act proximately related to the valid state purpose of protecting the public who avail themselves of accounting services in this state.

In its complaint in this case, the State alleges that Mr. Estep has acted in violation of 24 *Del. C.* §121 as well as the July 20, 2011 Order of the Board. The provisions of § 121(a) are set forth here in full:

> (a)    Where the Board has determined, upon notice and hearing pursuant to Chapter 101 of Title 29, that a person is engaged in the practice of certified public accountancy or public accountancy, or is representing himself or herself to the public as the recipient of a certificate or permit, or is holding himself or herself out as being authorized to practice certified public accountancy or public accountancy, without having lawfully obtained a certificate or permit, or without having a practice privilege under § 108 of this title, or otherwise wrongfully uses such title or any similar title to practice certified public accountancy or public accountancy, or continues to practice certified public accountancy or public accountancy after the revocation or suspension of a practice privilege in this State or after the revocation, suspension or expiration of a certificate or permit from this State or another state, the Board may issue a cease and desist order. In addition to the power to issue a cease and desist order, the Board may seek an injunctive order prohibiting such unlawful practice and/or seek the imposition of other civil penalties defined by this chapter.

The premise underlying the statutory allegation is that the State claims Mr. Estep has offered and advertised services as a public accountant since at least January 31, 2012. Complaint at para. 6.

In support of the "offering and advertising" allegation in the complaint, the State has attached as "Exhibit A" paper copies of six pages from a website with a URL of

25

"taxesbyestepde.com" which were printed on April 25, 2012.   The heading at the top of the first page of that exhibit identifies Mr. Estep's firm as "The Ralph V. Estep Firm – Accounting Resource Center." The title of the firm had therefore changed significantly from the heading at the top of the first website page printed out on January 30 and 31, 2012 by Division investigators.  At that time, the name of the firm was "Ralph V. Estep ABA, ATA, ATB – Public Accountants".  This chronology of website change at least demonstrates that Mr. Estep had the authority and ability to order changes in the content of his website hosted by Yellow Book.

According to his letter to Mr. Berman on November 2, 2011, Mr. Estep was ostensibly informed about or alerted on that date as to the content of his website by a Verizon representative.  SX 4 at 64.  Hence, as of November 2 (and assuming that he had conducted no due diligence about the representations on his site at any other time since his permit revocation in July 2011) he was aware of the potential legal problems which the site could pose for him and to his firm.

The practice of "public accounting" is defined at 24 *Del. C.* §101(11).  Mr. Estep is clearly aware of the content of the definition because the subject had some prominence during the May 2011 hearing.   In essence, "public accounting" involves, *inter alia*, the performance or offer to perform, as a permit holder, the following sorts of accounting services which involve the use of accounting or auditing skills:

    a.   issuance of reports or financial statements;
    b.   management advisory services;
    c.   financial advisory services;
    d.   consulting services;
    e.   preparation of tax returns;
    f.   furnishing advice on tax matters.

26

The January 30, 2012 Estep website prominently represented that his firm was one which provided "public accountants". SX 5 at 15.   It further stated that the firm provided accounting services, forensic accounting, audit reviews and management services.  It was, at the time, an "accounting firm".  *Id.*  The firm provides "audits" and "financial statements" and "reviews" such statements.  The firm "assists and oversees" tax-free exchanges and prepares a host of documents relating to such exchanges.  *Id.*  "Our accountants (are) well-suited to bring accounting...to bear in helping you run your business successfully."  The firm provided services in regard to "tax compliance, income tax return preparation, year round tax planning, tax advisory, tax audit representation. " *Id.*

Even if the prominent words "Public Accountants" had not been featured in large letters across the top of the first page of the Estep website in January 2012, in my opinion any casual or uninformed reader of the website, after reading this extensive list of professional services offered at the firm, would have come to the inevitable conclusion that it was staffed by permitted or licensed accountants, including Mr. Estep himself.

The Estep website printout attached to the complaint reflects a number of changes which had been made to the language of the site between January and April 2012.  Operative words in the firm name had been changed from "Public Accountants" to "Accounting Resource Center".  Some services had been deleted, such as the listing under the heading "Audits, Reviews, and Compilations'".  The title of the biographical section of the website was no longer "About Ralph V. Estep, E.A., P.A.  It had been changed to "About Ralph V. Estep, E.A.".  (The privilege of using the designation "PA" having been lost by virtue of Bd. Reg. 8.3.1.1.)  Again, though these edits do not have a direct bearing on the status of Mr. Estep's advertising in January 2012, they do demonstrate that he apparently had final

27

editorial control over the content of the site. (Though someone had "cleaned up" the Estep website by late April of this year, an argument could be made that the site still contained language which would lead the uninformed reader that he was reviewing the site of a permitted accounting firm and a permitted practitioner.)

