# Exhibit 18

Page 154

securities during the relevant time period?

A. I do not.

Q. So setting aside internet and TV, are there any other sources of information where you get financial news or information?

A. Wall Street Journal occasionally.

Q. Any other papers other than the Wall Street Journal?

A. No.

Q. Do you recall reading anything in the Wall Street Journal during the relevant time period about Tupperware or Tupperware securities?

A. I do not.

Q. Mr. Estep, I'm going to change gears here for a moment and ask you a little bit about your background. Did you attend college?

A. Yes, sir.

Q. Where did you attend college?

A. Which one?

Q. Which college did you first attend?

A. The first one was Salem Institute of Technology. Then I went to Goldey-Beacom College. Then I went to the American College. Then I went to University of Delaware. Went to Luther Rice for two years. I think that's about it.

Page 155

Q. Can you please give me the years for the court reporter that you attended each of those schools, to the best of your recollection, the best you could do?

A. Let's see, '66 -- yeah, the fall of '66 is when I started Goldey. Goldey-Beacom, I'm sorry. Probably '71 is when I went to the -- oh, Salem Institute of technology, I did that in the summer of '66. First week out of high school. Then I went to Goldey's. Then I went to the American College. Then I went to University of Delaware. Oh, I forgot Delaware Law School. That was around 1995 or so. I didn't graduate from there. I just went there. That's the best I can do it.

Q. Do you have any degrees from those schools?

A. I have degrees in both accounting and business administration.

Q. Where did you get your degree in accounting from?

A. Goldey-Beacom.

Q. Where did you get your degree in business administration from?

A. Same place, Goldey-Beacom.

Q. Any other degrees?

Page 156

A. No.

Q. You said you went to law school for some period of time, right?

A. For a short time. I took classes there in taxes and estate planning.

Q. What was the reason you took those classes?

A. It was something I wanted to know more about. And the reason I took the EA two classes were to pass the federal exam and get my enrolled agent certification.

Q. Any other education that you've taken?

A. Yeah. I've had education to get my real estate license. I've had education to get my property casualty insurance license. American College is where I went to to get my certified life underwriter license. That's all I can think of offhand.

Q. Okay. Do you currently have an accounting license?

A. No, I do not.

Q. Okay. When did you -- did you have an accounting license at some point?

A. Yeah.

Q. Okay. When?

Page 157

A. I had it around from I'm not sure, early '80s, '81, '82 until three or four years ago.

Q. Why is it you're no longer carrying that license?

A. My license was revoked by the Board of Accountancy.

Q. Why is that?

A. Well, it's a long story but there had been a disagreement -- well, a position that the board took in reference to me hiring attorneys and having attorneys on staff and doing wills, estates, and trusts. They felt it was appropriate to take my license for a year, which they did. After serving my year, at the end of it was looking to, you know, resurrect my name, if you will, because I was taken down from all signs and I was working with Reuben H. Donnelley at the time. That's the out pages, the yellow book, and worked out a plan of ads in there. And between the time that I spoke to him and the book actually came out and published, instead of marking it down as my name and title Ralph V. Estep EAPA, they put CPA. Well, I'm not a CPA. Never have been. So we went to the Board of Accountancy called me back in and said why had I done that? And I said I didn't do it on purpose, that's for damn sure. Of course

40 (Pages 154 - 157)

Page 158

they didn't agree with that. I said look, I've got a lawsuit pending in the Pennsylvania court against Donnelly. Can you at least delay this until you know if I owe him any money or not and of course they wouldn't so I continued to sue Donnelly. I won. They paid me. I never paid them a dime. I never cared to go back and get my license again. Just politics was more than I really appreciate. And plus, I'm 76 years old. I can care less.

Q. The other licenses you mentioned, and I may ask you to go back through them, but you mentioned you have a real estate license?

A. Used to.

Q. Okay. When did that go inactive?

A. Geez, I don't even remember when I got it. Let me see here. That was while I was in my old office and I've been here for 35 years so I would say in the neighborhood of 35 to 40 years ago.