Though the State's complaint alleges that Mr. Estep "offered and advertised" public accounting services from January 31, 2012 until at least the date the complaint was filed in late April 2012, the complaint actually focuses on January 30-31, 2012 – the date when investigators performed their internet search. When the January 30-31, 2012 site is viewed fairly, I have concluded that the site put Mr. Estep squarely in violation of 24 *Del. C.* §121. The site clearly made a representation that Mr. Estep was a permitted public accountant at a time when his permit had been revoked.

In his representations to the Board, in his letters to Mr. Berman, in the claims in his Pennsylvania lawsuit, and in his defense during this hearing, Mr. Estep placed blame for the unauthorized advertising of his credentials and for his permit revocation on Yellow Book and Mr. Berman. After carefully reviewing the evidence in this case, the mere addition of "dc" to the Estep firm URL does not permit Mr. Estep to disavow the website and to place blame for his status on others. The record in this case indicates that he did have editorial control over the content of the site. His contract with Yellow Book provided that control.

Yet for reasons which may be fairly inferred from this record, he did not begin to exercise that control until long after the May 2011 revocation hearing and the issuance of the Board's final order in July 2011. If not previously aware of its expectations, Mr. Estep became well aware from the July Board order that the Board holds Delaware permittees and others to a high standard of diligence in ensuring that their advertisements and other

28

representations to the general public are accurate and in accordance with law. According to that order, "the business of accounting is very exacting and depends on getting things correct." SX 1 at 10. The Board is, justifiably, intolerant with regard to "sloppiness" by those whom it has the authority to regulate.

But even in light of this clear and uncompromising message to Mr. Estep in May and July 2011, he presented no testimony nor documents which reflect any review of his website (and any amendments to it which Yellow Book may have made) immediately after he learned that his permit had been permanently revoked, or for months thereafter. His "sloppiness" and lack of attention to fundamental detail continued even after his permit had been revoked and his accounting privileges constricted. Since his website was being hosted by a third party, Mr. Estep had an affirmative duty to continually and diligently monitor it post-revocation to ensure that it was consistent with the permanent limitations in the scope of his practice. I find that the State has proved by a preponderance of the evidence that on January 30-31, 2012, Mr. Estep was acting in violation of 24 *Del. C.* §121.

In addition, in my opinion a fair inference can be made from this record that the legal violation proved by the State with regard to Mr. Estep's internet advertising in late January 2012 had continued from July 20, 2011 (the date of issuance of the revocation order) until January 30, 2012 as well. Pursuant to Delaware law, Mr. Estep had the right to subpoena documents and witnesses to the hearing in this case in order to establish that he had made the required changes in his advertising as soon as the revocation took effect. Yet he chose not to compel the production of any documents nor the attendance of any witnesses who could have established his efforts or attempts to render the website legally compliant immediately after the revocation.

29

The assertiveness of his letters to Mr. Berman only increased as he realized that new complaints had been filed against him. He chose not to file suit against Yellow Book until he realized that those complaints had matured into a formal filing by the Department of Justice in this case. I further find that Mr. Estep's *ex parte* filing of his Pennsylvania complaint with this hearing officer was simply a preemptive attempt to present his side of the story through his words or the words of his lawyer prior to this hearing.

The State also alleges that, by his actions, Mr. Estep has been "in continuing violation of the July 20, 2011 Order of the Board." Complaint at para. 6. I conclude that the State has also proved this allegation by a preponderance of the evidence. The July 20 Order revoked Mr. Estep's accounting license and effectively precluded him from holding himself out as a permitted public accountant offering the sorts of services described in 24 *Del. C.* §102(11). Yet in clear violation of that order he continued to do so.

A final note on the disciplinary recommendation below. In her closing argument the State's attorney requested that this hearing officer recommend the imposition of a "serious" fine in the amount of $5,000 per day for each day that the State has proved that Mr. Estep has violated State law, Board regulations, and/or prior orders of the Board. I am declining do to so for the following reasons.