Q. Okay. And sir, did you mention that you had at one point and another had other licenses other than what we discussed?

A. Yeah. I had all of my life insurance licenses. I passed all of my property casualty licenses at one time. There were 13 of those. And I passed the three CLU licenses at one time.

Page 159

Q. Are those licenses still active?

A. No.

Q. When did those go inactive?

A. Around the same time. 35 years or more ago.

Q. Other than what we've discussed, have any other licenses been revoked for disciplinary action?

A. No. The only license revoked has been my accounting license.

Q. Have you ever -- I'm sorry.

A. Nothing else has ever been revoked.

Q. Have you ever registered as an investment advisor?

A. No. Yes, I did. Boy, that would have been around 1969 or '70 and that was with Legg Mason and I'm trying to remember the name of it but I want to say it was something about licensing under the 1930 something or other. I don't remember much more about it, it was so long ago.

Q. You're not currently licensed as an investment advisor?

A. No.

Q. Have you ever filed an application or sought to be reregistered?

A. No, I have not.

Page 160

Q. Do you perform any broker/dealer services?

A. No.

Q. Have you ever registered as a broker/dealer?

A. No.

Q. Any other licenses or registrations you've applied for in connection with your investment advisory services?

A. No.

Q. Mr. Estep, we talked about the e-mail domain that you use for your accounting practice. Any other e-mails that you regularly use?

A. I don't have any others. Never have.

Q. The name of your company is Ralph V. Estep firm; is that right?

A. Yes, sir.

Q. And when was that registered as a company?

A. 1960 -- wait a minute. Around 1974, '75.

Q. Are you the owner of the company?

A. Yep.

Q. Have there ever been any other owners?

A. No. Never any other partners.

Q. Other than the services that we've

Page 161

discussed, accounting, tax, and investment advisory, has it ever performed any other services?

A. No. Yes. Yeah. I went through a period when we provided some specific legal services such as drafting wills, doing estate plans, testamentary trusts, irrevocable trusts. Yes.

Q. At the time you performed those legal services, who was -- who at your firm was performing those services?

A. I had attorneys that were on staff.

Q. Did you perform any of those services yourself?

A. No.

Q. The -- at any time have there been any other licensed CPAs working at your company other than you?

A. Yes.

Q. Are there --

A. Plenty.

Q. Are there currently any licensed CPAs working for you?

A. I'm sorry. Say that again.

Q. Are there currently any licensed CPAs working at your company?

A. No.

41 (Pages 158 - 161)

Page 162

Q. Are there any registered investment advisors working at your company?

A. No.

Q. During the period of time when you were performing those legal services, were you the only owner of the company?

A. Yes.

MR. WERNKE: Objection to form.

BY MR. ROSS:

Q. Let me rephrase that, Mr. Estep. At the period of time when your company was performing those legal services, were you the owner -- sole owner of the company?

A. Yes.

Q. Why did you stop providing those services?

A. This will be a longer conversation. Probably -- let me think here. It would have been 25 to 30 years ago I represented a lot of -- well, I still do. It's my main forte is representing clients before the Internal Revenue Service or state tax departments. I had hired an attorney to work on my staff because of course being a non-attorney I couldn't go to federal court and represent except as an expert witness but not as a representative. So I

Page 163

hired this young lady. I don't know how long she worked for me until one day she came in my office and she said so and so client wants to know if I can write a will for him. I said, well, you're an attorney. I guess you can. And she said, well, do you want me to? I said it's up to you. If you think it's prudent, go ahead and write the will. So she did. And it caught my attention, you know, I started asking questions, started doing research and over a period of perhaps six months to a year discovered there was no prohibition, if you will, to a non-attorney drafting such legal documents in Delaware. So I hired a couple of attorneys, that grew. At one time I had four attorneys, I had three paralegals, two other secretaries and we were doing a lot of that kind of work. And the estate planning committee of the Delaware Bar took issue with me providing that service and wanted me out of it since my firm in and of itself was doing more than they were collectively. So that was a long drawn out piece of litigation and the office of disciplinary counsel got into it and provided them all the freebies they had and they sued back and forth, back and forth over and over and over again. We never lost in court not one battle but they were just

Page 164

absolutely killing me with constantly hauling me into court with some other accusation.