The Board possesses that disciplinary authority over individuals and business entities which is explicitly delegated in the Board of Accountancy Act, or which may be fairly inferred from that express authority. The General Assembly has authorized the Board to issue a Cease and Desist order against any individual who has falsely represented himself or his firm as holding a certificate or permit to practice public accounting. 24 *Del. C.* §121(a). Any violation of a lawfully issued Cease and Desist order may, after notice and hearing,

30

result in a monetary fine ranging from \$100 to \$1,000 for each day on which a violation continues and is proven.  29 Del. C. §10161(d).

In addition to the authority to issuing such an order, the Board also has the authority to seek injunctive relief from a Delaware court against such practice.  *Id.*  Finally, the Board may "seek the imposition of civil penalties defined by this chapter."  *Id.*

The Board also has the authority to impose fines up to \$5,000 for each offense of the Act which has been proved after notice and hearing.  24 Del. C. §118(a)(6).  However, the authority to impose such a fine is circumscribed by the introductory language in §118(a). That statutory language provides that such fines (and other disciplinary measures such as reprimands, suspensions, revocations, and the like) may only be imposed upon "a certificate or permit holder or to an individual or firm with practice privileges under §108 of (the Act)." *Id.*  There is no evidence in this case that Mr. Estep holds practice privileges in Delaware pursuant to 24 *Del. C.* §108.  His status as a "certificate or permit holder" ended when he was permanently revoked by the Board in 2011.  Based on these statutory strictures, I am without authority to recommend monetary fines against Mr. Estep under 24 *Del. C.* §118(a)(6).

Due process has been afforded in these proceedings.

### Recommendation

Based on the relevant evidence in this case and the findings of fact and conclusions of law set forth above, the following is recommended to the Board of Accountancy in this case:

1. That the Board issue a **Cease & Desist** order to Ralph V. Estep which orders and directs Mr. Estep to immediately cease and desist and refrain from any and all acts which constitute the practice of certified public accountancy or public accountancy as that term is defined at 24 *Del. C.* §102(11), and further to cease and desist and refrain from representing himself or authorizing or requesting or directing that others represent him as qualified, licensed or permitted to engage in

31

the practice of certified public accountancy in any print or electronic media, including the internet;

2. That the Board exercise its administrative discretion and direct its legal counsel to seek injunctive relief against Ralph V. Estep with respect to any violation of such **Cease & Desist** order;

3. That any violation of the aforementioned **Cease & Desist** order by Ralph V. Estep or by any firm owned, co-owned, managed or operated by Mr. Estep shall be, on due notice and hearing, subject to the range of monetary fines set forth at 24 *Del. C.* §121(c) for each and every day on which such violation shall occur.


_____

Roger A. Akin
Chief Hearing Officer


Dated: December 20, 2012


**Any party to this proceeding shall have twenty (20) days from the date on which this recommendation was signed by the hearing officer in which to submit in writing to the Board of Accountancy any exceptions, comments, or arguments concerning the conclusions of law and recommended penalty stated herein. 29 *Del.C.* §8735(v)(1)d.**

## BEFORE THE DELAWARE BOARD OF ACCOUNTANCY

IN RE:                    )      Case No.: 04-01-12

    Ralph Estep          )

    Unlicensed Practice    )

## ORDER

By majority vote of the undersigned members, the Board approves the hearing officer's written recommendation based on the information contained therein. The Board finds the hearing officer's recommendation not to be contrary to state or federal law or regulation, is supported by substantial evidence, and is not arbitrary or capricious.

IT IS SO ORDERED this 16 day of January, 2013.

**BY THE DELAWARE BOARD OF ACCOUNTANCY:**

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

Date mailed: _____

## APPEAL RIGHTS

29 *Del. C.* §10142 provides:

(a) Any party against whom a case decision has been decided may appeal such decision to the Court.

(b) The appeal shall be filed within 30 days of the day the notice of the decision was mailed.

(c) The appeal shall be on the record without a trial de novo. If the Court determines that the record is insufficient for its review, it shall remand the case to the agency for further proceedings on the record.

(d) The court, when factual determinations are at issue, shall take due account of the experience and specialized competence of the agency and of the purposes of the basic law under which the agency has acted. The Court's review, in the absence of actual fraud, shall be limited to a determination of whether the agency's decision was supported by substantial evidence on the record before the agency.

Date mailed: _____