I remember one of them at the time was attorneys are not allowed to share fees with anyone else. I said we're not sharing fees for Christ sake. They are on salary. There is no sharing of the fee. I decide the fee. I collect it. I pay my employees a salary for it. That one actually ended up in the Delaware Supreme Court. And the Supreme Court's ruling was you don't have to be an attorney to draft those documents in the state of Delaware and, you know, that part of it was over.

I should have mentioned earlier when they first came at me was with a criminal charge for practicing law without a license. That very quickly went by the wayside because it wasn't law. It didn't exist. Finally my legal fees within this from about 2002 to about 2005 ran me over three quarters of a million dollars and I just finally said I can't pay this anymore. You know, I have no attorneys left. I have no staff left. There's nothing here for me to fight and try to win. So I just gave it up and that was the end of it.

Q. Did at that point you close that part of your business?

Page 165

A. Oh, yeah.

Q. Other than what we've mentioned, has your business at any time performed any other services that we haven't discussed yet?

A. No. No, sir.

Q. Have you ever personally been charged with a crime?

A. Have I personally been charged with a crime? Yeah. Because as a kid I did. Geez. Hope you're not going to ask me what year that was. I have no idea.

Q. It sounds like you can't remember what year it was?

A. It would have probably been around 15 or 16. Probably below 16. I wasn't driving yet.

Q. What year were you born, sir?

A. '48.

Q. What was the crime you were charged with?

A. Well, I don't know what the crime was. I know what we did. I was in a car with a couple of other guys and we had went out found a car and we were taking the tires off of it.

Q. Other than that, sir, have you been charged with any other crimes?

A. No. I don't know of any. Speeding

42 (Pages 162 - 165)

Page 166

tickets or red light or something like that.

Q. I'm talking about like a misdemeanor or a felony charge.

A. No.

Q. Have you been convicted of any misdemeanor or felony charge?

A. Misdemeanor, yeah.

Q. Okay. What have you been convicted of? What misdemeanor charge have you been convicted for?

A. Let's see, I've been married 22 years so it has to be before that. I'd say 24 years ago, perhaps 25, my wife and I had gone on vacation to the Bahamas and I was attacked and severely beaten. I ended up in a hospital. Went home the next day and of course my wife did what she typically did do was drink and take drugs and she called the police and said I threatened to kill her and that ended up with a misdemeanor.

Q. Do you know what the charge was?

A. Terroristic threatening. Don't hold me to that but I think that's what it was.

Q. You said terroristic threatening?

A. Yes.

Q. Other than what we talked about, have you been arrested on any other occasion?

Page 167

A. Not that I can think of, no.

Q. Have you ever filed for bankruptcy?

A. No.

Q. Has any business owned by you filed for bankruptcy?

A. No.

Q. Have you ever been sued for fraudulent conduct before?

A. No.

Q. You had talked this morning about other depositions you have given. What kind of cases have you given your depositions in?

A. Well, one of them was when I sued Merrill Lynch. When I sued Reuben H. Donnelley Company.

Q. Sorry. Can you give me that name again?

A. Reuben H. Donnelley, the yellow book. Donnelley Company. They had a bunch of different names.

Q. Can you tell me what that lawsuit involved?

A. What was it about?

Q. Yeah. Please.

A. Yeah. Reuben H. Donnelley, they were the ones who ran an ad in the yellow book or yellow pages without my agreement. They put in there that my

Page 168

title was CPA and it wasn't and I never authorized them to do that. And they finally admitted it in court and I got paid, but I didn't get my license back.

Q. Any other cases where your deposition was taken?

A. I know there are. It's not coming to mind immediately. I'm trying to think of others I had litigation with. Of course with the Delaware Bar. You know, all of that stuff going back and forth just seemed like there were a number of them throughout those years. All I can think of.

Q. Other than the cases we've discussed, have you ever been a party to a lawsuit in any other cases?

A. God, how do I answer that question? I've been a businessman for a lot of years. I've been in more businesses than you are years old, probably so, but I don't remember them specifically right now. If you ask me specifically, I'll tell you about it.

Q. Nope. It's just a yes-or-no question, sir. Have you ever testified in court?

A. Of course.

(Exhibit No. 28 was marked for identification.)

Page 169

BY MR. ROSS:

Q. All right. Sir, let me pull up another document. Can you see the document in front of you, sir?

A. Yes, sir.

Q. Can you see it says verification at the top of the page?

A. Yes, I see it. Yes.

Q. Okay. I actually just showed this to you in connection with the interrogatories we looked at a few moments ago, but do you recall executing this verification?

A. I do.

Q. And that's your signature on this page?

A. It is indeed.

(Exhibit No. 29 was marked for identification.)

BY MR. ROSS:

Q. All right. Thank you for that. All right, sir, I'm pulling up another document I'm going to have marked as Exhibit 29. You can see this is dated July 20th, 2022. You see it says, summary order to cease and desist?

A. Yeah. I see that, yeah.

Q. I'm happy to scroll through this.

43 (Pages 166 - 169)

Page 170

A.  Oh, yes.  Okay.  I know what it is.

MR. WERNKE:  Sorry to interrupt.  I'm not seeing 29 on the share drive -- on the share exhibit drive.

MR. ROSS:  Okay.  Let me -- no.  Let me -- that might be my fault.

MR. WERNKE:  No problem.

MR. ROSS:  Hopefully you'll see it now.

MR. WERNKE:  Yep.

BY MR. ROSS:

Q.  Okay.  Mr. Estep, you said you did recognize this document?  Did I hear you correctly?

A.  I do, yeah.

Q.  Okay.  So can you tell me what this is?

A.  Yeah.  This is -- it pertained to actually only one of my clients, but one of my clients, very nice elderly lady, she was left quite a bit from her deceased husband and it was being managed by a broker in Boston.  And several years ago she brought her paperwork in so I would pick up the dividends or whatever off of it and going through it I said, you know, you're not even earning one percent on this.  You ought to talk to your broker.  And I really left it at that.  And then whatever, a year or two year s later, I did a return again and it was

Page 171

still the same pathetic investment advice he had been giving her before and I sat down and wrote a letter to her outlining what my recommendations would be.  Of course she took it to the other broker and he turned it into the state of Delaware and then I got this letter and that was the end of it.

Q.  Do you recall what, if anything, this ordered you to do?

A.  Yeah.  Stop giving investment advice.

Q.  And you followed those instructions?

A.  Well, let me restate that.  That's not really true.  I was prohibited by virtue of the cease and desist order from managing portfolios.  We agreed to disagree and if they want to bring an action against me for giving advice, I'll be happy to fight that one.  I mean, I am a degreed accountant.  I've been doing this a hell of a long time.  I know what's a good investment and what's not.

Q.  What's the difference, sir, between managing a portfolio and providing investment advice?

A.  Actually making decisions on what to buy, when to sell, when to purchase at what price as versus just telling someone who's invested in one particular type of market.  When it's a market that doesn't have much return, they ought to get rid of.

Page 172

Q.  Would you describe the services that you provided for Mr. Dennehy as managing his portfolio?

A.  Exactly that.  As I managed it, I bought what I thought was a prudent investment there for him.  It proved not to be.  But were it not for fraud, it was a good investment, but I didn't know about that at the time.

Q.  Scrolling down to page 7 of this exhibit -- or actually I think this is page 6.  Do you see there's a letter addressed from your company.  It's dated December 27th, 2021?  Do you see that?

A.  Yes.

Q.  Do you know what this letter is?

A.  One of my annual letters I send out to clients.  Is there something specific about it?

Q.  I guess that's what I'm asking for.  Do you recall whether there's anything about this letter that any Delaware regulator or administrator took issue with?

A.  Well, it's not unusual for me to pick a topic like that or elaborate on something like fun cash or something and apparently -- I mean, obviously that's what I did there.

Q.  The lawsuits you had earlier that you said brought up an incorrect or improper

Page 173

advertisement, where was that advertisement placed?

A.  I said they put up an incorrect advertisement.

Q.  And I apologize, my understanding was that one of the lawsuits that you had had against Reuben H. Donnelley, do you recall discussing that?

A.  Yeah, Reuben Donnelley.

Q.  Correct.

A.  I'm sure you remember the old telephone books you used to have, the regular AT&T telephone book which were generally referred to as the white pages and then there was another book that was primarily commercial entities and you would have commercial advertisements in the yellow book.  And by regularly advertising in the yellow book every year, except for the year that my permit had been revoked, and at the end of that year I knew my license was coming back and I contracted with them to, you know, revise my ads again and in their infamous stupidity, instead of putting down my name and accreditations properly, they put down CPA, which I'm not, but I didn't tell them to do that and the sales rep for Donnelley got on the stand and testified.  He said he's been my agent for the last 20 years and he knew better and it wasn't supposed to be there.

44 (Pages 170 - 173)

Page 174

Q. Sir, have you ever passed any FINRA security exams?

A. Have I ever passed a securities exam?

Q. Yeah. Have you ever taken any or applied for any FINRA securities accreditations?

A. No.

(Exhibit No. 30 was marked for identification.)

BY MR. ROSS:

Q. Mr. Estep, I am going to have this labeled as Exhibit 30. Please take a moment to review it and let me know after you've had a chance to look at it.

A. Okay. I remember it, yes.

Q. Have you seen this document before?

A. Yep.

Q. And what is this?

A. It was at the end of my effort to provide Delaware citizens with a reasonable cost of estate planning documents and the attorneys who had been representing me throughout, you know, I said there has to be someway that I can do this or at least provide it. And they said, well, you can't meet with the clients and if you have an attorney meet with the clients and they delivered it to the clients, then

Page 175

you're out of it entirely. Well, Supreme Court didn't agree with that statement.

Q. And in this ruling it looks like you were to cease and desist the unauthorized practice of law. Do you see that?

A. Yes.

Q. Do you recall if there was any other further proceedings related to this matter?

A. No. None whatsoever other than from there it went to the Board of Accountancy and that's why they took my permit for a year and they also sent a copy -- I should say a bunch of copies up to the counsel at the Internal Revenue Service, the ones who oversee my credential of enrolled agent and they sent me a letter of inquiry. I called the lady, asked her if I could come up and see her. I did and went to New York and met with her for half a day. At the end of it she said what is their problem? I don't see any problem here at all. You're fine. Goodbye.

(Exhibit No. 31 was marked for identification.)

BY MR. ROSS:

Q. Give me one moment. I'm going to pull up I think only two more documents here. Sir, I just pulled up what I'm going to mark as Exhibit 31. Take

Page 176

as much time as you need to review it. This is actually a nine-page document, but let me know if you need me to scroll further.

A. Well, I have them reversed. This is the one after I made the changes to have no contact with my clients, I had my attorneys that were working for me do all of it, that's when they took me back in before the Supreme Court and they told me to stop, which I did and that's when the Board of Accountancy took my permit.

Q. Have you seen Exhibit 31 before this decision?

A. I don't know what Exhibit 31 is. Forgive me.

Q. Exhibit 31 is what I'm showing you now, this nine-page document.

A. You said did I ever see it before?

Q. Yeah. Have you ever seen this decision before?

A. Yeah. Sure.

Q. And do you see in the background summary it says that there was a petition filed based on a violation of a prior Supreme Court order directing you to cease and desist? Do you see that?

A. Yep.

Page 177

Q. And if you look at the holding, it says that sanctions were imposed. Do you recall that?

A. I don't remember anything. I have no idea what that means. What does that mean?

Q. Do you see that it references the disgorgement of all fees received for legal services?

A. Oh, I was down there looking at sanctions. Yes, I do see that. That was the initial decision.

Q. Do you recall whether any fees were disgorged from the services you provided?

A. Yeah. That was another 780 thousand dollars. That was after they had gone in and told the judge that they suspected a lot of my documents were probably compiled in error so they came to my office, took all of my file cabinets, every single client document, had the Delaware estate planning committee go over all of them who had the misfortune of having to go back in and tell the judge they couldn't find any single solitary thing wrong.

(Exhibit No. 32 was marked for identification.)

BY MR. ROSS:

Q. I'm pulling up one more document here. I'm going to have this marked as Exhibit 32. This is

45 (Pages 174 - 177)